# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HENDRICKS FURNITURE GROUP, LLC,[1] ) | | Case No. 09-50790 |
| et. al. | ) | |
| | ) | |
| Debtors. ) | | Jointly Administered |
| | ) | |

## FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT CONSOLIDATED PLAN OF REORGANIZATION OF HENDRICKS FURNITURE GROUP, LLC AND ITS AFFILIATE DEBTORS AND DEBTORS-IN-POSSESSION PROPOSED BY HENDRICKS FURNITURE GROUP, LLC AND ITS AFFILIATE DEBTORS

Dated: December 7, 2009

RAYBURN COOPER & DURHAM, P.A.
Albert F. Durham, Esq.
Paul R. Baynard, Esq.
Shelley K. Abel., Esq.
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina  28202-1675
(704) 334-0891

Counsel for Hendricks Furniture Group, LLC, et al.,
Debtors and Debtors In Possession

---

[1] The jointly administered cases are those of the following: Hendricks Furniture Group, LLC, d/b/a Boyles Distinctive Furniture and NaJa Oriental Rugs, Case No. 09-50790; Classic Moving & Storage, Inc., Case No. 09-50791; and Norris Furniture and Interiors, Inc.. Case No. 09-50792.

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| I. | | INTRODUCTION AND SUMMARY INFORMATION. | 6 |
| | A. | Purpose of This Document. | 6 |
| | B. | Summary Information. | 7 |
| | C. | The Confirmation Hearing, Voting Procedures, Bar Dates, And Other Important Deadlines. | 11 |
| | | 1. Time And Place Of The Confirmation Hearing. | 11 |
| | | 2. Entities Entitled To Vote On The Plan. | 11 |
| | | 3. Deadline For Voting For Or Against The Plan. | 11 |
| | | 4. Deadline For Objecting To Confirmation Of The Plan. | 12 |
| | | 5. Deadlines For Parties To Executory Contracts And Unexpired Leases To Assert Damage Claims And To Object To The Terms Of Assumption. | 12 |
| | | 6. Administrative Claims Bar Date. | 13 |
| | | 7. Fee Claims Bar Date. | 13 |
| | | 8. Unsecured Claims Bar Date. | 14 |
| | | 9. Materials To Be Filed In Support Of Confirmation. | 14 |
| | | 10. Information Regarding The Plan. | 14 |
| | | 11. Effective Date Of The Plan. | 14 |
| | D. | Important Notice and Cautionary Statement. | 14 |
| II. | | DESCRIPTION OF THE DEBTORS, THEIR BUSINESS OPERATIONS, AND THEIR FINANCIAL CONDITION. | 15 |
| | A. | Historical Summary. | 15 |
| | B. | Current Operations. | 17 |
| | C. | Competition. | 17 |
| III. | | PREPETITION DEBT AND EQUITY STRUCTURE OF THE DEBTORS. | 17 |
| | A. | Description of Prepetition Debt Structure of Debtors. | 17 |
| | | 1. The BB&T Facilities | 17 |
| | | 2. Other Secured Claims | 18 |

|  |  | 3. | Post Petition Debtor-in-Possession Financing Lenders | 18 |
|  |  | 4. | Exit Financing | 19 |
|  | B. | | Description of Prepetition Equity Structure of the Debtors. | 19 |
| IV. | | | THE CHAPTER 11 CASES AND SIGNIFICANT POSTPETITION EVENTS. | 19 |
|  | A. | | Significant Events Leading To The Commencement Of The Chapter 11 Cases. | 19 |
|  | B. | | The Chapter 11 Filings. | 20 |
|  | C. | | "First Day" Motions. | 20 |
|  | D. | | Appointment Of The Official Committee Of Unsecured Creditors. | 20 |
|  | E. | | Employment Of Professionals. | 21 |
|  |  | 1. | Reorganization And Other Professionals Employed Pursuant To Bankruptcy Code Section 327. | 21 |
|  | F. | | Postpetition Debtor-in-Possession Financing and Use Of Cash Collateral. | 22 |
|  | G. | | Filing Of Schedule Of Assets And Liabilities And Statement Of Affairs. | 22 |
|  | H. | | Actions Implemented To Restructure The Debtors' Business Operations. | 22 |
|  | I. | | Sales of Surplus Assets | 22 |
|  | J. | | Claims Bar Date And Analysis. | 23 |
|  | K. | | Avoidance Actions | 23 |
| V. | | | THE PLAN OF REORGANIZATION. | 23 |
|  | A. | | Vesting of Assets of the Estate | 23 |
|  | B. | | Distributions under the Plan. | 24 |
|  | C. | | Funding of Distributions under the Plan | 39 |
|  | D. | | Responsibility for Distributions | 41 |
|  | E. | | Retention of Rights, Causes of Action and Defenses | 41 |
|  | F. | | Considerations Concerning the Claims Objection Deadline | 42 |
|  | G. | | Considerations Concerning Discharge, Waivers, Injunctions and Exculpation Under the Plan. | 42 |

|   |   |   |   |   |
|---|---|---|---|---|
| | H. | | Considerations Concerning the Board of Directors, Manager and Management of the Debtors. | 44 |
| | I. | | Substantive Consolidation | 44 |
| | J. | | Retention of Jurisdiction | 45 |
| VI. | | | FINANCIAL PROJECTIONS. | 45 |
| VII. | | | CERTAIN CONSIDERATIONS REGARDING RISK. | 47 |
| VIII. | | | CERTAIN TAX CONSEQUENCES OF THE PLAN. | 49 |
| | A. | | General. | 49 |
| | B. | | Federal Income Tax Consequences to the Debtors. | 50 |
| | | 1. | Cancellation of Indebtedness Income. | 50 |
| | | 2. | IRC Section 382 - Limitations on NOL Carryforwards. | 51 |
| | | 3. | Net Unrealized Built-in Loss or Gain. | 51 |
| | | 4. | Alternative Minimum Tax. | 52 |
| | C. | | Federal Income Tax Consequences to Holders of Claims. | 52 |
| | | 1. | Accrued Interest. | 52 |
| | D. | | Information Reporting and Backup Withholding. | 52 |
| IX. | | | CONFIRMATION PROCEDURES. | 53 |
| | A. | | Voting And Right To Be Heard At Confirmation. | 53 |
| | | 1. | Who May Support Or Object To Confirmation Of The Plan. | 53 |
| | | 2. | Who May Vote To Accept Or Reject The Plan. | 53 |
| | | 3. | What Is An Allowed Claim For Voting Purposes. | 54 |
| | | 4. | What Is An Impaired Class Of Claims Or Interests. | 54 |
| | | 5. | Who Is Not Entitled To Vote. | 54 |
| | | 6. | Votes Necessary To Confirm The Plan. | 54 |
| | | 7. | Votes Necessary For A Class To Accept The Plan. | 54 |
| | | 8. | Treatment Of Non-Accepting Classes. | 55 |
| | | 9. | Request For Confirmation Despite Non-Acceptance By Impaired Classes. | 55 |

**B.**    **Hypothetical Liquidation Analysis.**    **55**

**C.**    **Feasibility.**    **56**

**D.**    **Alternatives To The Plan.**    **56**

**X.**    **RECOMMENDATION AND CONCLUSION.**    **56**

EX. A    First Amended Joint Consolidated Plan of Reorganization of Hendricks
Furniture Group, LLC and its Affiliated Debtors and Debtors-
In-Possession Proposed by Hendricks Furniture Group, LLC and its
Affiliated Debtors dated December 7, 2009
[If copy is not attached then filed and served separately]    A1

EX. B    Financial Projections    B1

EX. C    Liquidation Analysis    C1

I.      **INTRODUCTION AND SUMMARY INFORMATION.**

The Hendricks Furniture Group, LLC, d/b/a Boyles Furniture ("HFG"), a North Carolina limited liability company and two affiliated entities, Norris Furniture and Interiors, Inc. ("Norris"), a Florida corporation, and Classic Moving & Storage, Inc. ("Classic"), a North Carolina corporation, (each an "Affiliate Debtor(s)" and collectively with HFG, the "Debtors") are debtors and debtors-in-possession in jointly-administered chapter 11 cases that currently are pending in the United States Bankruptcy Court for the Western District of North Carolina (the "Bankruptcy Court"). The Debtors commenced their respective Chapter 11 Cases[2] by filing voluntary petitions in the Bankruptcy Court on June 10, 2009.

On July 24, 2009, the Debtors filed the Debtors' Joint Consolidated Plan of Reorganization of Hendricks Furniture Group, LLC and Its Affiliate Debtors and Debtors-In-Possession, dated July 24, 2009. The Debtors are the proponents of the First Amended Joint Consolidated Plan of Reorganization of Hendricks Furniture Group, LLC and Its Affiliate Debtors and Debtors-In-Possession Proposed by the Hendricks Furniture Group, LLC and Its Affiliate Debtors dated December 7, 2009, a copy of which is either filed separately with the Bankruptcy Court or attached to this Disclosure Statement as Exhibit A. The purpose of the Plan is to, among other things, (a) restructure, compromise and discharge creditors' Claims against each of the Debtors, (b) implement the business restructure of the Debtors, and (c) provide for the operations of one or more of the Debtors to continue so as to fund distributions to creditors.

The Plan provides for the substantive consolidation of some or all of the Debtors solely for purposes of voting on the Plan, Confirmation of the Plan and/or Distributions under the Plan. Under the Plan distributions will be made to all Holders of Allowed Claims for the consolidated Debtors from the consolidated Assets of the Debtors. To the extent that a Debtor's Estate is included for substantive consolidation, the Plan will be treated as a joint Plan for such Debtors and its treatment under the plan will be separately set out in the Plan. It is the intent of the Debtors that all three (3) of the Debtors will be consolidated for purposes of the Plan as set forth above.

For the Debtors whose assets and liabilities will be substantively consolidated for purpose of Distributions, the Cash Distributions distributed to the Holders of Allowed Unsecured Claims in Class 8C will continue as set forth in the Plan until such Holders shall received the Class 8C Distribution without interest after the Petition Date as set forth in the Plan. However, the ultimate recovery to creditors under the Plan will depend upon a variety of factors many of which are outside of the control of the Debtors and the ultimate recovery could be more or less than that estimated.

The Debtors reserve their respective rights to seek confirmation of a different plan of reorganization if the Plan is not confirmed. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan as set forth herein. In the event the Plan is not confirmed, nothing herein shall be deemed an admission by the Debtors and its filing shall not be deemed to have been a waiver of any rights of the Debtors, including, without limitation, the Debtors' exclusive periods in which to file a Plan and solicit acceptances thereof.

A.      **Purpose of This Document.**

The purpose of this Disclosure Statement is to enable the creditors of each of the Debtors, to the extent they are qualified to vote, to make an informed judgment about whether to vote to accept or reject the Plan. This Disclosure Statement summarizes the provisions of the Plan and provides certain information relating to the Debtors, their Chapter 11 Cases, the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. To the extent the Confirmation Order and/or this Plan is inconsistent with the Disclosure Statement, any other agreement entered into between or among any Debtors, or any of them and any third party, the

---

[2]      Capitalized terms that are not defined in this Disclosure Statement shall have the meaning assigned to them in the First Amended Joint Consolidated Plan of Reorganization of Hendricks Furniture Group, LLC and Its Affiliate Debtors and Debtors-In-Possession Proposed by Hendricks Furniture Group, LLC and Its Affiliate Debtors dated December 7, 2009.

Plan controls the Disclosure Statement and any such agreements; and the Confirmation Order and subsequent orders of the Bankruptcy Court controls the Plan.

The Bankruptcy Court has reviewed this Disclosure Statement and on December 7, 2009 conditionally determined that it contains adequate information and may be sent to you. The Bankruptcy Court, however, has not yet made a determination as to whether the Plan should be confirmed, and has not conducted an independent investigation of the factual and financial matters described herein.

***READ THIS DISCLOSURE STATEMENT CAREFULLY TO FIND OUT:***

1. **HOW THE PLAN WILL AFFECT YOUR CLAIMS OR INTERESTS,**

2. **WHAT RIGHTS YOU HAVE WITH RESPECT TO VOTING FOR OR AGAINST THE PLAN,**

3. **HOW AND WHEN TO VOTE FOR OR AGAINST THE PLAN [Only Holders of Claims that are Impaired by the Plan shall receive Ballots to vote to accept or reject the Plan], AND**

4. **WHAT RIGHTS YOU HAVE WITH RESPECT TO SUPPORTING OR OBJECTING TO THE PLAN.**

**YOU SHOULD READ BOTH THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS) AND THE PLAN (INCLUDING THE EXHIBITS AND ANY PLAN SUPPLEMENT) IN THEIR ENTIRETY. HOWEVER, THIS DISCLOSURE STATEMENT CANNOT TELL YOU EVERYTHING ABOUT YOUR RIGHTS. YOU SHOULD CONSULT YOUR OWN LEGAL, FINANCIAL AND TAX ADVISORS TO OBTAIN MORE SPECIFIC ADVICE ON HOW THE PLAN WILL AFFECT YOU AND WHAT IS THE BEST COURSE OF ACTION FOR YOU.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN GOOD FAITH AND IN COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BELIEVED TO BE CORRECT AT THE TIME OF THE FILING OF THE DISCLOSURE STATEMENT BASED UPON THE INFORMATION THEN CURRENTLY AVAILABLE TO THE DEBTORS. ONCE APPROVED BY THE BANKRUPTCY COURT, THIS DISCLOSURE STATEMENT WILL NOT BE UPDATED BASED UPON SUBSEQUENT EVENTS. NO INFORMATION PROVIDED BY ANY PERSON OR ENTITY (INCLUDING THE DEBTORS' AGENTS, OFFICERS, DIRECTORS, EMPLOYEES, ACCOUNTANTS, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES) CONCERNING THE DEBTORS, THEIR OPERATIONS, FUTURE REVENUES, PROFITABILITY, VALUATIONS, OR OTHERWISE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT, HAS BEEN AUTHORIZED. ANY INFORMATION, REPRESENTATION, PROMISE, STATEMENT OR INDUCEMENT MADE BY ANY PARTY TO SECURE OR OBTAIN ACCEPTANCES OR REJECTIONS OF THE PLAN THAT ARE OTHER THAN, OR ARE INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PERSON IN ARRIVING AT A DECISION TO VOTE FOR OR AGAINST THE PLAN. ANY SUCH ADDITIONAL INFORMATION, REPRESENTATIONS, AND INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED TO THE ATTENTION OF THE DEBTORS, THE COMMITTEE AND THE BANKRUPTCY COURT.**

B. **Summary Information.**

The following information summarizes the terms of the Plan and describes your rights to be heard and vote with respect to the Plan.

**THE FOLLOWING INFORMATION IS A SUMMARY ONLY AND DOES NOT FULLY ADDRESS ALL OF YOUR RIGHTS, ALL PROVISIONS OF THE PLAN OR ALL OF THE CONSEQUENCES CONFIRMATION OF THE PLAN MAY HAVE ON YOUR RIGHTS. YOU ARE**

**STRONGLY ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND TO CONSULT WITH YOUR LEGAL, FINANCIAL AND TAX ADVISORS PRIOR TO DECIDING WHETHER TO SUPPORT OR OPPOSE THE PLAN.**

| | |
|---|---|
| **The Debtors and Their Businesses:** | HFG and its affiliates Classic and Norris are a family owned and operated enterprise that addresses various aspects of the home furnishings industry. The Debtors' business began as a small North Carolina store known for name-brand furniture and friendly service and expanded over the years into a network of store locations in North and South Carolina and previously in Florida offering upscale name-brand bedroom, dining room and living room furniture at discounted prices for sale to the trade and individual customers through out the country. The Debtors operated a number of retail locations for their respective retail furniture businesses, as well as Classic, a delivery service for HFG and Norris customers and certain unaffiliated entities. |
| **Purpose of the Plan:** | The Plan provides for the reorganization of the Debtors through the restructure, compromise and discharge of the existing Claims against and Interests in each of the Debtors in a manner intended to enable  creditors of the Debtors to receive distributions on account of such Claims. |
| **Basic Structure of the Plan:** | The Plan groups Claims or Interests into various Classes of Claims or Interests by the type of Claim or Interest.  Certain Holders of Claims, such as Holders of Administrative Claims arising after the commencement of the Chapter 11 Cases, Holders of Fee Claims, Holders of Allowed Priority Tax Claims and the claims of the Debtor-in-Possession Financing providers, are not grouped in any Class pursuant to the Bankruptcy Code, but nonetheless will be addressed under the Plan. |

Unless otherwise noted, Holders of Allowed Claims will receive Distributions of Cash on or after the Plan's Effective Date in varying amounts and at varying times in satisfaction of their Claims.  Only those parties that have Allowed Claims against the Debtors will receive payment under the Plan.

The amount and timing of payment a Holder of an Allowed Claim will receive may depend upon whether such Allowed Claim is (a) entitled to special priority under the Bankruptcy Code, (b) a Secured Claim, (c) an Unsecured Claim or (d) otherwise separately classified or treated under the Plan.

The Plan contains numerous other provisions governing, among other things, (a) the assumption and assignment or rejection of executory contracts and unexpired leases, (b) the continuation of management and the designation of managers and directors for the Reorganized Debtors, (c) the possible winding down and dissolution of Norris, (d) the resolution of Disputed Claims and Causes of Action by the Debtors or against the Debtors, (e) the Bankruptcy Court's retention of jurisdiction following confirmation of the Plan including, without limitation, to determine Causes of Action and other litigation involving the Debtors whether filed prior to or subsequent to the Confirmation Date, and (f) the scope and nature of the Debtors' discharge following confirmation.  Please refer to the Plan itself for more detailed information.

The Plan contemplates the substantive consolidation of the Debtors' respective Estates for the purposes of voting on the Plan, Confirmation of the Plan and making and receiving Distributions under the Plan. Each Holder of an Allowed

Claim against any Debtor will be entitled to a Distribution from the Assets of all of the consolidated Debtors, in accordance with the distribution scheme set forth in the Plan and the Bankruptcy Code.  To the extent that a Debtor's Estate is not chosen for substantive consolidation or it substantive consolidation is not approved by the Court, the Plan will be treated as a joint Plan for such Debtors and its treatment under the plan will be separately set out in the Plan. It is the intent of the Debtors that all three (3) of the Debtors will be consolidated for purposes of the Plan as set forth above.

**Classifications and Treatment of Creditors' Claims and Shareholders' Interests Under the Plan:** The following summary table sets forth the classification and treatment of Claims and Interests of the consolidated Debtors under the Plan. There are eight (8) Classes of Claims and one (1) Class of Interests under the Plan. The descriptions in the Summary Table are only summaries and do not include all terms and conditions of the Plan.  **You are strongly advised to consult the relevant Plan provisions for a full description of the respective Classes and corresponding treatments under the Plan.**

### SUMMARY TABLE – CLAIMS AND INTERESTS

THE FOLLOWING IS A SUMMARY OF THE CLAIMS AND INTERESTS AGAINST THE DEBTORS CLASSIFIED IN THE PLAN.

| CLASS | CLAIM | STATUS | VOTING RIGHTS | RECOVERY |
|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Impaired | Entitled to Vote | Initial Distribution of 100.0% or deferred cash payments having a value, as of the Effective Date, of the Allowed Claim |
| Class 2 | Secured Claims | Unimpaired | Not Entitled to Vote; Deemed to Accept | Treatment options including payment, return of collateral and payment; reinstatement and/or payment in ordinary course of business. |
| Class 3 | Customer Deposit Claims | Unimpaired | Not Entitled to Vote Deemed to Accept | Complete orders and allow store credit for deposits OR can elect to opt out of Class 3 move to Class 1, 7 and/or 8 as appropriate |
| Class 4 | Workers Compensation Claims | Unimpaired | Not Entitled to Vote Deemed to Accept | Reinstate rights and allow claims paid in the ordinary course to the extent established by applicable non-bankruptcy law |
| Class 5 | GE Commercial Finance Secured Claims | Unimpaired | Not Entitled to Vote Deemed to Accept | Reinstate rights and allow claims paid in the ordinary course to the extent established by applicable non-bankruptcy law |

| Class 6 | BB&T Claims | Impaired | Entitled to Vote | Treatment to include Line of Credit Note, Conover Real Estate Note and Term Notes and continued secured status. |
|---|---|---|---|---|

| Class 7 | Convenience Claims | Impaired | Entitled to Vote | Will receive 25% of an Allowed Claim equal to or less than $1,000.00. |
|---|---|---|---|---|

| Class 8 | Unsecured Claims | Impaired | Entitled to Vote | May elect among 3 separate treatments. (A) to reduce any Allowed Claim equal to or less than $1,000.00 and move to Class 7; (B) to elect to receive between a recovery from 2 proposed distributions under the Plan in full satisfaction of such Claims the first within 60 days of the Effective Date; and the second by June 30, 2011 as set forth in more detail in the Plan; or (C) to receive future Distributions as that qualify under the Plan for Distribution to the Holders of Allowed Class 8C Claims as defined in the Plan. |
|---|---|---|---|---|
| Class 9 | Equity Interests | Impaired | Entitled to Vote | Larry G. Hendricks and N. Jane Hendricks will credit at least $500,000 for the Equity in the Debtors by cancellation of the DIP Lender Claim. At the election of the Hendricks, the Holders of Equity Interest may remain the same as existed on the Petition Dates but the Holders of Equity Interest shall not be entitled to any dividend or distribution solely based upon being the Holder of Equity Interest save and except for the Pass Through Tax Payments until the Holders of Allowed Unsecured Claims in Class 8C have received the Class 8C Distribution as set forth in Section 4.8 of the Plan. See Section 4.9 of the Plan for a more detailed |

| | | | | description of the treatment of Class 9 Interests. |
|---|---|---|---|---|

For a complete description of the treatments provided to Holders of Allowed Claims and Interests, see Articles III and IV of the Plan.

**C.      The Confirmation Hearing, Voting Procedures, Bar Dates, And Other Important Deadlines.**

**1.      Time And Place Of The Confirmation Hearing.**

The Plan cannot become effective until after it has been confirmed by the Bankruptcy Court and the conditions to the Effective Date set forth in the Plan have either been satisfied or waived.

The hearing to determine whether the Bankruptcy Court will enter the Confirmation Order to confirm the Plan will take place on **Wednesday, January 20, 2010 at 9:30am EST** in Courtroom 122 before the Honorable J. Craig Whitley, United States Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street, Charlotte, North Carolina 28202. The Confirmation Hearing may be continued from time to time without further notice.

**2.      Entities Entitled To Vote On The Plan.**

Prior to the Confirmation Hearing, certain Holders of Claims will have an opportunity to vote to accept or reject the Plan.  Pursuant to the Bankruptcy Code, only Holders of Allowed Claims or Allowed Interests in Classes 1, 6, 7, 8 and 9 (the "Voting Classes") are entitled to vote on the Plan because these Classes are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, but nonetheless may be entitled to receive Distributions under the Plan.  The impairment of a Claim or Interest generally occurs if the legal, equitable, or contractual rights of the Holder are altered.  Classes 2, 3, 4 and 5 are not Impaired and, therefore, are not entitled to vote and are deemed to have accepted the Plan.  The Holders of Claim in Class 3 may elect out of Class 3 and will receive a right to elect form.

The Plan may be confirmed even if it is not accepted by each Voting Class.  The Bankruptcy Code defines "acceptance" with respect to a Class of Impaired Claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class whose Holders cast Ballots. In the event that a Voting Class does not accept the Plan, the Debtors nonetheless will seek to have the Plan confirmed, provided that the Plan is "fair and equitable" and does not "unfairly discriminate" against the non-accepting Class of Claims or Interests, as provided in section 1129(b) of the Bankruptcy Code.

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY FEASIBLE ALTERNATIVE FOR CREDITORS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF SUCH HOLDERS OF CLAIMS. THE DEBTORS AND THE COMMITTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**3.      Deadline For Voting For Or Against The Plan**.

The Debtors are providing copies of this Disclosure Statement and Ballots, which include voting instructions, to all known Holders of Claims in the Voting Classes.  If you are entitled to vote as the Holder of a Claim in one of the Voting Classes, you may vote by completing the enclosed Ballot and returning the Ballot by the Ballot Deadline in the enclosed envelope to the Balloting Agent at the address identified on your Ballot. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Person acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing.

**TO BE COUNTED, IF YOU RECEIVE A BALLOT, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RETURNED IN ACCORDANCE WITH THE BALLOT INTRUCTIONS AND RECEIVED BY THE  BALLOTING AGENT BY NO LATER THAN <u>WEDNESDAY, JANUARY 13, 2010</u> AT <u>4:30 P.M.</u>, EASTERN TIME, OR IT WILL NOT BE COUNTED IN CONNECTION WITH CONFIRMATION OF THE PLAN.  ANY EXECUTED BALLOT THAT DOES NOT INDICATE EITHER ACCEPTANCE OR REJECTION SHALL NOT BE COUNTED.**

A Ballot cast with respect to the Plan does not result in the filing or allowance of a Claim.  Nor does the casting of a Ballot relieve a Holder of the obligation to file or have filed a proof of Claim in a timely manner.  The Debtors reserve the right to object to any Claims until the Claims Objection Deadline set forth in the Plan; provided, however, that Distribution may be made to Holders of Allowed Claims prior to the expiration of the Claims Objection Deadline.  Notwithstanding any of the foregoing, the Debtors or the Committee may request from the Bankruptcy Court an extension of the Claims Objection Deadline.

4.          **Deadline For Objecting To Confirmation Of The Plan**.

As noted, all Holders of Claims or Interests are entitled to be heard with respect to confirmation of the Plan, even if they are not eligible to vote to accept or reject the Plan.  Objections to confirmation of the Plan <u>must be filed with the Bankruptcy Court</u> and served upon (a) **counsel for the Debtors** (Rayburn Cooper & Durham, P.A., 1200 Carillon, 227 West Trade Street, Charlotte, North Carolina, 28202-1675, attention: Albert F. Durham, Esq. or Shelley K. Abel, Esq.); (b) **counsel for the Committee** (Allman Spry Leggett & Crumpler, P.A., 380 Knollwood Street, Suite 700, Winston-Salem, North Carolina, 27103-1862, attention: R. Bradford Leggett, Esq. and C. Edward Allman Esq.; (c) **counsel to BB&T** (Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202-4003, attention: Stephen E. Gruendel, Esq.); (d) **counsel to Sherrill Furniture Company** (Grier, Furr & Crisp, P.A., 101 North Tryon Street, Suite 1240, Charlotte, North Carolina 28246, attention: Anna Gorman, Esq.); (e) **counsel to Larry J. Hendricks and Nancy Jane Hendricks** (Katten Muchin Rosenman LLP, 401 South Tryon Street, Suite 2600, Charlotte, North Carolina 28202, attention: Bradley E. Pearce, Esq.); and (f) such other parties as are required by applicable law to receive copies so that they are <u>received</u> by the Bankruptcy Court by no later than <u>Wednesday, January 13, 2010 at 4:30 p.m., Eastern Time</u>.

5.          **Deadlines For Parties To Executory Contracts And Unexpired Leases To Assert Damage Claims And To Object To The Terms Of Assumption**.

Section 365 of the Bankruptcy Code allows each of the Debtors to assume, assume and assign, or reject executory contracts and unexpired leases to which a particular Debtor was a party as of the Petition Date.  In order to assume, or assume and assign, a contract or lease, a Debtor must make provision for the cure of certain outstanding defaults as required by Section 365 of the Bankruptcy Code.  If a Debtor rejects a contract or lease, the contract or lease is deemed to have been breached by the Debtor immediately before the Petition Date, and the non-debtor party to the contract or lease may be entitled to an Unsecured Claim for damages resulting from such breach.  The Debtors have previously received approval from the Court to  reject some executory contracts or unexpired leases. The Orders entered by the Court either on those contracts and leases or the Bar Date Order control both the timing and deadlines for such contracts and leases to file and assert Claims against the Debtors.

Under the Plan, on the Effective Date, and to the extent permitted by applicable law, each of the Debtors shall reject all executory contracts and unexpired leases except for those executory contracts and unexpired leases that are (a) listed on the Executory Contract Schedule filed by the Debtors filed by the Debtors at least ten (10) days prior to the later of the deadline for objecting to the confirmation of the Plan or voting on the Plan or (b) executory contracts or unexpired leases entered into after the Petition Date pursuant to the provisions of sections 365 and 1123 of the Code pursuant to the Confirmation Order, if not already rejected as of a prior date and the Confirmation Order shall constitute an order of the Court approving such treatment and any assumption and assignments and rejections pursuant to the Code and this Plan; provided, however, that any and all executory contracts or unexpired leases which were or are the subject of separate motions filed pursuant to section 365 of the Code by the Debtors before or on the Confirmation Date shall not be deemed assumed or rejected by the Confirmation Order but shall be treated as so ordered by the Bankruptcy Court in an order entered pursuant to the

motion.  Contracts or leases entered into after the Petition Date by any Debtor will be performed by such Debtor in the ordinary course of their businesses.  The listing of a contract or lease on any schedule filed with the Court will not constitute an admission by the Debtors or any other party that such contracts or leases are executory contracts or unexpired leases as set forth in the Code.

If the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 8B at the election of the Holder of such Allowed Claim (but only if such election is made at least 15 days prior to the making of the Class 8B Initial Distribution) or 8C at the election of the Holder of such Allowed Claim or if no timely election is made for Class 8B treatment; provided, however, that the Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Estates or their Assets, their successors or properties, unless a proof of such Claim is filed with the Bankruptcy Court and served on the Debtors and the Committee **within thirty (30) days after the Effective Date**.  See Article VII of the Plan for more information about how to comply with this deadline and to determine whether this deadline applies to you.  **Failure to comply with this deadline shall forever bar the Holder of such a Claim from seeking payment thereof**.

## 6.    Administrative Claims Bar Date.

All parties seeking payment of an Administrative Claim, other than a Fee Claim, must file with the Bankruptcy Court and serve upon the Debtors a request for payment of such Administrative Claim prior to the applicable deadline set forth below; provided, however, that parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of a Debtor's postpetition business and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file such a request.

With respect to Administrative Claims, other than Fee Claims, relating to, or arising in, the period from the Petition Date through July 31, 2009, except to the extent set forth in the Administrative Claim Bar Date Order, a Holder of such Administrative Claim must have filed a request for payment of such Claim by the applicable bar date in order to be eligible to receive Distributions under the Plan on account of such Administrative Claim.  See the Administrative Claim Bar Date Order for more information about how to comply with this deadline and to determine whether this deadline applies to you.  With respect to Administrative Claims (other than Fee Claims) not subject to the Administrative Claim Bar Date Order, including those Administrative Claims arising after July 31, 2009 and before the Confirmation Date, a Holder of such Administrative Claim must file with the Bankruptcy Court and serve on the Debtors a request for payment of such Claim so as to be received on or before 4:30 p.m. (Eastern Time) on the date that is the first Business Day after the date that is **thirty (30) days after the Effective Date**, unless otherwise agreed to by the appropriate Debtor, without further approval by the Bankruptcy Court.  **Failure to comply with these deadlines shall forever bar the holder of an Administrative Claim from seeking payment thereof.**

**Any Holder of an Administrative Claim that does not assert such Claim in accordance with this Section shall have its Claim deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, the Estates or their Assets.  Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.**

## 7.    Fee Claims Bar Date.

All proofs or applications for payment of Fee Claims must be filed with the Bankruptcy Court and served in accordance with the Fee Order by the date that is the first Business Day after the date that is **sixty (60) days after the Effective Date** unless otherwise agreed to by the Debtors, without further approval by the Bankruptcy Court.  **Failure to comply with these deadlines shall forever bar the holder of a Fee Claim from seeking payment thereof.**

**Any Holder of a Fee Claim that fails to file and serve an application in accordance with the Fee Order on or before such time as set forth in this sub-section of the Plan shall have their Claim be Disallowed under the Plan and be forever barred from asserting such Claim against any of the Debtors, the**

**Estates, or their Assets. Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.**

### 8. Unsecured Claims Bar Date.

All proofs of Claim for certain Unsecured Claims were required to be filed with the Bankruptcy Court by the general claims bar date established by the Bankruptcy Court, which was August 31, 2009. **Any Holder of an Unsecured Claim that fails to file such a timely proof of Claim to the extent required by the Bar Date Order, applicable Code sections or Rules, or other orders of the Bankruptcy Court with the Court on or before such time shall have their Claim be deemed a Disputed Claim against any of the Debtors, the Estates or their Assets or alternatively, shall be deemed to have such Claim as was listed in the Schedules of Assets and Liabilities, as may be amended, filed by a Debtor in the amount scheduled so long as the Claim was not scheduled as disputed, contingent or unliquidated. Pursuant to the terms of the Bar Date Order, the Plan and the Confirmation Order, any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim other than to seek to have such Claim determined to be an Allowed Claim in the Bankruptcy Court.** Any Claim that is a Disputed Claim solely because it was filed after the Bar Dar shall be Allowed or Disallowed by an order of the Bankruptcy Court or by a stipulation between the Holder of such Claim, the Debtors or Reorganized Debtors and the Committee.

### 9. Materials To Be Filed In Support Of Confirmation.

Documents related to the Plan, including, without limitation the Plan Supplement, to the extent not filed simultaneously with the Plan and Disclosure Statement, shall be filed with the Bankruptcy Court at least ten (10) days prior to the <u>later of</u> the deadline for objecting to the confirmation of the Plan or voting on the Plan.

### 10. Information Regarding The Plan.

**NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO OR INCORPORATED HEREIN BY REFERENCE, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS OR APPROVED BY THE BANKRUPTCY COURT.**

### 11. Effective Date Of The Plan.

The Effective Date of the Plan will occur once the conditions listed in Sections 9.1 and 9.2 of the Plan are satisfied or waived in accordance with Section 9.3 of the Plan.

### D. Important Notice and Cautionary Statement.

The historical financial data relied upon in preparing the Plan and this Disclosure Statement is based on the Debtors' books and records. The hypothetical liquidation analysis, projections, and other financial information have been developed by the Debtors with the assistance of their financial advisors. Nevertheless, the hypothetical liquidation analysis, projections, and other financial information are estimates only, and the timing, amount, and value of actual Distributions to creditors may be affected significantly by many factors that cannot be predicted.

**ALTHOUGH THE PROFESSIONAL ADVISORS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, REGULATORY, AND ACCOUNTING DATA PROVIDED BY THE DEBTORS AND THIRD PARTIES, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO**

**REPRESENTATIONS AS TO THE ACCURACY THEREOF.   IN ADDITION, MUCH OF THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AN AUDIT.   THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION, OR THAT ACTUAL VALUES OR FINANCIAL PERFORMANCE WILL COMPORT WITH THE ESTIMATES HEREIN.**

**THE ACTUAL RESULTS OF OPERATIONS AND THE TIMING, AMOUNT, AND VALUE OF DISTRIBUTIONS UNDER THE PLAN MAY DIFFER MATERIALLY AND ADVERSELY FROM THOSE PROJECTED HEREIN.   THE FUTURE OPERATIONS OF THE REORGANIZED DEBTORS MAY BE AFFECTED BY NUMEROUS ECONOMIC, COMPETITIVE, LEGAL, OPERATIONAL, AND OTHER FACTORS THAT CANNOT BE PREDICTED.**

**THIS DISCLOSURE STATEMENT CONTAINS A DISCUSSION OF CERTAIN RISK FACTORS RELATING TO THE PLAN AND THE DEBTORS' CURRENT BUSINESS OPERATIONS. THE DEBTORS STRONGLY ADVISE THAT ALL PARTIES IN INTEREST REVIEW THESE RISK FACTORS CAREFULLY AND CONSULT WITH THEIR ADVISORS BEFORE VOTING ON THE PLAN OR OTHERWISE DECIDING TO SUPPORT OR OPPOSE CONFIRMATION.**

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS OR INTERESTS.   YOU SHOULD CONSULT YOUR OWN LEGAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN FOR YOU.**

**II.    DESCRIPTION OF THE DEBTORS, THEIR BUSINESS OPERATIONS, AND THEIR FINANCIAL CONDITION**.

**A.    Historical Summary.**

HFG and its affiliates Classic and Norris are collectively a family owned and operated enterprise offering upscale name-brand furniture, rugs and accessories for sale at reasonable prices for purchase to individual customers and to the design trade from retail locations in North and South Carolina and previously in Florida, as described in greater detail herein.   The Debtors operated a number of retail locations for their respective retail furniture businesses, as well as a delivery service for HFG customers and certain unaffiliated entities.   Larry G. Hendricks, purchased in 1974 a predecessor to HFG known as The Country Shop.   Over the following years, Classic, Norris and NaJa were acquired or formed by Larry Hendricks or N. Jane Hendricks.   Chad Hendricks, the son of Larry and Jane Hendricks, joined HFG in 1991 and worked in many different positions, being named as President of HFG in late 2008.

HFG traces the beginning of its business as a retail furniture operation to The Country Shop, which was founded in 1949 and purchased by Larry Hendricks in 1974. The Country Shop was a retail furniture operation. HFG is a surviving entity to The Country Shop.   Classic was formed in 1980 as a furniture delivery business that handles the pick up from manufacturers, preparation and delivery of furniture and goods sold by HFG or its predecessor entities, as well as similar services for unaffiliated, non-debtor furniture retailers.   In 1989, HFG or its predecessor acquired Boyles Furniture locations in High Point, North Carolina, and HFG continued to operate these locations under the business name of "Boyles Distinctive Furniture." Further in 1989, HFG opened is first location doing business as Boyles Furniture in Charlotte, North Carolina.   NaJa Oriental Rugs, LLC ("NaJa") was formed by  Jane Hendricks in January 2006 and offered rugs for sale through the Debtors' retail furniture locations.

Also around the late 1980's Norris Furniture and Interiors in Florida was acquired

by Larry Hendricks as an affiliated entity, which expanded the retail footprint to locations in the Fort Myers and Naples area of Florida. In 2003 and 2004, HFG began another, larger venture with Thomasville Retail, Inc., opening 17 stores in 4 states, and with Drexel Heritage Furnishings, Inc., opening 6 stores in 2 states.   At their peak, HFG and Norris operated a total of 34 stores across North Carolina, South Carolina, Georgia and Florida, resulting in retail sales in excess of $270 million per year.

The Debtors' aggressive expansion during the mid-2000s ultimately was determined to be unsustainable.  The expanded single-line stores involving Drexel Heritage and Thomasville never met cash flow expectations. In addition, the costs associated with expanding these stores resulted in less favorable results. Essentially, the lack of increased sales from the expanded format did not provide the needed revenue to adequately cover the Debtors' occupancy costs and the costs of expansion increased the Debtors' losses. These efforts to capitalize on the Debtors' distribution capabilities and corporate infrastructure through expansion of these single-line stores not only failed to produce additional sufficient revenues, they distracted the company from its historically sound foundation of value-driven retailing in the Carolinas.

As a result, the Debtors began implementing a turnaround plan in 2007, continuing into 2009.  As a part of this turnaround plan, the Debtors closed the Drexel Heritage and Thomasville stores that were not meeting the Debtors' expectations.  During this time, two Drexel Heritage locations, one in Raleigh, North Carolina and another in Greenville, South Carolina, were converted to Boyles locations in an effort to honor the leases and implement a more effective retail model.  However, beginning in the summer of 2007, the sudden and unexpected turn in the economy, especially the crisis in housing industry, caused largely by the well-reported mortgage crisis, resulted in substantial reduced sales for the last half of 2007.  The store locations in the Florida market were especially hit by the housing downturn both as to  primary residences and the second-home and condominium market resulting in drastic reduction in furniture and accessory filings.  Subsequently, in 2007, HFG began comprehensive strategic reviews with consultants to reduce and refine its operations and commenced a number of cost cutting efforts.   In 2008, more specific restructuring began, including corporate leadership changes that resulted Larry Hendricks being named Chief Executive Officer and Chad Hendricks becoming the President of HFG. In late 2008, HFG acquired NaJa and its assets, and NaJa subsequently was merged into HFG prior to its bankruptcy filing. Further, in early 2009, non-performing Boyles locations in North Carolina owned by HFG were consolidated to avoid additional operating losses.

Also in early 2009, it became clear that HFG could no longer subsidize the losses in the Norris operations and the Norris stores would need to be closed.  Norris began an exit from its retail locations and related support facilities, including a liquidation of stocked merchandise through a going out of business sale, which was concluded in early April 2009.  During this wind-down, Norris has continued to work closely with liquidators and manufacturers to ensure all customer orders will be filled in a timely, equitable manner.  The Debtors expect to deliver the last of the Norris orders in the summer of 2009.

The Debtors, with the help of their consultants, are focused on and committed to retaining HFG's core business at the remaining Boyles locations in Hickory, High Point, Mocksville and Charlotte, North Carolina, with a goal of continuing their performance to increased profitability, and re-establishing the company's emphasis on core competencies like well-priced products and white-glove service.  Subsequent to the filing of the Chapter 11 Cases, it was determined that the Greenville, South Carolina location should be closed.  It was the smallest of the remaining retail center and was not meeting expectations.  The remaining locations were profitable at a store level through the first quarter of 2009.  All locations were adversely affected by interruptions in the flow of goods resulting from liquidity challenges and further market deterioration.

The closing of non-performing locations resulted in claims by some vendors and landlords regarding those locations.  After attempts with store conversions and numerous denied requests for lease concessions, the Debtors proposed in 2009 to restructure their unsecured debt with the holders of such claims and to work with their Prepetition Lender to achieve an out-of-court restructuring. Due to the varying and divergent positions taken by some of their creditors, the Debtors together with other cooperative creditors have determined that Chapter 11 filings were required to restructure the Debtors' operations and secure financing necessary to provide for a recovery to the parties in interest.

B.        **Current Operations.**

Since the Petition Date, the Debtors have been aggressively reorganizing their business model to reorganize the operations of the Debtors. To this end, as of the date of this Disclosure Statement, all of the less profitable locations have been closed. The Debtors have engaged Rayburn Cooper & Durham, P.A. as Debtors' bankruptcy counsel and The Finley Group as financial consultants to assist in their restructuring efforts. The Debtors have focused on retaining and expanding their customer base by fulfilling pre-bankruptcy customer orders; rebuilding confidence with their key suppliers and trade partners and efforts to strengthen their core retail business.

See Article IV of this Disclosure Statement, below, for more information concerning specific acts taken to reorganize and rehabilitate the Debtors' ongoing business activities.

C.        **Competition.**

Retail businesses in general and furniture retail operations specifically have been under tremendous economic pressures over the past few years. Due to the housing crisis, retail furniture operations have suffered severe drops in sales. As set forth above outlining the historical and recent business background of the Debtors, they have not escaped this industry downturn. Competition in the retail furniture business has always be intense; however it has become even more so in recent years with fewer customers spending fewer dollars. There is significant competition for the Debtors in that a number of its key retail locations are in High Point and Hickory, North Carolina which are the centers for selling the fine furniture and accessories for which North Carolina is known. The Debtors believe that there are positive signs that the economy, including, home sales and the housing industry, are beginning to make a come back.

III.     **PREPETITION DEBT AND EQUITY STRUCTURE OF THE DEBTORS**.

A.        **Description of Prepetition Debt Structure of Debtors.**

The Debtors maintained a secured credit facility with Branch Bank & Trust Company ("BB&T") prior to the Petition Date and subsequently thereto pursuant to Court approved Debtor-in-Possession Financing ("DIP Financing") and use of cash collateral.

1.        **The BB&T Facilities**

(a)      HFG as Borrower and Larry G. Hendricks as Individual Guarantor and Norris Furniture and Interiors, Inc. as Corporate Guarantor and together with the Individual Guarantor, collectively, the "Guarantors", and BB&T as the Bank are parties to a Modification and Restatement of Loan Agreement dated June 1, 1998, as amended by the First Amendment thereto dated December 1, 1998, the Second Amendment thereto dated October 12, 1999, the Third Amendment thereto dated July 11, 2000, the Fourth Amendment thereto dated August 1, 2002, the Fifth Amendment thereto dated August 26, 2004, the Sixth Amendment thereto dated December 31, 2004, the Seventh Amendment thereto dated September 20, 2006, the Eighth Amendment thereto dated January 24, 2008 and the Ninth Amendment thereto dated June 1, 2009, all among the Borrower, the Guarantors and the Bank (collectively, the "Original Agreement").

(b)      Pursuant to the Original Agreement, the Bank extended a $20,000,000 Revolving Line of Credit Loan (the "Line") maturing June 30, 2009, evidenced by a Promissory Note of Borrower originally dated May 30, 1996, as thereafter modified and amended (the "Line Note").

(c)      Pursuant to a Loan Agreement dated May 30, 2007 (the "2007

Loan Agreement") between Borrower and Bank, the Bank extended a $7,030,000 term loan (the "2007 Loan") maturing June 30, 2009, evidenced by a Promissory Note of Borrower originally dated May 30, 2007, as thereafter modified and amended (the "2007 Loan Note").

(d)   Pursuant to a Loan Agreement dated September 30, 2008 (the "2008 Loan Agreement" and together with the Original Loan Agreement and the 2007 Loan Agreement, collectively, the "Loan Agreements") between Borrower and Bank, the Bank extended a $3,000,000 line of credit (the "2008 Loan" and together with the Line and the 2007 Loan, collectively, the "Loans") maturing June 30, 2009, evidenced by a Promissory Note of Borrower originally dated September 30, 2008, as thereafter modified and amended (the "2008 Loan Note" and together with the Line Note and the 2007 Loan Note, collectively, the "Notes").

(e)   The Loans are secured by real property and personal property collateral provided by the Borrower and Guarantors.

(f)   Payment of the Borrower's Obligations under the Loans is unconditionally guaranteed by the Individual Guarantor pursuant to his Guaranty Agreement dated January 24, 2008 and any other guaranty agreements that have been executed by the Individual Guarantor in favor of the Bank (collectively, the "Individual Guaranty Agreements").

(g)   Payment of the Borrower's Obligations under the Loans is unconditionally guaranteed by the Corporate Guarantor pursuant to its Guaranty Agreement dated September 30, 2008 (the "Corporate Guaranty Agreement" and together with the Individual Guaranty Agreements, collectively, the "Guaranty Agreements") and other guaranty agreements that has been executed by the Corporate Guarantor in favor of the Bank.

(h)   As of the Petition Date, the Bank was owed approximately the amounts shown below:

| | | |
|---|---|---|
| (i) | Line Loan | $11,728,364.00 |
| (ii) | 2007 Loan | $6,184,220.00 |
| (iii) | 2008 Loan | $3,000,000.00 |
| (iv) | Letter of Credit for Travelers | $2,875,000.00 (contingent) |
| (v) | Letter of Credit for Washington Intl. | $50,000.00 (contingent) |

The Bank has asserted additional claims under its existing credit facilities for Ledger Debt of approximately $375,000 and for Credit Card Chargebacks of approximately $424,000.

**2.   Other Secured Claims**

Certain creditors assert or may assert a security interest in certain property or ownership of certain property of the Debtors' Estates.  GE Commercial Finance has the first Deed of Trust on HFG's store location in High Point, North Carolina.  The ultimate determination of the status of other creditors' claims is unknown and the Debtors reserve all rights to object to the asserted secured or ownership status of any creditor.

**3.   Post-Petition Debtor-in-Possession Financing Lenders**

(a)   **BB&T** shall be paid in full its outstanding Allowed DIP Loan

Claim on the Effective Date as set forth in Section 4.6 of the Plan or such other treatment as is agreed between BB&T and the Debtors and approved by the Bankruptcy Court.

    (b)    **Sherrill** has agreed to accept a Note from the Reorganized Debtors for 4 years that is payable as follows:  Interest only at the rate of prime plus 2% until the earliest of (i) six months after the confirmation of a plan by the Bankruptcy Court or (ii) twelve months from the Petition Date and thereafter forty-eight (48) equal monthly installments of principal and interest until the Note is paid in full.  Sherrill has agreed not to assert a right to payment as an Administrative Expense Claim prior to Confirmation of a plan.  To the extent interest after the Petition Date is included in the Allowed Amount of any Secured Claim, such interest shall accrue at the rate agreed by the parties or fixed by the Court, compounded annually, unless otherwise provided by Final Order.

    (c)    **Larry G. Hendricks and N. Jane Hendricks,** subject to the Confirmation of the Plan, in form and substance acceptable to them, shall purchase Equity in the Reorganized Debtors by converting their post-petition DIP Lender Claim in the amount of $500,000 to Equity as it existed as of the Petition Date or such treatment as is agreed between the Debtors and such parties and approved by the Bankruptcy Court.

    **4.**    **Exit Financing**

    The Debtors have obtained Exit Financing from BB&T to assist the Debtors and the Reorganized Debtors in their ongoing business affairs.  Such financing includes revolving credit terms and term loans as determined by the Debtors to be reasonably necessary to satisfy the DIP Facility Claims, support other payments required to be made under the Plan and to fund working capital and general business purposes of the Reorganized Debtors following the Effective Date, and having terms agreed to by the Debtors, which terms shall be substantially in accordance with the treatment of BB&T Claims set forth in Section 4.6 of the Plan.

    **B.**    **Description of Prepetition Equity Structure of the Debtors.**

    (a)    Membership Interest in HFG:
        (i)    Larry J. Hendricks    70%
        (ii)    Chad Hendricks  10%
        (iii)    Sarah H. Ferebee 10%
        (iv)    Alex Hendricks    10%

    (b)    Shareholder interest in Norris
        (i)    Larry J. Hendricks    100%

    (c)    Shareholder interest in Classic
        (i)    Larry J. Hendricks    70%
        (ii)    Chad Hendricks  10%
        (iii)    Sarah H. Ferebee 10%
        (iv)    Alex Hendricks    10%

**IV.**    **THE CHAPTER 11 CASES AND SIGNIFICANT POSTPETITION EVENTS**.

    **A.**    **Significant Events Leading To The Commencement Of The Chapter 11 Cases.**

    The Debtors decided to file for reorganization under Chapter 11 in order to, among other things, (a) restructure, compromise and discharge creditors' Claims against, and shareholders' Interests in, the Debtors and (b) reorganize the Debtors' financial affairs.

### B.    The Chapter 11 Filings.

Each of the Debtors commenced their respective Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code on June 10, 2009 (the aforementioned "Petition Date"). The Debtors' Chapter 11 Cases are jointly administered and assigned to the Honorable J. Craig Whitley, United States Bankruptcy Judge for the Western District of North Carolina (defined in the Plan and herein as the "Bankruptcy Court").

The Debtors have made progress toward their goal of reorganization during their respective Chapter 11 Cases. Among other things, the Debtors have: (a) maintained operations and reduced their workforce and operations where appropriate; (b) worked to obtain debtor-in-possession financing and consensual use of cash collateral to enable the Debtors to continue operations; (c) developed a new business plan, which has been discussed with the Debtors' principal creditor constituencies and forms the basis for the Plan; (d) implemented significant improvements to the Debtors' business operations and reducing overhead; and (e) closed the Greenville, South Carolina store with approval of the Bankruptcy Court. Moreover, the Debtors have devoted significant efforts to the development, negotiation, and filing of the Plan that is the subject of this Disclosure Statement, which Plan the Debtors believe provides for the fair and equitable treatment of the Debtors' creditors.

### C.    "First Day" Motions.

On or after the Petition Date, the Debtors filed several "first day" motions relating to the ordinary course operations of their businesses. The Bankruptcy Court has entered Final Orders granting the Debtors' motions either as requested or modified to some extent, but in either event permitting the Debtors to continue operations during the Chapter 11 Cases. The "first day" orders enable the Debtors to, among other things: (a) maintain employee morale and confidence by authorizing the Debtors to pay prepetition employment Claims and all costs and expenses incident thereto, as well as maintain the Debtors' workers compensation insurance programs; (b) fund certain debts that were in process at the Petition Date, enabling the Debtors to continue their normal business operations without interruption, preserving value for all constituencies; (c) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; (d) confirmed that the Debtors could maintain and continue their customer practices to allow for full credit to all prepetition deposits and credits; and (e) establish certain other administrative procedures to promote a smooth transition into Chapter 11.

### D.    Appointment Of The Official Committee Of Unsecured Creditors.

On July 2, 2009, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors (defined in the Plan as the "Committee") pursuant to section 1002 of the Bankruptcy Code. The current members of the Committee are:

| Member Creditor | Individual Originally Participating on Committee |
|---|---|
| Baker Furniture Company<br>444 Highland Drive<br>Kohler, WI 53044 | James Frusher |
| Century Furniture, LLC<br>P.O. Box 608<br>Hickory, NC 28603 | Brandon Hucks |
| Kingsdown, Inc.<br>P.O. Box 388, 126 West Holt Street<br>Mebane, NC 27302 | Charles G. Bingenheimer, Jr. |
| Michael Aziz Oriental Rugs, Inc.<br>80 Cutter Mill Road<br>Great Neck, NY 11021 | Leonard Rodney |
| Pruitt & Huntley, LLC<br>P.O. Box 2344 (28603)<br>3985 Third St., NW<br>Hickory, NC 28601 | Robert P. Huntley |

| Salem Leasing Corp.<br>175 Charlois Blvd.<br>Winston-Salem, NC 27103 | Dennis Giff |
| Lexington Home Brands<br>1300 National Hwy.<br>Thomasville, NC 27360 | Ron Teglas |
| Larry T. Norris, Trustee<br>6914 Old Whiskey Creek Drive<br>Fort Myers, FL 33919 | Larry Norris |

### E.    Employment Of Professionals.

#### 1.    Reorganization And Other Professionals Employed Pursuant To Bankruptcy Code Section 327.

Pursuant to section 327 of the Bankruptcy Code, a debtor in possession or Committee may employ, after notice and a hearing, attorneys, financial advisors, and other professionals at the expense of the bankruptcy estate. The Debtors and the Committee have employed the following professionals in the Chapter 11 Cases with the Bankruptcy Court's approval (except for Ordinary Course Professionals that were employed by separate orders and disclosures):

| EMPLOYED PROFESSIONALS | | |
|---|---|---|
| **Professional** | **Scope of Representation** | **Date Approved [3]** |
| The Finley Group, Inc. | Consultants and Financial Advisors to the Debtors | 6/10/09 |
| Rayburn, Cooper & Durham, P.A. | Bankruptcy Counsel to the Debtors | 6/10/09 |
| Gardner & Hughes | Special Employment Counsel to the Debtors | 6/10/09 |
| Henderson, Franklin, Starnes & Holt, P.A. | Special Florida Counsel to the Debtors | 6/10/09 |
| Blair Bohle & Whitsett, P.L.L.C. | Accountants for the Debtors | 6/10/09 |
| Allman Spry Leggett & Crumpler, P.A. | Attorneys for the Creditors' Committee | 7/10/09 |

Pursuant to the Administrative Order and Sections 331 and 105 of the Bankruptcy Code, Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, each of the professionals employed at the expense of the Debtors' Estates (except for Ordinary Course Professionals that were employed by separate orders and disclosures) are able to file monthly fee applications seeking payment of 90% of the fees and reimbursement for 100% of the expenses incurred during the applicable month. If no objection to a fee application is received on or before the applicable objection deadline, the Debtors are permitted to make payment of 90% of the fees and 100% of the expenses incurred by the relevant professional, subject to final approval of the Bankruptcy Court. In addition, every four calendar months, each of the professionals employed at the expense of the Debtors' estates must file a request for interim approval of the compensation and reimbursement of expenses sought in the monthly fee applications (the "Quarterly Interim Fee Request"). Upon the Bankruptcy Court's approval of any such professional's Quarterly Interim Fee Request, the Debtors are authorized to pay the professional 100% of the fees not previously paid during the relevant period. The Bankruptcy Court may schedule a hearing to determine whether payment of the fees and the expenses incurred is appropriate. All fees and expenses

---

[3] If the approval date is shown as June 10, 2009, it represents that the Order was entered approving the employment of the professional *nunc pro tunc* to the Petition Date.

paid to professionals are subject to final review and allowance, after notice and a hearing, in accordance with section 330 of the Bankruptcy Code.

F.       **Postpetition Use Of Cash Collateral and DIP Financing.**

Pursuant to the Final Debtor-in-Possession and Cash Collateral Order entered on July 1, 2009, and subsequent amendments thereto, the Bankruptcy Court authorized the Debtors' obtaining credit and using cash collateral and the granting of certain liens and provision of other security to Branch Banking and Trust Company and to the other DIP Lenders (Sherrill Furniture Company and Larry J. Hendricks and N. Jane Hendricks) (the Final Order entered on July 1, 2009 and all subsequent Amendments or orders allowing for continued financing and use of cash collateral are hereafter for this paragraph, the "Final Financing Order"). The Debtors' ability to obtain financing and to use cash collateral provides needed liquidity for the Debtors to be able to continue operating their businesses. The Debtors have endeavored to arrive at consensual financing and the use of cash collateral to avoid additional cost and expenses associated with a disputed cash collateral litigation. Under the Final Financing Order, the Debtors may obtain credit and use cash collateral to pay those expenses enumerated on the budget which was attached to the Final Financing Order, as amended and to make new loans in the ordinary course of the Debtors' business in compliance with the Final Financing Order. The Final Cash Collateral Order additionally provided for a limited carve-out to pay professional expenses and "permitted trailing expenses" such as employee salaries and benefits that have accrued and are due and owing in the event the DIP Facility terminated. Under the Final Financing Order, the Debtors granted BB&T and the other DIP Lenders certain Replacement Liens, as that term is defined by the Order, and subject to certain conditions as set out in the Order.

G.       **Filing Of Schedule Of Assets And Liabilities And Statement Of Affairs.**

Sections 521(1) and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007 require the Debtors to file a schedule of assets and liabilities and statement of financial affairs, which contain information regarding the Debtor's assets, liabilities, income, and other matters. The Debtors, respectively, filed their Schedules of Assets and Liabilities and Statements of Financial Affairs on June 17, 2009, including several amendments to such Schedules and Statement of Financial Affairs that have been filed subsequent to that date. The Debtors reserve their rights to make any amendments to their respective Schedules and Statements of Financial Affairs as is appropriate.

H.       **Actions Implemented To Restructure The Debtors' Business Operations.**

Leading up to and after the Petition Date, the Debtors and their financial professionals evaluated the Debtors' operations and financial condition in order to develop and implement a reorganization strategy that would enable the Debtors to emerge from chapter 11 as a profitable enterprise. Going forward, the Debtors focused on enhancing the profitability of their remaining store locations and operations. The Debtors employed The Finley Group, Inc. as financial advisors prior to the Petition Date. With the assistance of The Finley Group, the Debtors have substantially tightened the financial operations, reduced overhead expenses and costs as warranted and stabilized the Debtors' business operations.

I.       **Sales of Surplus Assets**

As part of the Debtors' restructuring efforts, outlined above, the Debtors actively marketed the sale of surplus assets consisting generally of office furniture and equipment, store displays and related products that were not needed for the continued operation of the business. Pursuant to the Order Establishing Procedures For Transactions Involving Certain Miscellaneous Assets, entered by the Bankruptcy Court on June 12, 2009 (the "Surplus Sale Order"), the Debtors have provided notice of certain sales of miscellaneous assets to various purchasers. Under the Sale Order, the Debtors are required to provide notice of the proposed sale of assets, with a proposed sale price of up to $25,000.00, to interested parties and provide such parties with an opportunity to object to such sale. If no objections are received by the Court within 10 days, the Debtors are to file a Certificate of No Objection so stating, and thereafter are authorized to proceed with the proposed sale. As of the date of filing of this

Disclosure Statement, no proposed sales of miscellaneous assets have been objected to in accordance with the Sale Order.

In addition, after the Petition Date, HFG determined that its retail store located in Greenville, South Carolina should be closed.    Pursuant to an order of the Bankruptcy Court entered in July 2009 (the "Greenville Store Closing Order"); the Debtors were authorized to conduct a store closing sale at the Greenville location and to reject the lease for the non-residential real estate in Greenville as of July 31, 2009.

### J.    Claims Bar Date And Analysis.

Pursuant to the Bar Date Order, the Bankruptcy Court established a general claims bar date in the Debtors' Chapter 11 Cases of August 31, 2009.  The Debtors also have scheduled certain Claims with respect to which no proofs of Claim have been filed.  The Debtors believe that the total amount of Allowed Claims against their respective estates will be lower than the amount asserted. Because of the large number of proofs of Claim filed, the complexity of many of these Claims, and the fact that many of the Claims are disputed and/or unliquidated, the Debtors may not have completed a final analysis of each of the Claims asserted against them prior to the Plan's Effective Date.

**Each of the Debtors and the Committee reserves all rights and defenses with respect to the allowance or disallowance of any Claim not previously allowed by a Final Order of the Bankruptcy Court or pursuant to the terms of the Plan, and further with respect to the secured or priority status thereof.**

### K.    Avoidance Actions

The Debtors have not undertaken an analysis of possible Avoidance Actions, including, without limitation, preference actions to recover pre-bankruptcy transfers that may be avoidable and recoverable under the bankruptcy code.  However, potential Avoidance Actions may be disclosed in the responses to Questions 3(b), 3(c) and 23 in the Statement of Financial Affairs, as amended, filed by each Debtor.  **If the Plan is confirmed and the Effective Date occurs, the Debtors (i) shall not pursue Avoidance Actions that may or may not exist and (ii) shall not use the possible existence of an Avoidance Action to object to any Claim. Nothing shall prevent the Debtors, the Committee or any other party in interest from pursuing all other objections to Claims or from asserting any facts or claims, relating in any manner to any Avoidance Action as a defense, affirmative defense or counterclaim to any Cause of Action that may be commenced against or in reference to any one or more of the Debtors or the Reorganized Debtors.**

### V.    THE PLAN OF REORGANIZATION.

Attached hereto as Exhibit A or incorporated herein if separately filed, in its entirety, is the First Amended Joint Consolidated Plan of Reorganization of Hendricks Furniture Group, LLC and Its Affiliate Debtors and Debtors-In-Possession Proposed by Hendricks Furniture Group, LLC and Its Affiliate Debtors, dated December 7, 2009, which is fully incorporated herein and shall be considered a portion of this Disclosure Statement.  Certain notable provisions of the Plan are recited or described below.  **HOLDERS OF CLAIMS AND INTERESTS AND OTHER INTERESTED PARTIES MUST READ THE PLAN IN ITS ENTIRETY TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

### A.    Vesting of Assets of the Estates

On the Effective Date pursuant to section 1141(b) of the Code and as otherwise provided in the Plan, (i) the Assets and property of the Debtors shall vest or revest in the appropriate Reorganized Debtors for use, sale and distribution in accordance with operation of the Reorganized Debtors' business and this Plan and (ii) the Initial Distributions in Cash and other Distributions required to be made by the Plan shall be made by the Debtors save and except for Distributions to the Holders of Allowed Class 8C Claims which Distributions shall be made by the Disbursing Agent.   As of the Effective Date, all Assets vested or revested, and all Assets dealt with by the Plan, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan and/or the Confirmation Order.

From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, sell and otherwise dispose of property without supervision or approval of the Bankruptcy Court, free of any restrictions of the Code, the Bankruptcy Rules, and the guidelines and requirements of the United States Bankruptcy Administrator, other than those restrictions expressly imposed by the Plan or the Confirmation Order; <u>provided</u>, <u>however</u>, that nothing herein restricts the right of the Reorganized Debtors to seek Bankruptcy Court approval for the sale, assignment, transfer, or other disposal of certain of the Reorganized Debtors' Assets after the Confirmation Date in the event that such Court approval is deemed to be beneficial or advisable.

## B.   Distributions under the Plan.

Distributions to Holders of Allowed Claims will be made under the Plan as follows:

**Administrative Claims.**   Subject to the terms of the Plan and unless otherwise agreed by the Holder of an Allowed Administrative Claim (in which event such other agreement shall govern), Distributions on Allowed Administrative Claim shall be provided for as follows:

(a)   if such Claim is for goods sold or services rendered representing liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases involving customers, suppliers, trade or vendor Claims shall be paid by the Debtors in the ordinary course in accordance with the terms and conditions of any agreements relating thereto;

(b)   if such Claim is for amounts necessary to cure executory contracts and unexpired leases assumed by the Debtors in connection with the orderly operation of its business after the Effective Date shall be paid by the Debtors or the Reorganized Debtors as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

(c)   amounts due other Holders of other Allowed Administrative Claims, including, without limitation, Claims arising pursuant to Section 503(b)(9) of the Bankruptcy Code shall be paid as agreed between the parties, as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

(d)   Administrative Claims of the United States Bankruptcy Administrator for fees pursuant to sections 1930(a)(6) and (7) of title 28 of the United States Code shall be paid in accordance with the applicable schedule for payment of such fees by Debtors; and

(e)   other Allowed Administrative Claims shall be paid in full in Cash on the later of (i) the Effective Date or as soon as practicable thereafter and (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

## PRIORITY TAX CLAIMS.

Subject to the terms herein, each Holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid amount of such Allowed Priority Tax Claim in Cash by the Debtors on or as soon as reasonably practicable after the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; provided, however, that at the option of the Debtors, the Debtors or the Reorganized Debtors may make (a) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, (b) equal to the Allowed Amount of such Priority Tax Claim, (c) over a period not exceeding five (5) years after Petition Date (the date of the order for relief for these cases), and (d) in a manner no less favorable than the most favorable nonpriority unsecured claim provided for by the Plan (other than Class 7 Claims) as provided in Section 1129(a)(9)(C) of the Code.  If the Debtors elect this option as to any Allowed Priority Tax Claim, then the payment of such Allowed Priority Tax Claim shall be made in installment payments of up to forty-eight (48) monthly installments with the first installment due on the later of: (i) the Initial Cash Distribution, (ii) 30 calendar days after the date on which an order allowing

such Allowed Priority Tax Claim becomes a Final Order, and (iii) such other time as may be agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors. Each installment shall include simple interest on the unpaid portion of such Allowed Priority Tax Claim, without penalty of any kind, at the statutory rate of interest provided for such taxes under applicable nonbankruptcy law; provided, however, that the Debtors shall reserve the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Allowed Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty. Any claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in section 507(a)(8)(G) of the Code) shall be disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors, the Estates, or their Assets.

**Fee Claims.** Subject to the terms herein, each Holder of an Allowed Fee Claim shall be paid in the manner specified by the Bankruptcy Court in any order approving payment of such Fee Claim.

**DIP Lender Claims.** Subject to the provisions of section 506(d) of the Code and the terms herein, each Holder of an Allowed DIP Lender Claim shall receive such other treatment as is agreed between the Debtors and each DIP Lender or determined by Final Order of the Bankruptcy Court.

(a) **BB&T** shall be paid in full its outstanding Allowed DIP Loan Claim on the Effective Date as set forth in Section 4.6 of the Plan or such other treatment as is agreed between BB&T and the Debtors and approved by the Bankruptcy Court.

(b) **Sherrill** has agreed to accept a Note from the Reorganized Debtors for 4 years that is payable as follows: Interest only at the rate of prime plus 2% until the earliest of (i) six months after the confirmation of a plan by the Bankruptcy Court or (ii) twelve months from the Petition Date and thereafter forty-eight (48) equal monthly installments of principal and interest until the Note is paid in full. Sherrill has agreed not to assert a right to payment as an Administrative Expense Claim prior to Confirmation of a plan. To the extent interest after the Petition Date is included in the Allowed Amount of any Secured Claim, such interest shall accrue at the rate agreed by the parties or fixed by the Court, compounded annually, unless otherwise provided by Final Order.

(c) **Larry G. Hendricks and N. Jane Hendricks,** subject to the Confirmation of the Plan, in form and substance acceptable to them, shall purchase Equity in the Reorganized Debtors by converting their post-petition DIP Lender Claim in the amount of $500,000 to Equity as it existed as of the Petition Date or such treatment as is agreed between the Debtors and such parties and approved by the Bankruptcy Court.

Class 1 (Priority Non-Tax Claims). Subject to the terms herein and unless otherwise agreed by the Holder of an Allowed Priority Non-Tax Claim (in which event such other agreement shall govern), Allowed Class 1 Claim shall be paid as follows (a) deferred Cash Distributions of a value, as of the Effective Date of the Plan, equal to the Allowed Amount of such Claim over a three (3) period of time beginning on the Effective Date or (b) cash on the Initial Distribution Date as soon as practicable after the Effective Date of the plan equal to the Allowed Amount of such Claim. Class 1 is impaired, and Holders of Class 1 Claims are entitled to vote to the extent of deferred Cash Distributions.

Class 2 (Secured Claims).

Non-Tax Other Secured Claim. Subject to the provisions of sections 502(b) and 506(d) of the Code and the terms herein, each Holder of an Allowed Class 2 Claim shall, at the option of the Reorganized Debtors, be treated as follows: (i) the Plan will leave unaltered the legal, equitable and contractual rights to which such Claim entitles the Holder thereof, (ii) return of the collateral securing such Claim, (iii) the proceeds, net of any cost of sale or liquidation, of the Debtors' interest in the relevant collateral, up to the Allowed Secured Amount of such Class 2 Claim; (iv) Cash in the Allowed Amount of such Secured Claim, in exchange for release of the lien securing such Claim, (v) Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) with payment in the ordinary course of business in accord with the terms and conditions of any agreement related thereto; (vi) such other treatment as is agreed to in writing between the Debtors or the Reorganized Debtors and the

Holders of such Allowed Secured Claim; or (vii) such other treatment as is determined by Final Order of the Bankruptcy Court to provide the indubitable equivalent of such Allowed Secured Claim.  To the extent interest after the Petition Date is allowable and included in the Allowed Amount of any Secured Claim in Class 2; such interest shall accrue at the lower of a non-default contractual rate of interest provided for such Allowed Class 2 Claim or as otherwise provided by Final Order.

Secured Tax Claims.  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a different treatment, each Holder of an Allowed Secured Tax Claim shall receive at the option of the Debtors or Reorganized Debtors, (i) on the date of the Initial Distribution after the Effective Date or the date on which such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or (ii) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, (a) equal to the Allowed Amount of such Allowed Secured Tax Claim, (b) over a period not exceeding five (5) years after Petition Date (the date of the order for relief for these cases), and (c) in a manner no less favorable than the most favorable nonpriority unsecured claim provided for by the Plan (other than Class 7 Claims) as provided in Section 1129(a)(9)(C) of the Code.  If the Debtors elect the second option above as to any Allowed Secured Tax Claim, then the payment of such Allowed Secured Tax Claim shall be made in installment payments of up to forty-eight (48) monthly installments with the first installment due on the later of: (i) the Initial Cash Distribution, (ii) 30 calendar days after the date on which an order allowing such Allowed Secured Tax Claim becomes a Final Order, and (iii) such other time as may be agreed to by the Holder of such Allowed Secured Tax Claim and the Debtors.  Each installment shall include simple interest on the unpaid portion of such Allowed Secured Tax Claim, without penalty of any kind, at the statutory rate of interest provided for such taxes under applicable nonbankruptcy law; provided, however, that the Debtors shall reserve the right to pay any Allowed Secured Tax Claim, or any remaining balance of such Allowed Secured Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty.

Class 2 is not impaired, and Holders of Class 2 Claims are not entitled to vote.

Class 3 (Customer Deposit Claims) Each Holder of an Allowed Class 3 Claim shall receive the treatment set forth in 3(A) below with a right of certain Holders to elect treatment under 3(B) below.  **The Holder of an Allowed Class 3 Claims will receive a Right to Elect treatment under sub-classification 3B below and movement of their Claims to one or more other classes.**  The Claim of any Holder of a Class 3 Claim that does not elect to treatment under 3B below shall be treated under 3A below.

3A Treatment:    The Holder of an Allowed Class 3 Claim against the Debtors shall be treated under this sub-classification and given the option to complete their purchase transaction or use any credit balance or gift certificate with the Debtors or the Reorganized Debtors pursuant to the Debtors' customer practices in the ordinary course of business of the Reorganized Debtors. Such Holders will receive Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) of their Claim and (i) upon tender of delivery and final payment for the goods and merchandise purchased by such Holder from the Debtors, such Holder shall receive full credit for their respective deposit, credit balance or gift certificate or (ii) such other treatment as is determined by Final Order of the Bankruptcy Court.

3B Treatment:    The Holder of an Allowed Class 3 Claim whose Claim results from (i) a prepayment deposit, (ii) a credit balance resulting directly from a prepayment deposit or (iii) a gift certificate, who voluntarily elects not to complete their purchase transaction or use of such qualified credit balance or gift certificate with the Debtors and who demands a refund from the Debtors will be allowed to elect out of the treatment of Allowed Class 3 Claims.   Such Holders as identified  in (i-iii) of the preceding sentence may have one or more of the following Claims: (a) if the Holder of such Claim is an individual, a Claim in Class 1 up to the amount of the priority of up to $2,425 for each individual provided by Section 507(a)(7) of the Bankruptcy Code for a deposit Claim or (b) a Claim in either Class 7 or 8 to the extent such Holder has an Allowed Claim that is not entitled to a priority as set forth in Section 507(a)(7) whether in full or to the extent of any non-priority amount.  The Holders of Allowed Class 3 Claims who elect treatment under this sub-classification shall elect to move to Class 1, 7 or 8 as applicable and be treated thereunder. Such treatment shall be in full and complete satisfaction of the Holder's claims against the Debtors.

The Holders of Allowed Class 3 Claims are not impaired and are not entitled to vote. The Holders of Allowed Class 3 Claims who are entitled to elect treatment under 3B above and thereby elect out of Class 3 shall elect to be transferred to Classes 1, 7 or 8 and will be thereafter be entitled to be treated under such other applicable class or classes.

Class 4 (Workers Compensation Claims). The Holders of Allowed Workers Compensation Claims against the Debtors will receive Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) of their claim subject to a full and complete reservation of all rights and defenses available to the applicable Debtor and upon completion of any procedure to determine the amount of such claim, such Holder shall receive payment of their respective Allowed Claims as determined. Class 4 is not impaired, and Holders of Allowed Class 4 Claims are not entitled to vote.

Class 5 (GE Commercial Finance Secured Claims). Subject to the provisions of section 506(d) of the Code and the terms herein, each Holder of an Allowed Class 5 Claim shall receive on account of that Claim on the Effective Date, Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) with payment in the ordinary course of business in accord with the terms and conditions of any agreements related thereto. Class 5 is not impaired, and the Holder of an Allowed Class 5 Claims is not entitled to vote.

Class 6 (BB&T Claims  except BB&T DIP Lender Claims). Subject to the provisions of section 506(d) of the Code and the terms herein, each Holder of an Allowed Class 6 Claim shall receive on account of that Claim on the Effective Date the following treatment:

Treatment:  The BB&T Claims (other than BB&T DIP Lender Claims) are Allowed, including post-petition interest, fees and charges. In full and final satisfaction of the BB&T Claims (other than BB&T DIP Lender Claims), the Debtors shall execute the New BB&T Loan Documents in a form acceptable to BB&T and consistent with the treatment described below or such other treatment as is agreed between the Debtors and BB&T and approved by the Bankruptcy Court. The obligations of the Debtors under the New BB&T Loan Documents shall be secured by perfected liens on all assets of the Debtors without any further action on the part of the Debtors or BB&T; provided that BB&T shall be authorized to file or record financing statements, mortgages or other instruments in any jurisdiction, or take any other action, as BB&T deems necessary to perfect such liens.

Existing Credit Facilities:

1. Note 1 Prepetition Line of Credit (dated 6/1/98 in the amount of $11,728,364 as of the petition date): borrower:  HFG; Guarantors:  HFG, Norris and Larry Hendricks

2. Note 2 Prepetition Short Term Loan (dated 5/30/07 for $6,184,220 as of the petition date): borrower: HFG – Conover Mortgage; Guarantors: HFG, Norris and Larry Hendricks

3. Note 3 Prepetition Over-line Loan (dated 9/30/08 for $3,000,000 as of the petition date): borrower: HFG; Guarantors: HFG; Guarantors:  HFG, Norris and Larry Hendricks

4. Note 4 Post Petition DIP Loan (dated 6/10/09 for $500,000 projected upon Exit): borrower: HFG, Norris, CMS; Guarantors: None

5. Note 5 Letter of Credit Supporting Self-Insured Workers Compensation Plan: Current Exposure estimated at $550,000 (Face Amount: $2,875,000);

6. Ledger Debt ([approximately $375,000])

7. Credit Card Chargeback Recovery – Approximately $424,000.

Total indebtedness $ 21,791,584 [including approx. $375,000 in ledger debt but excludes $550,000 in contingent liabilities

**BB&T'S DIP LENDER CLAIMS**:  $500,000 of the $2,000,000 advanced by BB&T post-petition ($1,500,000 of which was participated to Sherrill Furniture) will be paid in full in cash on the Effective Date of the Debtors' Plan of Reorganization, including in part from a payment to the Debtors of post-petition credit card recoveries for pre-petition charges of approximately $424,000 and the $76,000 balance from cash of the Borrowers.   The balance of $1,500,000 would be assigned by BB&T to Sherrill Furniture outright (and the participation interest cancelled) and would be treated as previously agreed by Sherrill Furniture. Any continuing lien securing the obligations to Sherrill Furniture (the "Sherrill Note") would be subordinated to the liens of BB&T (and any refinancing of BB&T) pursuant to terms acceptable to BB&T.

The following description of the treatment of BB&T's Claims is in form and substance the Exit Financing for the Debtors:

**NOTE A – LINE OF CREDIT**:
Principal Balance (deemed outstanding upon Exit): $5,268,380
Credit Line:          $8,000,000
  Advance Rate      55%
  Term:   1 year
Interest Rate:         Prime + 0.25%
Payment Terms:             Monthly interest payments commencing upon emergence with the outstanding balance due on maturity
Annual Interest Payments (estimated)   $175,000
Contingent Liability for the adjusting estimated exposure for the Letter of Credit Supporting the Self-Insured Workers Compensation Plan shall be reserved against availability and such reserve regarding BB&T Merchant Services as is mutually agreed.

**NOTE B – CONOVER MORTGAGE**:

Principal Balance (projected upon Exit):  $6,184,220
Interest Rate:       Prime + 0.25%
Payment Terms:
•        Monthly interest payments commencing upon emergence
•        Monthly principal payments of $20,000 commencing January 15, 2011
•        Due in full January 15, 2015
Annual Debt Service Payments (estimated):
          •        Interest          $ 200,000
          •        Principal         $ 240,000
          •        Total             $ 440,000

**NOTE C – TERM NOTE:**

Principal Balance:          $7,424,000 (the balance is subject to adjustment up or down based on the final amount of the ledger debt)
Interest Rate:             Prime + 0.25%
Payment Terms:
•        Monthly interest payments beginning on January 15, 2010
•        Monthly principal payments of $10,000 beginning January 15, 2011
•        Due in full January 15, 2015
Annual Debt Service Payments (estimated):
•        Interest          $ 260,000
•        Principal         $ 120,000
•        Total             $ 380,000

**NOTE D– SECOND TERM NOTE:**
Principal Balance:  $2,834,984
Interest Rate: Prime + 5%
Payment Terms:
Note D would accrue interest compounded quarterly beginning in January 2010.
Payment from any Subrogation Payment Funds shall be applied first to amounts
outstanding under Note D and thereafter to amounts outstanding under Note C.
Due in full January 15, 2015

**Other collateral and payments**:

BB&T holds as additional collateral for its loans certain real estate located in Guilford County, North
Carolina ("HFG Additional Collateral").   If any of the HFG Additional Collateral is sold while there is a
remaining principal balance due under Note D, Note C or Note B, the net proceeds of such sales shall be
used first to pay down the remaining principal due under Note D, then to pay down the remaining
principal due under Note C and then to pay down the remaining principal due under Note B.

BB&T holds as additional collateral for its loans certain collateral owned by Larry and N. Jane Hendricks
("Hendricks Collateral") that has been pledged to assist the Borrowers.
The Hendricks Collateral includes the Mooresville Property discussed below.

Mooresville Property:   The "Mooresville Property" is the home and real property owned by Larry G.
Hendricks and N. Jane Hendricks (the "Hendricks") in Mooresville, North Carolina subject to a first lien
deed of trust in favor of BB&T securing debt of the Hendricks in the amount of approximately $5.5 million
and a second lien deed of trust in favor on BB&T securing debts of HFG and Larry G. Hendricks. The
Mooresville Property is also subject to other junior lien claims.   The Hendricks shall expend their best
efforts to cause a sale of the Mooresville Property for a price acceptable to BB&T as soon as is reasonably
practicable.  On or before the Effective Date, the Hendricks shall fund an interest escrow account with an
amount sufficient to pay BB&T interest accruing (and taxes and insurance) on the Mooresville Property
first deed of trust loan for a period of 18 months (the "Interest Reserve").  If the Mooresville Property is
sold for a net amount of more than $5.5MM, then the excess amount, up to $4.5MM, shall be paid to
BB&T and applied to the Note D indebtedness and thereafter to the Note C indebtedness.
BB&T has agreed to release its deeds of trust on the Mooresville Property upon its receipt of $10.0 million
from a consensual sale of the Mooresville Property.

Subrogation:  The Hendricks' subrogation rights, whether arising from a sale of the Mooresville Property or
otherwise, shall be matured and fixed upon BB&T's receipt of any Subrogation Payment Funds in the
amount of such Subrogation Payment Funds received; provided that such subrogation rights shall be
expressly subordinated to the repayment in full of (i) all indebtedness owed to BB&T (and any lender
refinancing the indebtedness owed to BB&T), (ii) the Sherrill Note and (iii) the Reorganized Debtors
payment of the amounts required to be paid to the Holders of Allowed Claims in Class 8 pursuant to the
Debtors' confirmed Plan.   As used herein, the term "Subrogation Payment Funds" means (a) up to
$4,500,000 of the net determined (after payment of the underlying first deed of trust of BB&T, payment of
the $500,000 post-petition loan to the Hendricks and the funding of the Interest Reserve) proceeds from
the sale of the Mooresville Property for an amount in excess of $5.5MM (plus any unpaid interest) or (b)
any and all funds from the Hendricks in payment of the New BB&T Loans or the BB&T Claims or from
the sale or assignment of any other asset that has been pledged by the Hendricks to secure any of the
Reorganized Debtors' debts to BB&T.   The Hendricks shall not exercise any subrogation rights or
remedies until such time as all indebtedness owed to BB&T, and any refinancing thereof, have been paid
in full.

Subordination of Rights to Payments or Distributions; Allowance of Claims:  The Hendricks have agreed
that the Allowed DIP Lender Claim of the Hendricks which shall be converted to equity under the Plan,
and all other Claims scheduled by the Debtors or filed by the Hendricks as of the Confirmation Date or by
N. Jane Hendricks, as discussed in the immediately following paragraph, shall be subordinated as to
payment until such time as (i) all BB&T debts (and any refinance thereof) by the Debtors, the Reorganized

Debtors and the Hendricks shall have been paid in full; (ii) the Sherrill Note has been paid in full; and (iii) creditors of the Debtors who are the Holders Allowed Unsecured Claims shall have received all distributions as provided in Section 4.8 of the Plan,

The Claims of N. Jane Hendricks (a) in the prepetition principal amount of $962,070, and (b) resulting from any payment to any Allowed Claim of Noori's Liquidation Center that may be made out of her own funds shall be allowed and not subject to dispute, disallowance, reduction, offset or subordination except as expressly provided herein.  These claims shall be Allowed Class 8C Claims and shall not be discharged under the Plan (but shall be subordinated as provided above).

**Notwithstanding the foregoing and any other provision of this Plan, neither the Debtors nor the Reorganized Debtors shall be obligated to make Minimum Payments or True Up Amount payments to the Disbursing Agent for the Creditors' Fund as set forth in Section 4.8 herein based upon the Allowed Class 8C Claim of N. Jane Hendricks nor shall the Disbursing Agent be obligated to collect or distributed funds from the Debtors or the Reorganized Debtors based upon the Allowed Class 8C Claim of N. Jane Hendricks.**

**Additional payments**:

(1)      The Minimum Payment to be paid on a monthly basis is a prepayment of
 the amount to be distributed under the Net Amount Distributable From EBITDA Calculation.  Provided that the Reorganized Debtors are authorized to make a Minimum Payment as defined in the Plan then beginning on or before June 30, 2011, the Minimum Payments shall be paid (a) to the Disbursing Agent for deposit to the Creditors' Fund for the Holders of Class 8C Claims of $25,000 as provided in Section 4.8 herein and (b) to BB&T of $10,417 for principal reduction of Notes D and C as provided in Section 4.6 herein.

 **Notwithstanding the foregoing, if the Class 8B Notes have not been paid in full by June 30, 2011, the Minimum Payments by the Reorganized Debtors shall not begin until earlier of (a) payment in full of the Class 8B Notes or (b) January 31, 2012.**

This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.

 **For example and for illustrative purposes only**: The proposed Minimum Payment (beginning on June 30, 2011 for the 12 months from June 30, 2011 through May 31, 2012 provided to the Disbursing Agent ($25,000 monthly) for deposit to the Creditors' Fund for the benefit of Holders of Class 8C Claims would total $300,000 for the 12 month period and to BB&T ($10,417 monthly) for principal reductions of Notes D, C and B would total $125,000 for the 12 month period and serves as prepayment against amounts owed by the Reorganized Debtors under the Net Amount Distributable from EBITDA Calculation in accordance with the Plan. It is anticipated that the Minimum Payments will begin prior to an amount being due under the Net Amount Distributable From EBITDA Calculation and thus are a prepayment of the distribution under that calculation.

 (2)      Annually based on the fiscal year (currently ending on December 31st) of the Reorganized Debtors, the Reorganized Debtors, BB&T and the Disbursing Agent shall determine, prior to end of the sixth month after the end of the prior fiscal year, the Net Amount Distributable From EBITDA Calculation which is an amount equal to 85% of the consolidated EBITDA for the prior fiscal year in excess of the amount of EBITDA needed to achieve a Debt Service Coverage Ratio of 1.25 to 1.0.   The portion sharing of 85% is 60% to the Disbursing Agent for deposit to the Creditors' Fund and 25% to BB&T as set forth in the Plan.

 If the Reorganized Debtors, BB&T and the Disbursing Agent agree that the required Debt Service Coverage Ratio has been met for the prior fiscal year and that a distribution is due under the determined calculation then to the extent such distribution is in excess of the Minimum Payments previously made (the

"**True Up Amount**"), the Reorganized Debtors will owe the True Up Amount to the Disbursing Agent and to BB&T based on the percentages set forth above.

The Reorganized Debtors shall pay the respective amounts due for the True Up Amount on or before the end of the sixth month after the end of the prior fiscal year to the Disbursing Agent for deposit to the Creditors' Fund and to BB&T.  For clarification, the True Up Amount would be the amount determined to be due under the Net Amount Distributable From EBITDA Calculation for the prior fiscal year of the Reorganized Debtors less amounts already paid by the monthly Minimum Payments.  This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.

**For example and illustrative purposes only**: If the Reorganized Debtors had previously remitted Minimum Payments (a) to the Disbursing Agent for deposit to the Creditors' Fund in the sum of $300,000 and (b) to BB&T in the sum of $125,000 and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $360,000 and $150,000, respectively, the difference of $60,000 and $25,000 would represent the True Up Amount due each party. The True Up Amount will be due to be paid on or before the end of the sixth month after the end of the prior fiscal year.   If the Reorganized Debtors remitted Minimum Payments totaling $300,000 and $125,000 respectively to the parties as outlined above and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $240,000 and $100,000, respectively, then no True Up Amount would be due for that period.

<u>Additional BB&T Treatment Issues</u>:

<u>Pledge of Membership Interests</u>:  BB&T will receive a pledge of the membership interest of Larry Hendricks in HFG (anticipated to be not less than 70%) and that pledge would be released upon BB&T receiving not less than $4.5 million in net proceeds (after payment of any underlying obligation of the Hendricks to BB&T, including the underlying first deed of trust obligations on the Mooresville Property and the $500,000 made available to the Hendricks to fund their post-petition DIP Loan to the Debtors) from a sale of the Mooresville Property or other collateral pledged by the Hendricks (the "Required Paydown").  The extension of the maturity of the underlying deed of trust(s) on the Mooresville Property and the $500,000 loan to the Hendricks after the Petition Date shall be on terms acceptable to BB&T and the Hendricks, including a pledge by the Hendricks of any anticipated tax returns (subject, however, to rights reserved with respect to a 2009 income tax refund in Section 4.8 of this Plan).

<u>Voting Trust</u>:  BB&T will receive, pursuant to a voting trust agreement or other documentation in form acceptable to BB&T and Larry Hendricks, the right to vote the 70% membership interest of Larry Hendricks in HFG.  BB&T's rights in respect of the voting trust agreement would be surrendered once BB&T has received the Required Paydown, provided that (i) not less than 60 days had elapsed since BB&T's receipt of the reviewed financial statements of the Reorganized Debtors for the fiscal year 2010 in the form required by the New BB&T Loan Documents, and (ii) upon receipt of the Required Paydown, or the date that is 12 months after the Effective Date (if later), provided that no Event of Default then exists under the BB&T existing credit facilities.

Larry G. Hendricks shall serve as the manager of HFG following the dates on which the Plan is confirmed and becomes effective, and shall remain as a manager of HFG so long as he is competent and willing.  Each person holding an equity interest in HFG as of the Petition Date has the right (but not the obligation) to remain employed by HFG upon confirmation of the Plan, subject to the rights of HFG's manager to terminate or modify the terms of such employment.  Until such time as all indebtedness due BB&T shall have been paid in full and the Holders of Allowed Unsecured Claims in Class 8 shall have received a distribution as provided in Section 4.8 of the Plan: (i) no such equity holder, nor any relative of such equity holder that has been employed by HFG or any of its affiliates within one year of the Petition Date (a "Subject Person"), shall receive a bonus or pay increase from HFG except for cost of living adjustments; and (ii) HFG's members shall not be allowed to sell, assign or distribute any of their membership interests in HFG except that any member of HFG may assign any or all of his or her membership interests to any relative, directly or through a trust or other estate planning device, at any time and without restriction and Larry Hendricks may pledge his membership interests to BB&T as contemplated hereby without

restrictions.  Each Subject Person shall be required to act in the best interests of HFG and its creditors so long as such Subject Person remains employed by HFG.

The restated operating agreement of HFG shall be in a form reasonably acceptable to BB&T and to the Creditors' Committee.

**Letter of Credit**:    HFG's obligations to reimburse BB&T in connection with any draws would remain upon emergence.  Face amount would be reduced in the future.

**BB&T Merchant Services**:     Existing merchant services credit agreement to remain in place and all reimbursement obligations to remain upon emergence.

| **Borrowers and Guarantors**: | Existing: | • | HFG |
|---|---|---|---|
| | | • | Norris Furniture & Interiors, Inc. |
| | | • | Larry Hendricks |
| | New: | • | HFG |
| | | • | CMS |
| | | • | Larry Hendricks |

**Collateral**:     All assets of the Debtors (other than Avoidance Actions) to secure all obligations to BB&T upon emergence provided that BB&T will only require execution of a junior deed of trust on the property located in Guilford County, North Carolina encumbered by a lien in favor of GE Commercial Finance to the extent such junior lien is obtained with the express written consent of GE Commercial Finance and does not cause a default under the loan agreement with GE Commercial Finance.  Further, such junior deed of trust if obtainable would be subject to any documentation, including, a subordination agreement as is reasonably acceptable to GE Commercial Finance.

**Reporting Requirement**:

1.  Monthly internal financial statements
2.  Monthly Borrowing Base Certificate / ABL Reporting
3.  Annual financial statements presented in accordance with GAAP
4.  Such other reporting as is reasonably requested by BB&T.

**Covenants**:    1.    Financial covenants
a.    EBITDA/Debt Service Coverage (Quarterly)
b.    Inventory Coverage Ratio (Advance rate 55%)
c.    Capital Expenditures not to exceed $1.0M on an annual basis
2.    Owner's compensation will be limited to that outlined in the Forecast as presented in the Disclosure Statement
3.    Any distributions, dividends, or payments to any related party will be dealt with as set forth above
4.    No new debt, guarantees or encumbrances unless approved by BB&T
5.    Such other covenants as are reasonably requested by BB&T.

Class 6 is impaired, and the Holder of an Allowed Class 6 Claims is entitled to vote.

Class 7 Convenience Claims).  The Holders of Allowed Unsecured Claims against the Debtors of equal to or less than $1,000.00 or the Holders of Allowed Unsecured Claims of greater than $1,000.00 who elect to reduce their Claims to equal to or less than $1,000.00 shall receive twenty-five (25%) percent of such Allowed Unsecured Claim in one or more payments of up to three (3) monthly payments, without interest, of approximate equal amounts beginning with the first payment within 30 days after the Effective Date of the Plan and continuing

every 30 days after the first payment date in full and complete satisfaction of all claims against the Debtors.  Class 7 is impaired, and Holders of Allowed Class 7 Claims are entitled to vote.

Class 8 (Unsecured Claims).    Creditors who are the Holders of Allowed Unsecured Claims in Class 8 shall be entitled to treatment and to receive distributions under the Plan as follows or such other treatment as is agreed to in writing by the Debtors or the Reorganized Debtors and the Holders of such Allowed Class 8 Claims with the consent of any applicable secured creditor.

**Holders of Class 8 Claims have three (3) options or elections regarding the treatment of their Claim as shown below.  As set forth herein and on the Class 8 Ballot, any Holder of a Class 8 Claim who (a) fails to return a Class 8 Ballot, (b) fails to specifically designate on the Class 8 Ballot only one of the three treatment options, or (c) designates more that one option for treatment on the Class 8 Ballot will be deemed to have elected treatment under Class 8B.**

8A Treatment:  Holders of Claims in Class 8 may vote to (a) elect to reduce their claims to $1,000.00 and (b) to participate in the Distribution to be made pursuant to the Holders of Allowed Class 7 Claims if and when such Claims are determined to be an Allowed Claim.  Holders of Claims in Class 8 who elect such treatment shall be deemed to waive and release any Claim that exceeds the amount of $1,000.00 and the balance of any Claims by the creditors electing option 8A shall be discharged.   Such Holders upon the election to move to Class 7 shall no longer be a Holder of a Class 8 Claim. **The Ballot for voting on the Plan for Class 8 Claims shall contain the election for any Holder of an Allowed Class 8 Claim who wishes to reduce such Claim and participate in the Distribution for the Holders of Allowed Class 7 Claims.**

8B Treatment:     Holders of Allowed Claims in Class 8 may elect to participate in a distribution pool, if and when their Claims are Allowed Claims, designated as the "Class 8B Fund" in an aggregate amount of up to $1,000,000 to be funded in two (2) separate Distributions of $500,000 each (a) the first Distribution within sixty (60) days of the Effective Date and (b) the second Distribution on June 30, 2011 as set forth herein. Assuming that the conditions to the establishment of the Class 8B Fund are met, the Reorganized Debtors shall be obligated to make the first Distribution as provided above, and the second Distribution on June 30, 2011 but only to the extent the Reorganized Debtors maintain a minimum net availability of $1.0 million under the revolving credit facility with BB&T under the New BB&T Loan Documents both immediately prior to and after making such second Distribution (such conditions, the "Distribution Conditions").

**Condition Precedent to Creation of Class 8B**: Class 8B will be created **and the proposed Distribution to Holders of Allowed Class 8B Claims shall be due and will be made if and only if sufficient Holders of Allowed Class 8 Claims that equal or exceed the minimum amount of $5,000,000 ("Class 8B Minimum Amount") elect treatment as Class 8B Claims or are deemed to have elected such treatment as provided herein.**

The Distribution to be made to Holders of Allowed Class 8B Claims shall be made in two (2) installments:  (a) the first, within 60 days of the Effective Date of the Plan in the amount of $500,000 and (b) the second due on June 30, 2011 in the amount of $500,000, subject to the availability limitations described above.   The second installment shall be represented by notes to each Holder of an Allowed Class 8B Claim in a dollar amount based upon the percentage of the second Distribution that is allocated to such Claim Holder (the "Class 8B Notes").

**For example and illustrative purposes only:** If the Holders of Allowed Class 8 Claims equaling $5,000,000 elect Class 8B treatment then such electing Holders of Allowed Class 8B Claims would receive installment payments of approximately 10% each of their Allowed Claims, the first within sixty (60) days of the Effective Date and the second on June 30, 2011 (subject to the conditions and Class 8B Notes set forth herein). In this example, the amount of the second Distribution for each Holder of an Allowed Class 8B Claim shall be represented by the Class 8B Note.   In this example, the total estimated to be distributed to the Holders of Allowed Class 8B Claims is approximately 20% of their respective Allowed Claims.   **For further example only**, if the Holders of Allowed Class 8 B Claims totaling $8,000,000 elect Class 8B treatment then the approximate payment percentage would be 6.25% for each installment payment and total an approximate payment of 12.5% (subject to the conditions set forth herein).

{00172983 v 1}-33-

The Class 8B Notes shall be structured to provide for payment on June 30, 2011 but include a grace period for the Reorganized Debtors to make such payments through and including December 31, 2011 without penalty. The Reorganized Debtors may make partial payments against the Class 8B Notes until such notes are fully paid from amounts in excess of net availability under the revolving credit facility of $1.0 million.

If the Reorganized Debtors have not fully paid the Class 8B Notes before January 1, 2012, then (a) any unpaid portion of the Class 8B Notes shall bear interest at the rate of six (6%) percent per annum beginning on January 1, 2012 and (b) each Holder of a Class 8B Note that had not been fully paid may sue to recover any balance then due under such Holder's Note.

To the extent that BB&T has a lien on tax refund for the tax year 2009 to be received by Larry G. Hendricks and (i) the Reorganized Debtors meet the Distribution Conditions and (ii) the Reorganized Debtors maintain a Debt Service Coverage Ratio of at least 1.0 to 1.0 for the six-month period ending on June 30, 2011, BB&T shall release its lien on an amount of up to $250,000 of such tax refund and shall permit Larry G. Hendricks to contribute such funds to the Reorganized Debtors as an additional contribution to Equity and in support of the Plan which sum shall be distributed by the Reorganized Debtors as part of the second Distributions to the Holders of Allowed Class 8B Claims if Class 8B qualifies under this Plan. If no funds from the tax refund for 2009 are received by the Reorganized Debtors from Larry G. Hendricks by June 30, 2011, if BB&T is not obligated to release its lien or if the amount received by the Reorganized Debtors from Larry G. Hendricks is insufficient to fund up to $250,000, then the balance to bring the second Distribution amount to $500,000 shall come from the Reorganized Debtors.

Immediately following the payment in full of the Class 8B Notes, the Allowed Amount of the Class 8B Notes shall be deemed paid and discharged and each paid Class 8B Note shall be deemed fully satisfied, canceled and of no further force or effect pursuant to this Plan and the Confirmation Order without further action of the Reorganized Debtors or the Holders of the Class 8B Notes.

On the Effective Date of the Plan, all Claims of Holders of Class 8B Claims (other than the amounts to be distributed under the Plan to the Holders of Allowed Class 8B Claims), for or on account of a Class 8B Claim, shall be discharged.

**The Ballot for voting on the Plan for Class 8 Claims shall contain the election for any Holder of an Allowed Class 8 Claim who wishes to elect treatment under Class 8B.** Assuming the Class 8B Minimum Amount elects treatment under Class 8B, the percentage repayment from the Class 8B Fund to the Holders of Allowed Class 8 Claims under the Debtors' Plan who elect treatment under Class 8B will vary depending on the amount of Allowed Claims that elect such treatment. **As set forth herein and on the Class 8 Ballot, any Holder of a Class 8 Claim who (a) fails to return a Class 8 Ballot, (b) fails to specifically designate on the Class 8 Ballot only one of the three treatment options, or (c) designates more that one option for treatment on the Class 8 Ballot will be deemed to have elected treatment under Class 8B.**

**If the Class 8B Minimum Amount is not reached, then any Holder of a Class 8 Claims that elected treatment for their Claim as a Class 8B Claim shall be deemed to have elected the treatment as the Holders of Claims under Class 8C.**

8C Treatment:      Holders of Unsecured Claims in Class 8 who do not make the election under 8A or 8B may make an election to have their Class 8 Claims treated under Class 8C. Treatment under Class 8C involves payment based upon different formulas over time. If and when their Claims shall become Allowed Class 8C Claims, shall receive Distributions from the Creditors' Fund as follows: After the Confirmation Date and on or before the Effective Date, the Court will appoint a Disbursing Agent to make Distributions to the Holders of Allowed Class 8C Claims (excluding, however, N. Jane Hendricks) as set forth in the Plan and in the proposed Disbursing Agent's Agreement to be filed with the Plan or as part of the Plan Supplement. The duties and responsibilities of the Disbursing Agent are set forth herein and in the Disbursing Agent's Agreement. The duties of the Disbursing Agent shall include reviewing and verifying the determination of the Net Amount Distributable From EBITDA Calculation.

The Plan forecasts 2 related payments to the Creditors' Fund:

(1)    The Minimum Payment to be paid on a monthly basis is a prepayment of the amount to be distributed under the Net Amount Distributable From EBITDA Calculation.  Provided that the Reorganized Debtors are authorized to make a Minimum Payment as defined in the Plan then beginning on or before June 30, 2011, the Minimum Payments shall be paid (a) to the Disbursing Agent for deposit to the Creditors' Fund for the Holders of Class 8C Claims of $25,000 as provided in Section 4.8 herein and (b) to BB&T of $10,417 for principal reduction of Notes D, C and B as provided in Section 4.6 herein. This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.    **Notwithstanding the foregoing, if the Class 8B Notes have not been paid in full by June 30, 2011, the Minimum Payments by the Reorganized Debtors shall not begin until earlier of (a) payment in full of the Class 8B Notes or (b) January 31, 2012.**

**For example and for illustrative purposes only**: The proposed Minimum Payment (assuming beginning on June 30, 2011) for the 12 months from June 2011 through May 2012 provided to the Disbursing Agent ($25,000 monthly) for deposit to the Creditors' Fund for the benefit of Holders of Class 8C Claims would total $300,000 for the 12 month period and to BB&T ($10,417 monthly) for principal reductions of Notes D, C and B would total $125,000 for the 12 month period and serves as prepayment against amounts owed by the Reorganized Debtors under the Net Amount Distributable from EBITDA Calculation in accordance with the Plan. It is anticipated that the Minimum Payments will begin prior to an amount being due under the Net Amount Distributable From EBITDA Calculation and thus are a prepayment of the distribution under that calculation.

As referenced in Section VI of the Disclosure Statement, the Debtors' Projections should allow for the making of the Minimum Payments.

(2)    Annually based on the fiscal year (currently ending on December 31st) of the Reorganized Debtors, the Reorganized Debtors, BB&T and the Disbursing Agent shall determine, prior to end of the sixth month after the end of the prior fiscal year, the Net Amount Distributable From EBITDA Calculation which is an amount equal to 85% of the consolidated EBITDA for the prior fiscal year in excess of the amount of EBITDA needed to achieve a Debt Service Coverage Ratio of 1.25 to 1.0.    The portion sharing of 85% is 60% to the Disbursing Agent for deposit to the Creditors' Fund and 25% to BB&T as set forth in the Plan.

If the Reorganized Debtors, BB&T and the Disbursing Agent agree that the required Debt Service Coverage Ratio has been met for the prior fiscal year and that a distribution is due under the determined Net Amount Distributable From EBITDA Calculation then to the extent such distribution is in excess of the cumulative Minimum Payments previously made (the "True Up Amount") and so long as the prior Minimum Payments were not applied to any prior True Up Amount, the Reorganized Debtors will owe the True Up Amount to the Disbursing Agent and to BB&T based on the percentages set forth above.  For the avoidance of doubt, the cumulative Minimum Payments shall not include net Minimum Payments previously applied to fulfill a prior obligation based upon Net Amount Distributable From EBITDA Calculation for the Creditors' Fund and BB&T. The Reorganized Debtors shall pay the respective amounts due for the True Up Amount on or before the end of the sixth month after the end of the prior fiscal year to the Disbursing Agent for deposit to the Creditors' Fund and to BB&T.    This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.

**For example and illustrative purposes only**:  If the Reorganized Debtors had remitted cumulative Minimum Payments (a) to the Disbursing Agent for deposit to the Creditors' Fund in the sum of $300,000 and (b) to BB&T in the sum of $125,000 and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $360,000 and $150,000, respectively, the difference of $60,000 and $25,000 would represent the True Up Amount due each party. The True Up Amount will be due to be paid on or before the end of the sixth month after the end of the prior fiscal year.  If the Reorganized Debtors remitted Minimum Payments totaling $300,000 and $125,000 respectively to the parties as outlined above and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $240,000 and $100,000, respectively, then no True Up Amount would be due for that period and the prepayment carry forward will be $60,000 and $25,000 respectively.

The Disbursing Agent shall make a Distribution to the Holders of Allowed Class 8C Claims (excluding, however N. Jane Hendricks) and reserve a prorata Distribution to the Holders of a Disputed Class 8C Claim if  the amounts available in the Creditors' Fund at the time of a Distribution to the Holders of Allowed Class 8C Claims equals or exceeds two (2%) percent of the total amount of Class 8C Claims including for purposes of any Distributions, Disputed Amounts held in the Disputed Claims Reserve for Class 8C Claims (but excluding the Allowed Class 8C Claim of N. Jane Hendricks)  but shall not make a Distribution if such amounts available in the Creditors' Fund are less than one (1%) of such total amount of Class 8C Claims.   The Disbursing Agent shall be entitled to make Distributions in its discretion if the amount available in the Creditors' Fund described above is equal to or greater than one (1%).

**Notwithstanding the foregoing and any other provision of this Plan, neither the Debtors nor the Reorganized Debtors shall be obligated to make Minimum Payments or True Up Amount payments to the Disbursing Agent for the Creditors' Fund as set forth in Section 4.8 herein based upon the Allowed Class 8C Claim of N. Jane Hendricks nor shall the Disbursing Agent be obligated to collect or distributed funds from the Debtors or the Reorganized Debtors based upon the Allowed Class 8C Claim of N. Jane Hendricks.**

The amount of each Distribution shall be computed based upon the percentage of each Allowed Claim (but excluding the Allowed Class 8C Claim of N. Jane Hendricks) as part of the total of all Allowed Claims less any previous distributions.  In the event that the due date for any payment is not a Business Day, the payment required for such date shall be made on the first Business Day following such due date.  All distributions shall be applied to principal of the Unsecured Claims.  Distributions to the Holders of Allowed Class 8C Claims (excluding N. Jane Hendricks) shall continue as provided above until the **later of the date** when Distributions have been made to the Holders of Allowed Class 8C Claims (excluding N. Jane Hendricks) of at least thirty (32.5%) percent of the principal of their Allowed Class 8C Claims which amount shall represent the Minimum Percentage Payment **or seven (7) years** after the Effective Date  up to payment of one hundred (100%) percent of the principal amount of the Allowed Class 8C Claims (collectively, the "Class 8C Distribution").

In the event that a Claim is a Disputed Claim, the Pro Rata share distributable to the holder of the claim shall be paid into the Disputed Claim Reserve established to segregate such funds. The funds allocated to such Distributions placed in the Disputed Claims Reserve shall be held until such claim has been allowed or disallowed in a fixed amount by agreement or by a Final Order of a court having jurisdiction of such dispute.  Upon determination of a disputed claim, either by agreement or by Final Order as set forth above, the holder of such claim shall receive prorata distribution from the segregated account of such funds to which it is entitled.  Any amounts in the Disputed Claims Reserve allocated for Class 8C Claims that are disallowed in whole or part shall be paid to the Creditors' Fund for future distribution to Holders of Allowed Class 8C Claims until the Class 8C Distribution is accomplished.

If there is any dispute as to either the amount due or whether any amount is due for any measurement period based upon the Net Amount Distributable From EBITDA Calculation and the minimum Debt Service Coverage Ratio, the Company, BB&T and the Disbursing Agent shall seek to resolve any conflict or disputes within the forty – five (45) days following the due date. If the Reorganized Debtors, BB&T and the Disbursing Agent do not then agree to and consent to whether a Distribution is then due and in what amounts, then the parties shall invoke the Dispute Resolution Procedures.  If the dispute is only as to the amount of the Distribution, the Company shall fund the undisputed amount of the Distribution on a timely basis pari passu based upon the percentages due to BB&T and to the Disbursing Agent for the Creditors' Fund.  **As an example and for illustrative purposes only**, if all three parties agree that some amount is distributable as the respective 25% due to BB&T and 60% due to the Disbursing Agent for the Creditors' Fund (but BB& and/or the Disbursing Agent assert a larger amount should be distributed thus created a dispute) the Reorganized Debtors would distribute respective percentage to BB&T and to the Disbursing Agent.   Whether any balance is then due would be determined under the Dispute Resolution Procedures.

If it is determined through the Dispute Resolution Procedures that a Distribution is due to have been made and none was and/or that an additional amount should have been distributed, the amount of the approved Distribution shall bear interest at the rate of Prime + 0.25% from the original due date until paid.

Payment of any determined Distribution would be due not later than 15 days after the final conclusion of such Dispute Resolution Procedures.

The Holders of Equity Interests of HFG have no intention to sell or irrevocably assign or dispose of all or substantially all of the equity interests of the Reorganized Debtors (other than as allowable under Section 4.6 hereof) or all or substantially all of the assets of the Reorganized Debtors before the date on which the Class 8C Distribution is completed to the Holders of Allowed Class 8C Claims pursuant to Section 4.8 of the Plan (any such sale, assignment or disposal prior to the Class 8C Distribution being completed shall be a "Trigger Event"). If, however, a Trigger Event shall occur, Allowed Class 8C Claims shall be entitled to receive, pro rata (based on the Allowed Amount of each Holder's Allowed Class 8C Claim), an amount equal to the lesser of: (A) 50% of the proceeds resulting from such Trigger Event less the sum of (i) all payments, credits, costs and expenses required to consummate such sale, (ii) the sum required to complete the Minimum Percentage Payment to the Holders of Allowed Class 8C Claims, (iii) all amounts (including without principal, interest, fees, expenses and attorneys fees) required to pay in full any indebtedness owed in respect of any Exit Financing or any replacement financing and (iv) after payment of the obligations set forth in (i) through (iii) of this paragraph, then payment of thirty-two and one-half (32.5%) percent of N. Jane Hendricks' Allowed Class 8C Claim related to note debt due N. Jane Hendricks in the amount of $962,070; or (B) 100% of the Allowed Amount of Class 8C Claims to the extent not already paid to such Holders as Minimum Payments or True Up Amounts. The remaining 50% of the net proceeds resulting from such Trigger Event shall accrue to the Holders of Equity Interests of Reorganized Debtors and their respective heirs and assigns, it being the intent of this paragraph that Allowed Class 8C Claims and the Holders of Equity Interests share equally in any net proceeds after the Minimum Percentage Payment or such greater amount as may have been paid or due to the Holders of Allowed Class 8C Claims at the time of such Trigger Event is made to the Holders of Allowed Class 8C Claims.

Prior to the Class 8C Distribution being completed under the Plan, the Reorganized Debtors shall:

(a)     Limit Capital Expenditures to $500,000 per year for the first 5 years and then capped at the amount allowed under the then existing senior bank financing loan documents currently $1.0 M exclusive of any
castrophic damage claim that was not covered by insurance or any insurance proceeds received.

(b)     Limit payments on Mocksville lease to Larry G. Hendricks or any insider
of the Reorganized Debtors or Larry G. Hendricks as defined in the Bankruptcy Code to the amount of $15,000 per month subject to increase by a yearly adjustment to match any increase in the Consumer Price Index ("CPI").

(c)     Provide the Disbursing Agent, subject to the execution of a mutually agreed Confidentiality Agreement, the following;

(i)     a copy of any annual accounting review performed for the Reorganized Debtors by an independent accounting firm and otherwise shared with the bank providing senior bank financing loans;

(ii)     access to the books and records of the Reorganized Debtors sufficient for the Disbursing Agent to review and verify the Net Amount Distributable From EBITDA Calculation and otherwise perform the duties and comply with the obligations of the Disbursing Agent;

(iii)     a certification of an officer of the Reorganized Debtors the calculation by the Reorganized Debtors of the Net Amount Distributable From EBITDA Calculation is true and correct to the best of the knowledge and belief of such officer; and

(iv)     provide the Disbursing Agent with such other general reports and certifications provided by the Reorganized Debtors to the bank providing senior bank financing loans.

Notwithstanding the Discharge provisions of this Plan, the Claims of the Holders of Allowed Class 8C Claims shall not be discharged until the Class 8C Distribution is made on account of such Claims. The Holders of Class 8C Claims that are Disallowed Claims shall be discharged effective as of the Confirmation Date. **The Holders of Class 8C Claims shall be subject to the injunction relief set forth in the Plan, including, without limitation, Section 10.6, and applicable law against taking, directly or indirectly, any action against the Debtors, the Reorganized Debtors or the Disbursing Agent or any Assets or property of the Debtors, the Reorganized Debtors, the Creditors' Fund or the Disbursing Agent based on the existence of any Class 8C Claim other than to seek to enforce the rights of such Holder to receive payments pursuant to the Plan as set forth in Class 8C.** Upon the payment of the Class 8C Distribution to the Holders of Allowed Class 8C Claims, the then remaining balance of all Class 8C Claims existing as of the Confirmation Date shall be deemed fully and completely discharged by the Plan

Class 8 Claims are impaired, and Holders of Allowed Class 8 Claims are entitled to vote on the Plan.

Class 9 (Equity Interests). The Hendricks shall, subject to the Confirmation of the Plan in form and substance acceptable to them, credit their post-petition DIP Lender Claim in the amount of $500,000 to acquire new Equity Interests in the Reorganized Debtors or at their sole election, to continue the existing Equity Interests and such Equity Interests shall survive confirmation of the Plan and may revest in the Holder of such Equity Interest as they existed on the Petition Date. However, there shall be no dividends paid to the Holders of such Equity Interests on account of such Interests until the Class 8 Distribution is made to the Holders of Allowed Class 8 Claims save and except for the Pass Through Tax Payments necessary to provide tax neutral treatment to the Holders of Allowed Equity Interests. Nothing herein shall limit a Holder of an Equity Interest from continuing to be employed by one or more of the Reorganized Debtors and from receiving compensation and benefits available to other employees related to such employment or to receive market rate lease payments for the lease of property to one or more of the Reorganized Debtors. Any Holder of an Equity Interest who is employed by any of the Reorganized Debtors shall be entitled to receive an appropriate increase in compensation of based upon the Consumer Price Index ("CPI") but not to exceed five (5%) per annum until such time as the Class 8C Distribution is completed under the Plan.

If the Plan is confirmed and to assist the Reorganized Debtors in their restructurings, (a) Larry G Hendricks shall (i) guaranty the Reorganized Debtors obligations to BB&T, (ii) pledge to BB&T his membership interest in HFG as collateral security for his guaranty and (iii) enter into a voting trust agreement or other arrangement granting BB&T certain rights with respect to Larry G. Hendricks' membership interests in HFG, each as more particularly described in Section 4.6 of the Plan; (b) the Hendricks shall (i) subordinate their rights to payment in respect of their Claims, as set forth in Section 4.6 of the Plan and (ii) remit to HFG, as a contribution to the equity in HFG and to the extent allowed by applicable law and subject to any rights of BB&T as a secured creditor in respect of such tax refunds, 2009 and subsequent income tax refunds available to either or both of the Hendricks so long as all costs, taxes and fees related with such remittance are paid by the Reorganized Debtors until the Class 8C Distribution (defined in Section 4.8) is completed. As set forth in and subject to Section 4.8 of this Plan and subject to the rights of BB&T as a secured creditor in respect of any tax refund, 50% of any tax refund for the tax year 2009, up to $250,000, that shall be received by Larry G. Hendricks on or before June 30, 2011 is anticipated to be contributed to the Reorganized Debtors to be distributed as part of the second Distribution to the Holders of Allowed Class 8B Claims if Class 8B qualifies under this Plan.

The Holders of Equity Interests of HFG have no intention to sell or irrevocably assign or dispose of all or substantially all of the equity interests of the Reorganized Debtors (other than as allowable under Section 4.6 hereof) or all or substantially all of the assets of the Reorganized Debtors before the date on which the Class 8C Distribution is completed to the Holders of Allowed Class 8C Claims pursuant to Section 4.8 of the Plan (any such sale, assignment or disposal prior to the Class 8C Distribution being completed shall be a "Trigger Event"). If, however, a Trigger Event shall occur, Allowed Class 8C Claims shall be entitled to receive, pro rata (based on the Allowed Amount of each Holder's Allowed Class 8C Claim), an amount equal to the lesser of: (A) 50% of the proceeds resulting from such Trigger Event less the sum of (i) all payments, credits, costs and expenses required to consummate such sale, (ii) the sum required to complete the Minimum Percentage Payment to the Holders of

Allowed Class 8C Claims, (iii) all amounts (including without principal, interest, fees, expenses and attorneys fees) required to pay in full any indebtedness owed in respect of any Exit Financing or any replacement financing and (iv) after payment of the obligations set forth in (i) through (iii) of this paragraph, then payment of thirty-two and one-half (32.5%) percent of N. Jane Hendricks' Allowed Class 8C Claim related to note debt due N. Jane Hendricks in the amount of $962,070; or (B) 100% of the Allowed Amount of Class 8C Claims to the extent not already paid to such Holders as Minimum Payments or True Up Amounts.   The remaining 50% of the net proceeds resulting from such Trigger Event shall accrue to the Holders of Equity Interests of Reorganized Debtors and their respective heirs and assigns, it being the intent of this paragraph that Allowed Class 8C Claims and the Holders of Equity Interests share equally in any net proceeds after the Minimum Percentage Payment or such greater amount as may have been paid or due to the Holders of Allowed Class 8C Claims at the time of such Trigger Event is made to the Holders of Allowed Class 8C Claims.

       Class 9 is an Impaired and the Holders of Allowed Equity Interests in Class 9 are entitled to vote on the Plan.

       **C.**       **Funding of Distributions.**

       (i)       The Distributions to be made pursuant to the Plan will be available from Cash less Reserves.  To the extent not otherwise provided for herein or ordered by the Bankruptcy Court, the Debtors or the Reorganized Debtors shall estimate appropriate Reserves to be set aside in the Disputed Claims Reserve or other Reserves necessary to pay or reserve for the payment of actual expenses and liabilities of the Debtors subject to such Reserves.

       (ii)       <u>Creditors' Fund:</u>  <u>Creditors' Fund:</u>  A separate trust fund denominated the Creditors' Fund shall be established by the Disbursing Agent for Distributions from the Reorganized Debtors for the benefit of Class 8C Claims when funds are distributable as set forth in the treatment provided in Section 4.8 of the Plan .  The Reorganized Debtors shall deposit to the Creditors' Fund the amounts distributable under Section 4.8 of the Plan for Class 8C Claims (the "Creditors' Fund Amount").  The Disbursing Agent shall maintain the Creditors' Fund until the Class 8C Distribution as set forth in Section 4.8 of the Plan has been completed. After the Class 8C Distribution has been made, the Creditors' Fund shall terminate and the Disbursing Agent shall disburse any funds in the Creditors' Fund at that time to the Debtors.

       Subject to the Disbursing Agent Agreement as approved by the Court, the Disbursing Agent shall (a) assist in calculating and verifying the Net Amount Distributable From EBITDA Calculation and the True Up Amount, (b) in calculating the amounts distributable to the Holders of Class 8C Claims from the Creditors' Fund and (c) both reserve for Disputed Class 8C Claims and make Distributions to the Holders of Allowed Class 8C Claims.   The Disbursing Agent shall make a Distribution to the Holders of Allowed Class 8C Claims (excluding, however, N. Jane Hendricks) and reserve a prorata Distribution to the Holders of a Disputed Class 8C Claim if  the amounts available in the Creditors' Fund at the time of a Distribution to the Holders of Allowed Class 8C Claims equals or exceeds two (2%) percent of the total amount of Class 8C Claims including for purposes of any Distributions, Disputed Amounts held in the Disputed Claims Reserve for Class 8C Claims but shall not make a Distribution if such amounts available in the Creditors' Fund are less than one (1%) of such total amount of Class 8C Claims.   The Disbursing Agent shall be entitled to make Distributions in its discretion if the amount available in the Creditors' Fund described above is equal to or greater than one (1%).   **As an example and for illustrative purposes only**, if the aggregate of Allowed Class 8C Claims and Disputed Claims in Class 8C equal $10,000,000.00 then the Disbursing Agent would need to have received at least $100,000.00 into the Creditors' Fund in order to make a discretionary distribution.  If the amount of $200,000 was received in the Creditors' Fund, the Disbursing Agent would be required to make a Distribution of the funds exclusive of any Disputed Claims Reserve for Disputed Class 8C Claims.

       **Notwithstanding the foregoing and any other provision of this Plan, neither the Debtors nor the Reorganized Debtors shall be obligated to make Minimum Payments or True Up Amount payments to the Disbursing Agent for the Creditors' Fund as set forth in Section 4.8 herein based upon the Allowed Class 8C Claim of N. Jane Hendricks nor shall the Disbursing Agent be obligated to collect or distributed funds from the Debtors or the Reorganized Debtors based upon the Allowed Class 8C Claim of N. Jane Hendricks.**

(iii)    **Negative Covenant**. Until the Class 8C Distribution to the Holders of Allowed Class 8 Claims is made, the Debtors shall make not declare or pay any dividends upon its stock or pay any distribution on its membership interests or make any distributions of cash to any Holders of Equity Interests on account of such Equity Interest save and except for the Pass Through Tax Payment necessary to provide for tax neutral treatment to the Holders of Allowed Equity Interests. Nothing herein shall limit a Holder of an Equity Interest from continuing to be employed by one or more of the Reorganized Debtors and from receiving compensation and benefits related to such employment. For illustrative purposes, this covenant does not prohibit or block compensation in the nature of salary or benefits earned by a person or payments for property leased at a market rate by a person who is also a Holder of Equity Interest. Any Holder of an Equity Interest who is employed by any of the Debtors shall be entitled to receive an appropriate increase in compensation of based upon the Consumer Price Index ("CPI") but not to exceed five (5%) per annum until such time as the Class 8C Distribution is completed under the Plan.

Larry G. Hendricks shall serve as the manager of HFG following the dates on which the Plan is confirmed and becomes effective, and shall remain as a manager of HFG so long as he is competent and willing. Each person holding an equity interest in HFG as of the Petition Date has the right (but not the obligation) to remain employed by HFG upon confirmation of the Plan, subject to the rights of HFG's manager to terminate or modify the terms of such employment. Until such time as all indebtedness due BB&T shall have been paid in full and the Holders of Allowed Unsecured Claims in Class 8C shall have received the Class 8C Distribution as provided in Section 4.8 of the Plan: (i) no such equity holder, nor any relative of such equity holder that has been employed by HFG or any of its affiliates within one year of the Petition Date (a "Subject Person"), shall receive a bonus or pay increase from HFG except for cost of living adjustments; and (ii) HFG's members shall not be allowed to sell, assign or distribute any of their membership interests in HFG except that any member of HFG may assign any or all of his or her membership interests to any relative, directly or through a trust or other estate planning device, at any time and without restriction and Larry Hendricks may pledge his membership interests to BB&T as contemplated hereby without restrictions. Each Subject Person shall be required to act in the best interests of HFG and its creditors so long as such Subject Person remains employed by HFG.

(iv)    **Consequences of Failure To Fund or Impossibility of Performance by Reorganized Debtors**

(A)    Failure to Fund If Funding Due:

(i)    If the Reorganized Debtors fail to fund to BB&T and to the Disbursing Agent for deposit to the Creditors' Fund by end of the sixth month after the end of the prior fiscal year for the Reorganized Debtor (the "True Up Date") the True Up Amount determined to be due based upon the Net Amount Distributable From EBITDA Calculation as determined on an annual basis at the end of the Reorganized Debtors' fiscal year (currently December 31st ), then the amount of any prepayment by reason of the cumulative Minimum Payments by the Reorganized Debtors made prior to the determination of that any True Up Amount is owing shall first be used to offset the unfunded True Up Amount and after such prepayments may have been fully utilized, the amount of any True Up Amount shall bear interest at the rate of Prime plus 0.25% until paid. If the Reorganized Debtors have failed to fund to BB&T and to the Disbursing Agent for deposit to the Creditors' Fund the True Up Amount due (after setoff and reduction for all Minimum Payments made prior to each True Up Date) on or before six (6) months after any True Up Date, then the Holders of Allowed Class 8C Claims would have the remedy of accelerating the balance of their debt subject to the cap of 32.5% less any amount previously funded to the Disbursing Agent and allocable to each Allowed Claim and exercise any available remedies free of any injunction provided by the Plan. Further, it is intended that such unfunded payments and all accrued interest thereon shall be paid as soon as the Reorganized Debtors are able to make the payments pursuant to Sections 4.6 and 4.8 of the Plan.

(ii)    If the Reorganized Debtors fail to fund to BB&T and to the Disbursing Agent for deposit to the Creditors' Fund the Minimum Payment amount, then the amount of such unfunded payment shall bear interest at the rate of Prime plus 0.25% until paid. Further, it is intended that such unfunded payments and all accrued interest thereon shall be paid at the time of the next Minimum Payment date or as soon as the Reorganized Debtors are able to make the payments pursuant to Sections 4.6 and 4.8 of the Plan.

Notwithstanding the foregoing, nothing set forth herein is intended to modify   or   limit any rights or remedies available to BB&T under the New BB&T Loan Documents or applicable law in connection with any default or event of default that may exist from time to time under the New BB&T Loan Documents except for a default arising exclusively as a result of any failure to pay the True Up Amount as set forth above.

(B)   Impossibility of Performance by the Reorganized Debtors.   In no event does the retention or acquisition of Equity Interests in the Reorganized Debtors entitle the Holder of such Equity Interests to any preferential treatment if any senior bank lender(s) (i) declares a default, does not waive or forbear from exercising its rights regarding such default and by the enforcement of the default prevents the Debtors from complying with the requirements of the Plan as confirmed , including the obligation to fund as and when determined to be due under the Plan including, without limitation, payments to the Creditors' Fund.   In the event that any senior bank lender(s) force an involuntary liquidation of the Debtors, no distributions shall be made by the Reorganized Debtors to the Holders of Equity Interests in respect of their Equity Interests other than payment of normal course of business salaries and expenses incurred in assisting in the orderly wind down and liquidation of the Reorganized Debtors' business operations until the Holders of Allowed Class 8C Claims are paid the full amount of their Allowed Class 8C Claims.

## D.   Responsibility for Distributions

(i)   For All Claims Other than Class 8C Claims.   The Debtors or the Reorganized Debtors shall be solely responsible for making the Initial Cash Distributions and all other payments and Distributions under the Plan required to be made after the Effective Date, including, without limitation, the payment of Allowed Amounts to unclassified Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Workers Compensation Claims, BB&T Claims, GE Commercial Finance Claims, Convenience Claims and Class 8B Claims, save and except for Distributions to the Holders of Allowed Class 8C Claims which shall be made by the Disbursing Agent, all Distributions subject to appropriate Reserves as described in the Plan.

(ii)   For Class 8C Claims.   The Debtors have requested that the Court appoint a Disbursing Agent for purposes of verifying the Net Amount Distributable From EBITDA Calculation, for collecting the distributable funds for the Creditors' Fund and for making Distributions shall be solely responsible for making Distributions under the Plan required to be made after the Effective Date to the Holders of Allowed Class 8C Claims.   As set forth above, the form of a proposed Disbursing Agent's Agreement is filed with the Plan or a part of the Plan Supplement.   The Debtors reserve the right to seek appointment of a Disbursing Agent and approving the Disbursing Agent Agreement as it may be modified or amended as part of the Confirmation Order or a separate Order.

## E.   Retention of Rights, Causes of Actions and Defenses.   Except as expressly provided for in the Plan or the Confirmation Order, any and all Causes of Action, of any kind or nature whatsoever, against parties arising before the Effective Date, whether known or unknown, asserted or unasserted, matured or unmatured and regardless of whether the existence of same has been disclosed, including Avoidance Actions, shall survive the Effective Date of the Plan and shall be preserved for the benefit of the Debtors and their creditors, and shall be enforceable by the parties set forth herein in the name of the Debtors or otherwise.   The primary responsibility for the prosecution and settlement of such Causes of Action, including Avoidance Actions, shall be vested in the Debtors. The Debtors may, in their sole discretion, pursue those Causes of Action, including Avoidance Actions, as appropriate, in accordance with their business judgment, of what is in the best interests, and for the benefit of the Debtors or the Reorganized Debtors, their Estates and their Assets.

Subject to the foregoing proviso, the Debtors shall retain all rights to pursue, settle or abandon such Causes of Action that have vested in each of them as a representative of the Estates pursuant to section 1123(b)(3) of the Code in accordance with the Plan and the Confirmation Order.  All Causes of Action, including Avoidance Actions, are reserved and preserved to the extent set forth in the Plan, including, without limitation, this Section and Section 10.2 of the Plan.  Confirmation of this Plan shall not be deemed res judicata or waiver or the basis for estoppel or create any defense as to the prosecution to judgment on the merits of any and all claims by the Debtors, Causes of Action, including without limitation, the Avoidance Actions by the Debtors,

whether an action to prosecute such claims of the Debtors or Causes of Action are filed prior to or after confirmation of the Plan.

All Avoidance Actions that are pending at the Confirmation Date are specifically preserved and reserved and shall continue in the same status as existed on the Confirmation Date subject to further order of the Court.

For the avoidance of doubt, the Debtors acknowledge and confirm (i) that all BB&T Claims and all Liens securing such BB&T Claims are valid and perfected and are not subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) any period of time for challenging such BB&T Claims and Liens by any person entity has lapsed and expired, and (iii) any and all Causes of Action, including Avoidance Actions, against BB&T or with respect to any BB&T Claims or Liens have been waived, in each case, in accordance with the provisions of the DIP Orders, including without limitation Paragraph 30 of the Final DIP Order.

**Notwithstanding the foregoing or any other provision of this Plan, if this Plan is confirmed and the Effective Date occurs, the Debtors (i) shall not pursue Avoidance Actions that may or may not exist and (ii) shall not use the possible existence of an Avoidance Action to object to any Claim.  Nothing shall prevent the Debtors, the Committee or any other party in interest from pursuing all other objections to Claims or from asserting any facts or claims, relating in any manner to any Avoidance Action as a defense, affirmative defense or counterclaim to any Cause of Action that may be commenced against or in reference to any one or more of the Debtors or the Reorganized Debtors.**

F.      **Considerations Concerning the Claims Objection Deadline.**

The Claims Objection Deadline shall be one hundred-twenty (120) days after the Effective Date. Notwithstanding any of the foregoing, the Debtors, the Reorganized Debtors or the Committee may request from the Bankruptcy Court an extension of the Claims Objection Deadline, which extended date shall become the new Claims Objection Deadline.

The Debtors, the Reorganized Debtors or the Committee shall have the responsibility for reviewing and objecting to the allowance of any Claim filed in the Chapter 11 Cases as set forth below.   If the Debtors or the Committee have objected to claims prior to the Effective Date, such party may continue to prosecute such objections.

Subject to the foregoing after the Effective Date, the Debtors, the Reorganized Debtors or the Committee may object to Claims and shall have until the Claims Objection Deadline, as it may be extended, to file objections to Claims.  All objections shall be litigated to a Final Order or settled with Bankruptcy Court approval. Notwithstanding the foregoing, nothing in this Plan shall be interpreted to operate as a waiver or release of (x) any right that any party in interest may have to object to (a) any Claim prior to the Effective Date or (b) any Fee Claim after the Effective Date; or (y) any pending objection to Claims pending as of the Effective Date, regardless of whether such objection was brought by the Debtors, the Reorganized Debtors, the Committee or any other party in interest.

Objections to Claims shall not be subject to any defense, including, without limitation, res judicata, estoppel or any other defense because of the confirmation of the Plan and all such objection rights are expressly preserved and reserved by the Plan for the Debtors and  their Estates.

G.      **Considerations Concerning Discharge, Waivers, Injunctions and Exculpation Under the Plan.**

**The Plan provides for waivers, injunctions and exculpations under Article X of the Plan. The Debtors believe that the waivers, injunctions and exculpations being given under the Plan are supported by valuable consideration and are appropriate support  confirmation of the Plan.**

(i)    **Discharge.**  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors and all successors in interest, including, without limitation, the Reorganized Debtors, shall be discharged from, and the Confirmation Order shall operate as a permanent injunction against, the commencement or continuation of any action, the employment of any process, or any act to collect, recover, offset or recoup, right to sue, on account of any Claim, from or against the Debtors, their Estates and any and all successors in interest (including, without limitation, the Reorganized Debtors, any direct or indirect transferee of any property or any direct or indirect successor in interest), and all successors' liability in respect thereof shall be extinguished completely, and the Debtors and all successors in interest (including, without limitation, the Reorganized Debtors, any direct or indirect transferee of any property or any direct or indirect successor in interest) shall be released and discharged from any Claim or Interest of a kind specified in section 502(g), 502(h) and 502(i) of the Code, whether or not a proof of such Claim is filed or deemed filed under section 501 of the Code, such Claim is allowed under section 502 of the Code, or the Holder of such Claim or Interest has accepted the Plan.  All Holders of Claims, shall be precluded and enjoined, from and after the Confirmation Date, from asserting against the Debtors, their Estates or any successors or assigns in interest or any of their respective Assets or property, based upon any Claim, existing prior to the Confirmation Date, whether or not such Holder has filed a proof of Claim and whether or not the facts or legal basis therefore were  known or existed prior to the Confirmation Date.

In accordance with the foregoing, except as provided in the Plan or the
 Confirmation Order, as of the Effective Date, the Confirmation Order will be a judicial determination of a discharge of all Claims against the Debtors, pursuant to sections 524 and 1141 of the Code, and such discharge will void any judgment obtained against a Debtor or its successors at any time and shall act as res judicata or collateral estoppel as against third parties, but not as to the Debtors, their Estates or any and all successors in interest.  Except as otherwise provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made thereunder, shall completely satisfy all existing Claims and all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their respective Assets to the fullest extent permitted by section 1141 of the Code.  whether or not the facts or legal basis

(ii)  **Special Discharge Provisions for Class 8C Claims.**    Notwithstanding the Discharge provisions of this Plan, the Claims of the Holders of Allowed Class 8C Claims shall not be discharged until the Class 8C Distribution has been made to the Holders of Allowed Class 8C Claims.   The Holders of Allowed Class 8C Claims shall be subject to the provisions of the Plan, including, the injunction relief set forth in the Plan and applicable law against taking, directly or indirectly, any action against the Debtors, the Reorganized Debtors or the Disbursing Agent based on the existence of any Class 8C Claim other than to seek to enforce the rights of such Holder pursuant to the Plan.  Upon the payment of the Class 8C Distribution to the Holders of Allowed Class 8C Claims (excluding, N. Jane Hendricks), the balance of all Class 8C Claims existing as of the Confirmation Date (other than the Hendricks Claims that are being subordinated under the Plan) shall be deemed fully and completely discharged by the Plan.

(iii)    **Term of Injunctions or Stays.**  Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date after which the permanent injunctions of the Plan and the Code will be given full force and effect.

(iv)    **Exculpation**. **From and after the Effective Date, except as specifically provided herein or in any agreement or instrument contemplated herein: (a) the Debtors, (b) all current officers and directors of the Debtors, and all other agents, employees, professionals, and representative of the Debtors; (c) the Committee, their members, acting in such capacity, and its professionals; and (d) BB&T and its agents, employees and professionals (collectively, with each of their predecessors and successors in interest and their respective officers, directors, employees, agents, professionals and other representatives, acting in such capacity, the "Exculpated Parties") shall neither have nor incur any liability to any Holder of a Claim or Interest, or a governmental entity on behalf of a Holder of a Claim or Equity Interest for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan, Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors arising from and after the Petition Date until the Effective Date (the "Exculpated Claims") to**

the fullest extent permitted by law; **provided**, **however**, that the foregoing provisions of this Section of the Plan shall have no effect on the liability of any entity that results from any such act or omission that has been determined in a Final Order to have constituted willful misconduct. From and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any Exculpated Claims against an Exculpated Party pursuant to the Plan.

(v)    **Injunction.** *Confirmation of this Plan shall have the effect of, among other things, permanently enjoining all Persons who have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in any of the Debtors or the Reorganized Debtors against any of the Debtors or Reorganized Debtors or their Assets, including but not limited to Holders of Class 8B and 8C Claims, with respect to any such Claim or Interest from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under or expressly reserved by the Plan): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Assets; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Assets; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Asset; (d) asserting any right of setoff, or recoupment directly or indirectly, against any obligation due or Assets of the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Assets, except as contemplated or allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (f) prosecuting or otherwise asserting any Claim or Interest, including any right, claim or cause of action, released pursuant to the Plan. Any Person who accepts the Plan, either by affirmation vote or by the acceptance of the Plan by the consolidated Class in which such Person is a member, shall be deemed to have given the releases, waivers, injunctions and exculpations to the fullest extent provided by law.*

H.    **Considerations Concerning the Board of Directors, Manager and Management of the Debtors:**

The management of the Debtors is described below and is intended to include the following post-confirmation. The Finley Group is assisting the Debtors in interviewing additional and new senior management personnel from outside the Debtors' current employees to fulfill roles going forward for the Debtors including, the Chief Financial Officer position.

**HFG Manager and Officers and Compensation.** The officers of the HFG that will continue after the Effective Date and their salaries will be as follows:

Larry G. Hendricks, Chairman and Manager ($100,000.00 annually)
Chad Hendricks, President ($175,000.00 annually)
Jane Hendricks, Secretary ($100,000.00 annually)

**Classic Officers and Directors and Compensation:**

Larry G. Hendricks, President and Director (included as set forth above)
Jane Hendricks, Secretary and Director (included as set forth above)

I.    **Substantive Consolidation.** For the purposes of the Chapter 11 Cases and the Plan only, all assets and liabilities of the Debtors will be substantively consolidated on the Effective Date. As a result, Claims filed against multiple consolidated Debtors seeking recovery of the same debt shall be Allowed

only once against such Debtors regardless of any differences in the legal theories supporting the various Claims and Pre-Petition Related-Party Claims shall be disregarded for voting or distribution purposes.  For any Debtors not included in the substantive consolidation, the treatment of those creditors will be as set forth in the Plan as amended as a joint plan or by a separate plan.

        The Debtors decision to seek substantive consolidation solely for purposes of voting on the Plan, Confirmation of the Plan and making and receiving Distributions under the Plan is based on, among other factors, an analysis of the facts and circumstances surrounding the Debtors, including the Debtors' financial and accounting structure and business operations, the existence of some inter-companies guarantees and the Pre-Petition Related-Party Claims reconciliation.  The entry of the Confirmation Order confirming the Plan shall constitute approval by the Bankruptcy Court pursuant to Sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Confirmation Date, of the substantive consolidation of the Debtors and their respective Estates  solely for purposes of voting on the Plan, Confirmation of the Plan and making and receiving Distributions under the Plan and for no other purpose.

        Notwithstanding the foregoing, (i) the treatment proposed by the Debtors to the Holders of Allowed Secured Claims against each Debtor after the Effective Date shall be unaffected by such substantive consolidation, (ii) any Liens that are maintained, recognized, or preserved hereunder shall be unaffected by the substantive consolidation, and (iii) any claims under or with respect to any insurance policy of any Debtor (or any right to the proceeds of any such policy or policies) shall be unaffected by the substantive consolidation.

        Substantive consolidation of the Debtors shall not:

        (a)      affect the legal and organizational structure of each Debtor from and after the Effective Date;

        (b)      affect or change any Cause of Action or other claim that\ any Debtor would possess had any of the Chapter 11 Cases not been substantively consolidated as provided herein or any defenses that any defendant in respect of such Causes of Action would have in connection therewith;

        (c)      destroy or otherwise affect the separate corporate existence of each Debtor and the ownership interest in each Debtor; or

        (d)      divest any Debtor of any tax attributes.

        The Plan shall be deemed a motion, pursuant to Bankruptcy Rule 9013, by the Debtors for the limited substantive consolidation with respect to the Plan as set forth herein.   Any objection by an affected Creditor to such consolidation shall be treated as an objection to Confirmation and shall be determined by the Bankruptcy Court at the Confirmation Hearing.

        **J.**      **Retention of Jurisdiction**.  After the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, for the following purposes set forth in Section 11.1 of the Plan.

     **VI.**     **FINANCIAL PROJECTIONS**.

        One of the conditions to confirmation of a Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  The Debtors believe that the Plan meets this condition and the other requirements for confirmation.   Attached hereto as **Exhibit B** are financial projections of the Debtors containing a projected income statement, balance sheet and statement of cash flows (the "Projections").  The Projections forecast financial information for each Reorganized Debtor on an annual basis from 2009 through the year 2018.

The Projections have been prepared by or under the direction of the Debtors' management and have not been audited.  The Projections present, to the best of the Debtors' management's current belief, the expected financial results for the periods projected, subject to the various assumptions set forth therein.  Readers are urged to review carefully all of the disclaimers, notes and assumptions included in the Projections and to consult with their own financial, legal, and tax advisors regarding the same.

**THE PROJECTIONS ARE INHERENTLY SPECULATIVE AND REQUIRE A SIGNIFICANT AMOUNT OF ESTIMATED OR FORECASTED DATA. BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH THOUGH CONSIDERED REASONABLE BY THE DEBTORS AT THE TIME THEY WERE PREPARED, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY, LEGISLATIVE, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTIONS.  IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTINS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD.  CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE COMMITTEE OR ANY OTHER PARTY THAT THE PROJECTED RESULTS WILL BE ACHIEVED.   THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.   SOME ASSUMPTIONS WILL INEVITABLY NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED, OR THAT WERE NOT THEN KNOWN TO THE DEBTORS, MAY BE MATERIALLY DIFFERENT FROM THOSE ASSUMED.   THE PROJECTIONS THEREFORE MAY NOT BE RELIED UPON AS AN OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.**

**INFORMATION INCLUDED IN THE PROJECTIONS CONTAINS FORWARD LOOKING STATEMENTS WITHIN THE MEANING OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED.  SUCH FORWARD LOOKING INFORMATION IS BASED ON INFORMATION AVAILABLE WHEN SUCH STATEMENTS ARE MADE AND IS SUBJECT TO RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN THE STATEMENTS.**

**THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.   ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS AT ANY TIME PRIOR TO OR AFTER THE EFFECTIVE DATE.**

*General Assumptions*

1. The Projections assume a Substantive Consolidation Plan treatment for the Debtors and that the Plan will be implemented in accordance with its stated terms.

2. The Projections are inherently uncertain as they are based on estimates and assumptions that rely on the forecast of key economic variables, including, but not limited to consumer confidence, consumer spending trends and the ability to maintain good customer relations in the current economic environment.

3. The Projections contemplate only pass-through corporate federal tax payments by HFG's due to it's status as an S-Corporation; however, no tax payments are shown as the Projections contemplate the Debtors' tax-loss carry forwards offsetting income throughout the forecast period

4. Classic will continue to operate as a separate entity and maintain its C-Corporation tax status

5. Classic and HFG will be co-borrowers for exit financing and all of their assets have been pledged as collateral supporting the exit financing credit facility

6. The Company's 2008 actual performance and 2009 year-to-date results serve as the baseline for projecting the remainder of 2009 and beyond

7. The Projections only contemplate the go-forward locations which include Hickory, High Point, Charlotte, Mocksville, North Carolina (collectively the "Retail Operations"), and Conover, North Carolina which provides for the corporate office as well as Classic Moving & Storage ("Classic")

8. Income Statement / Sales projections:

    i. Utilization of 4-wall income statement from the Retail Operations
    ii. During 2010 a 20% comp store sales increase is projected over 2009 for the Retail Operations
    iii. A 12% comp store sales increase is assumed for 2011
    iv. A sales growth factor of 3% is projected for the remainder of the forecast
    v. A new merchandising strategy focused on lower price points coupled with significant margin improvements over 2009 beginning in 2010; however, returning to 2008 historical performance
    vi. Implementation of an overall right-sized operating / cost structure with reductions in corporate expenses and certain overhead and lease costs
    vii. Classic is projected to deliver the sales for the Retail Operations at arm's-length competitive delivery rates
    viii. Classic's non-HFG warehouse and delivery revenues are forecasted to remain at the current run rate performance of ~$90,000 per month
    ix. Refinement in the selling expenses associated with the Retail Operations whereby commission based sales associates are compensated based on gross profit instead of percentage of sales
    x. No salary or wage increases forecasted over the existing 2009 compensation structure and only nominal inflationary increases contemplated throughout the projection period
    xi. Certain wind-down payments associated with the Company's previous self- insured workers' compensation and health care plans are included in the projections
    xii. Certain Minimum Payments as outlined in the Plan
    xiii. No new retail locations are planned to be opened during the entire projection period and no closure of current retail locations.

9. Balance Sheet Projections:

    i. Certain debt forgiveness and or restructuring as outlined in the Plan
    ii. Exit financing (including cost of funds which are not forecasted to increase during the projection period) as outlined in the Plan
    iii. The future credit markets together with the Debtors future financial performance should provide the Debtors the ability to re-finance the exit credit facility as they mature during the projection periods
    iv. DIP Lender Debt for equity conversion as outlined in the Plan
    v. Vendor trade credit support is contemplated and should be sufficient to provide Debtor that portion of its working capital requirements as illustrated in the projections

## VII.   CERTAIN CONSIDERATIONS REGARDING RISK.

The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the Exhibits hereto. ***You should consult your legal,***

*financial, and tax advisors regarding the risks associated with the Plan and the distributions you may receive thereunder*.

***Certain Risks Associated with the Chapter 11 Cases:***  The Debtors are parties to various material contractual arrangements under which the commencement of transactions contemplated by the Plan could, subject to the Debtors' rights and powers under sections 362 and 365 of the Bankruptcy Code: (a) result in a breach, violation, default, or conflict; (b) give other parties thereto rights of termination or cancellation; or (c) have other adverse consequences on the operations of the Debtors.  The magnitude of any such adverse consequences may depend upon, among other factors, the diligence and vigor with which the other parties to such contracts may seek to assert any such rights and pursue any such remedies in respect to such matters, and the ability of the Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.  Further creditors may object to the classification of their Claims and/or oppose Confirmation of the Plan.  There can be no assurance that the requisite acceptances for confirmation of a chapter 11 plan will be received or that the Bankruptcy Court will confirm the Plan.  If the Plan is not confirmed, it is unclear what Distributions, if any, the Holders of Allowed Claims would receive with respect to their Allowed Claims.   If the Plan is not confirmed and an alternate reorganization plan is not confirmed, it is possible that the Debtors would have to liquidate their Assets, in which case the Debtors believe the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan if they received anything at all.  The Debtors have reserved the right to seek a nonconsensual confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code and believe that the Plan satisfies the requirements of that section; however, there is not assurance that the Bankruptcy Court will reach this conclusion, in which case the Plan may not be confirmed.

***Risks Relating to the Projections:***  The Debtors have prepared projections in connection with the development of the Plan and to present the projected effects of the Plan and the projected results of operations following the Effective Date of the Plan.  These projections assume the Plan and transactions contemplated thereby will be implemented in accordance with their terms.  The assumptions and estimates underlying such projections are inherently uncertain and are subject to, among other factors, business, economic, legislative, and competitive risks and uncertainties that could cause actual results to differ materially from those projected.  Such uncertainties and other factors include approval by the Bankruptcy Court of the Plan and potential objections of third parties.  Accordingly, the projections herein are not necessarily indicative of the future financial condition, results of operations, or equity value of the Debtors, which may vary materially from those projections.  Although the Financial Projections represent management's view based upon current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee by the Debtors, their advisors, or any other person that the Financial Projections will be realized.

***Value of the Hendricks Furniture Group:***  The most significant portion of the value of the Debtors' estates is continuation of the business by HFG.  Because of the nature of the HFG's industry, and a variety of other factors, including without limitation, the general state of the economy from time to time, a retail furniture operation could potentially decrease in the future, and the ultimate recovery to the creditors is uncertain and cannot be predicted.

***Risks Relating to Distributions to Creditors:***  The Plan provides for the  distribution to the Holders of Allowed Claims.  However, the ultimate recovery to creditors under the Plan will depend upon a variety of factors many of which are outside of the control of the Debtors and the ultimate recovery could be more or less than that estimated depending on future operations and the treatment afforded such Allowed Claims.

***Leverage, Liquidity, and Capital Requirements:***  The Debtors' principal sources of liquidity following their emergence from bankruptcy will be net proceeds generated by it business operations. While the Debtors believe that they will have adequate liquidity to meet requirements following the Effective Date of the Plan, no assurances can be had in this regard.

***Highly Competitive Industry:***  There can be no assurance that increased competition in the future will not adversely affect the Debtors' financial condition and results of operations.

***Certain Risks of Non-Occurrence of the Effective Date:***  The consummation of the Plan is subject to certain conditions.  There can be no assurance that all of the conditions necessary for the Plan to become

"Effective" will be met.  If the Plan were not to be consummated or become "Effective", it is unclear whether the restructuring could be implemented and what distribution Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests.  If an alternative plan of reorganization could not be agreed to and confirmed, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that it is likely that Holders of Claims or Interests would receive drastically less than the treatment they will receive pursuant to the Plan.

> ***Reliance on Key Personnel:***  HFG is reliant on certain of its key personnel.  There can be no assurance that HFG will be able to retain or employ qualified personnel.  Loss of key personnel could have a material adverse effect on HFG.

> ***Prolonged Continuation of the Chapter 11 Cases May Harm the Debtors' Business:***  The prolonged continuation of these Chapter 11 Cases may adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue without a confirmed plan, the more likely it is that the Debtors' employees, customers and suppliers may lose confidence in the Debtors' ability to successfully reorganize their business and seek alternative commercial options.  Further, so long as the Chapter 11 Cases continue without a confirmed plan, the Debtors will incur substantial costs for professional fees and expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases will also require the Debtors to seek continued use of cash collateral of BB&T or additional financing to operate their businesses.  BB&T may not continue to consent to the extended use of cash collateral and it may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially reasonable terms or at all.

> ***Risks of Non-Confirmation of the Reorganization Plan:***  If the Plan is not confirmed, it is unclear what Distributions, if any, the Holders of Allowed Claims would receive with respect to their Allowed Claims. If the Plan is not confirmed and an alternate reorganization plan could not be confirmed, it is possible that the Debtors would have to liquidate their Assets, in which case the Debtors believe the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan if they would received anything at all based upon the Liquidation Analysis attached to this Disclosure Statement and incorporated herein by reference.

## VIII.    CERTAIN TAX CONSEQUENCES OF THE PLAN.

### A.    General.

The following discussion is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain holders of Claims and Interests.  This description is for informational purposes only and, due to the lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only a general summary of principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims and Interests who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of a Claim.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The following United States federal income tax consequences are based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the IRS as in effect on the date hereof.  Changes in such rules or new interpretations thereof may occur, possibly with retroactive effect, and could significantly affect the United States federal income tax consequences described below.

This summary does not address foreign, state or local tax consequences or any non-income tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, FOREIGN, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### B.      Federal Income Tax Consequences to the Debtors.

The tax consequence to the debtors will vary by the specific tax entity type of each debtor.  Hendricks Furniture Group, LLC is taxed as an S-corporation for income tax purposes; where both Classic Moving and Storage, Inc. and Norris Furniture and Interiors, Inc. are tax as a C-corporation.  The fact that the debtors are taxed under different methodology adds complexity in the application of the following.  These entities do not file as part of a consolidated or combined tax filing and as such will need to apply the following on a separate entity basis.

### 1.      Cancellation of Indebtedness Income.

Upon implementation of the Plan, the amount of the Debtors' aggregate outstanding indebtedness may be substantially reduced.  In general, the discharge of a debt obligation in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt gives rise to cancellation of indebtedness ("COD") income to the debtor. However, COD income that arises in a Title 11 bankruptcy case is excluded from tax.  In order to exclude such COD income from tax in the year of debt cancellation, the debtor's will be required to reduce certain tax attributes in the year following discharge, generally in the following order: (a) net operating losses ("NOLs") (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the debtor's depreciable and non-depreciable assets (but not below the amount of the debtor's liabilities immediately after the discharge); (f) passive activity loss and credit carryovers for a C-Corporation; and (g) foreign tax credit carryforwards.  To the extent the amount of COD income exceeds the tax attributes available for reduction, the excess COD has no further tax consequences. A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets.  The reduction in tax attributes occurs after the end of the tax year in which the debt discharge occurs.

For an S-Corporation treatment, the amount of COD exclusion and attribute reduction are to be applied generally at the corporate level.  However for the purpose of an S-corporation a shareholder's loss in excess of the shareholder's adjusted stock basis shall be treated as a net operating loss subject to reduction.

As a result of the discharge of Claims pursuant to the Plan, the Debtors may realize significant COD income.  The amount of such COD income and the extent of the resulting tax attribute reduction will depend, in part, on the fair market value, as of the Effective Date, of the value of the distributions to creditors.  It is possible that the Debtors' NOL and capital loss carryforwards could be significantly reduced or eliminated and that the respective Debtors' tax basis in their assets also may be reduced.

The operating Debtors shall continue to report all income and expenses, including, without limitation, the proceeds of any Sale Transaction for its tax returns.

2.        **IRC Section 382 - Limitations on NOL Carryforwards.**

The Debtors do not anticipate that they would experience an "ownership change" (within the meaning of IRC Section 382) on the Effective Date.    However, issues involved with a determination of an ownership change are discussed below.

IRC Section 382, generally applies if a if a C-corporation undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally is subject to an annual limitation.    In general, the amount of the annual limitation to which the losses are subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs.    For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change, also with certain adjustments.    The stock value in this case would take into account any increase in value resulting from the surrender of creditors' claims.    In the case of "built-in" losses and deductions (such as depreciation), the annual limitation applies only for five years after the ownership change and only to the extent of the "net" unrealized built-in loss as of the ownership change.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.    However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

The operation and effect of IRC Section 382 will be materially different from that just described if the Debtors are subject to the special rule for corporations in bankruptcy provided in IRC Section 382(I)(5).    This special rule may apply where, immediately after a corporation's emergence from bankruptcy, its shareholders and certain "qualified" creditors own at least 50% of the stock of the corporation.    If this rule were to apply, the Debtors' ability to utilize their pre-Effective Date NOLs would not be limited as described above.    However, several other limitations would apply to the Debtors under IRC Section 382(I)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged for new common stock, if any, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' IRC Section 382 annual limitation with respect to that ownership change would be zero.    A corporation that qualifies for IRC Section 382(I)(5) may elect not to have its provisions apply, in which case the annual limitation rules described above would apply.    The Debtors have not determined whether they would qualify for IRC Section 382(I)(5), or if they would elect to have the IRC Section 382(I)(5) rules apply to the ownership change that is expected to arise from the consummation of the Plan.

3.        **Net Unrealized Built-in Loss or Gain.**

As indicated above, IRC Section 382 can operate to limit built-in losses recognized subsequent to the date of the ownership change.    If a loss corporation has a "net unrealized built-in loss" at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.    Conversely, if the loss corporation has a "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its pre-change losses against such built-in gains in addition to its regular annual allowance.    Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in

loss.  Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain.  In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  The Debtors may have a net unrealized built-in loss.

### 4.      Alternative Minimum Tax.

In general, an alternative minimum tax ("AMT") is imposed on a C-corporation's alternative minimum taxable income at a 20% tax rate to the extent such tax exceeds the corporation's regular federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, a corporation is generally not allowed to offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards.

In addition, if a corporation undergoes an ownership change within the meaning of IRC Section 382 and has a net unrealized built-in loss (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets should be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

### C.      Federal Income Tax Consequences to Holders of Claims.

The United States federal income tax consequences of the transactions contemplated by the Plan to a holder of Allowed Claims (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) whether the Claim and the consideration received in respect thereof are "securities" for federal income tax purposes; (2) the manner in which a holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; (8) whether the Claim is an installment obligation for federal income tax purposes, and (9) potentially other factors and facts.  **Therefore, holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan**.  This discussion assumes that the holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year.

### 1.      Accrued Interest.

Under the Plan, if any cash or other property is distributed or deemed distributed to certain holders of Claims with respect to their Claims for accrued interest, holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary interest income equal to the amount of cash or other property received with respect to such Claims for accrued interest.  Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest.  The adjusted tax basis of any property received in exchange for a Claim for accrued interest will equal the fair market value of such property of the Effective Date, and the holding period for the property will begin on the day after the Effective Date.  The extent to which consideration distributable under the Plan is allocable to interest is not clear.  Holders of Claims are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

### D.      Information Reporting and Backup Withholding.

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject

to backup withholding under certain circumstances.  Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate Claim for refund with the IRS.

**CIRCULAR 230 DISCLOSURE:   PURSUANT TO U.S. TREASURY DEPARTMENT CIRCULAR 230 REGULATIONS, WHICH GOVERN PRACTICE BEFORE THE INTERNAL REVENUE SERVICE, PLEASE BE ADVISED THAT ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT OR PLAN (INCLUDING ATTACHMENTS) HAS NOT BEEN PREPARED TO BE USED AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED BY THE INTERNAL REVENUE SERVICE.**

## IX.    CONFIRMATION PROCEDURES.

**PERSONS CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.**  The following discussion is intended solely for the purpose of alerting readers about certain basic Plan confirmation issues, which they may wish to consider.  The Debtors *CANNOT* and *DO NOT* represent that the discussion contained below is a comprehensive summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Plan.  Some of the requirements discussed in this Disclosure Statement include acceptance of the Plan by the Voting Classes, whether the Plan can be confirmed even if one or more Classes do not accept the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  These requirements, however, are not the only requirements for confirmation.

### A.    Voting And Right To Be Heard At Confirmation.

#### 1.    Who May Support Or Object To Confirmation Of The Plan.

Any party in interest may support or object to the confirmation of the Plan.  As explained in further detail below, entities that may not have a right to vote (e.g., entities whose Claims or Interests belong to an Unimpaired Class or to a Class that will receive no Distribution under the Plan) may still have a right to support or object to the confirmation of the Plan.

#### 2.    Who May Vote To Accept Or Reject The Plan.

A creditor generally has a right to vote for or against the Plan if that creditor has a Claim that is both "allowed" for purposes of voting and classified in an Impaired Class.  Notwithstanding the foregoing, under section 1126(g) of the Bankruptcy Code, impaired classes that will neither receive nor retain any consideration under a plan are deemed to have rejected the plan and do not vote.

Under the Plan, only Holders of Allowed Claims in Classes 1,6, 7 and 8 and

the Holders of Allowed Interest in Class 9 (the aforementioned "Voting Classes") are entitled to vote on the Plan. Holders of Claims in Classes 2, 3, 4 and 5 are Unimpaired and deemed to have accepted the Plan.

### 3. What Is An Allowed Claim For Voting Purposes.

As noted above, a creditor's Claim must be "allowed" for purposes of voting in order for such creditor to have the right to vote. Generally, for voting purposes a Claim is deemed "allowed," absent an objection to the Claim, if: (a) a proof of Claim was timely filed, or (b) if no proof of Claim was filed, the Claim is identified in the Debtors' Schedule of Assets and Liabilities as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules of Assets and Liabilities, in which case the Claim will be deemed allowed for the specified amount for voting purposes. In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes. The Debtors, the Reorganized Debtors and the Committee have reserved all rights to review and object to Claims after the Effective Date pursuant to the Plan.

Note that the definition of "Allowed Claim" used in the Plan for purposes of determining whether creditors are entitled to receive Distributions thereunder may differ materially from that used by the Bankruptcy Court to determine whether a particular Claim is "allowed" for purposes of voting. Holders of Claims are advised to review the definitions of "Allowed Claim" and "Disputed Claim" in the Plan to determine whether they may be entitled to receive distributions under the Plan.

### 4. What Is An Impaired Class Of Claims Or Interests.

As noted above, a Claim or Interest that is "allowed" for voting purposes only has the right to vote if it is in a Class that is Impaired under the Plan and if that Class will receive or retain any consideration under the Plan. A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the Holders of Claims or Interests of that Class. As noted, under the Plan, all Classes are Impaired except Classes 3, 4 and 5.

### 5. Who Is Not Entitled To Vote.

The Holders of the following types of Claims are not entitled to vote: (a) Claims that have been Disallowed; (b) Claims that are subject to a pending objection and that have not been allowed for voting purposes; (c) Claims in Unimpaired Classes; (d) Claims entitled to priority pursuant to sections 507(a)(1), 507(a)(2), and 507(a)(8) of the Bankruptcy Code; and (e) Allowed Claims in Classes 1, 3, 4 and 5 which Holders are not entitled to vote because such Classes are not treated as Impaired and are deemed to have accepted the Plan. Holders of Claims entitled to priority pursuant to sections 507(a)(1), 507(a)(2), and 507(a)(8) of the Bankruptcy Code are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Even if your Claim or Interest is of the type described above, you may still have a right to support or object to the confirmation of the Plan.

### 6. Votes Necessary To Confirm The Plan.

The Court cannot confirm the Plan unless: (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class; and (b) either all Impaired Classes have voted to accept the Plan, or the Plan is eligible to be confirmed by "cramdown" with respect to any dissenting Impaired Class as discussed in section 1129(b) of the Bankruptcy Code.

### 7. Votes Necessary For A Class To Accept The Plan.

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims that actually voted have voted in favor of the Plan.

### 8.    Treatment Of Non-Accepting Classes.

As noted above, even if all Impaired Classes do not accept the proposed Plan for a particular Debtor, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which a Plan is confirmed despite rejections by non-accepting Classes and made binding on those Classes is commonly referred to as a "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims or Interests if the Plan meets the requirements of section 1129(a)(1) through (a)(7) and 1129(a)(9) through (a)(16) of the Bankruptcy Code for a particular Debtor and if the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to non-accepting Classes of a particular Debtor as those terms are defined in section 1129(b) of the Bankruptcy Code section.

### 9.    Request For Confirmation Despite Non-Acceptance By Impaired Classes.

By the Plan, the Debtors have asked the Bankruptcy Court to confirm this Plan by cramdown on any Classes that are deemed to have rejected the Plan and on any Impaired Voting Class that does not vote to accept the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### B.    Hypothetical Liquidation Analysis.

Another confirmation requirement is the "Best Interest Test" or "Hypothetical Liquidation Test" incorporated in section 1129(a)(7) of the Bankruptcy Code.  The test applies to individual Holders of Unsecured Claims and Holders of Interests that are both (i) in Impaired Classes under the Plan, and (ii) do not vote to accept the Plan.  Section 1129(a)(7) of the Bankruptcy Code requires that such Holders of Unsecured Claims and Holders of Interests receive or retain an amount under the Plan as it relates to a particular Debtor not less than the amount that such Holders would receive or retain if that particular Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

The Debtors do not intend that the Chapter 11 Cases actually will be converted to chapter 7 liquidations.  However, in order to apply the Best Interest Test, the Debtors have prepared a hypothetical liquidation analysis including the assumption as an integral part thereof for the Debtors attached hereto as Exhibit C.  The hypothetical liquidation analysis projects an estimate of what Holders of Unsecured Claims and Holders of Interests might receive in the event the Debtors' Chapter 11 Cases were to be converted to chapter 7 cases and the Debtors' assets subsequently liquidated.  **This hypothetical liquidation analysis is based upon assumptions that the Debtors believe to be reasonable based upon the best information available to them.  However, there are numerous economic, legal, operational, and other uncertainties that could dramatically change the results in an actual liquidation.  Moreover, because the businesses in which the Debtors' operate are highly competitive and dependent on other industries like the housing industry, there may be significant consequences and restrictions in a liquidation that cannot be predicted with any certainty.  Thus, there can be no guaranty that an actual liquidation of the Debtors would result in the projected recoveries for any party.**

In a typical chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code.  Secured creditors generally are paid first from the sales proceeds of properties securing their liens.  If any assets are remaining in the bankruptcy estates after the satisfaction of secured creditors' claims from their collateral, administrative expenses generally are next to receive payment.  Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

The hypothetical liquidation analysis included in Exhibit C to this Disclosure Statement projects that Holders of Unsecured Claims and Holders of Interests for the Debtors would receive substantially less consideration if any at all in the event that the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code than under this Plan.  Moreover, it is projected that Holders of Secured Claims against most of the Debtors would receive less than payment in full.  Under the Plan, all Holders of Allowed Claims in Classes 1, 2, 3, 4, and 5 will

receive payment in full, and most Holders of Allowed Unsecured Claims will receive Distributions of Cash.  Thus, the Debtors believe that all creditors will receive at least as favorable treatment under the Plan as they would in a hypothetical liquidation, and in fact, most creditors will receive far better treatment under the Plan.  Holders of Equity Interests will retain their Interests but they shall receive no distribution from the Debtors on account of holding such Interests until the Holders of Allowed Unsecured Claims in Class 8C have received the Class 8C Distribution.

C.      Feasibility.

The Bankruptcy Code requires that, in order for the Plan to be confirmed, the Debtors must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

For purposes of determining whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  Based upon the Projections set forth in Exhibit B hereto, which show continued net operating income in years shown, the Debtors believe that the Plan is feasible and that they will be able to make all payments required to be made pursuant to the Plan.  **HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE CAUTIONARY STATEMENTS INCLUDED IN SECTION I OF THIS DISCLOSURE STATEMENT AND THE ASSUMPTIONS INCLUDED IN THE PROJECTIONS IN CONNECTION WITH THEIR REVIEW OF THE SAME.  AS NOTED THEREIN, ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PROJECTED.**

D.      Alternatives To The Plan.

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan has expired, any other party in interest) could attempt to formulate a different plan of reorganization.  Such a plan of reorganization might involve a sale or an orderly liquidation of the Debtors assets in a fashion not contemplated by the Plan.  The Debtors have explored various alternatives in connection with the formulation and development of the Plan.  They believe that the Plan and the continued operations of the Reorganized Debtors, as described herein, enables creditors to realize the most value under the circumstances.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in a chapter 7 case but subject to the potential of additional cost and expenses both of operations and for professional fees.

X.      **RECOMMENDATION AND CONCLUSION**.

The Debtors believe that confirmation and implementation of the Plan are preferable to any of the feasible alternatives because the Plan will provide substantially greater recoveries for creditors.  **Accordingly, the Debtors and the Creditors' Committee urge Holders of Impaired Claims and Equity Interests to vote to accept the Plan by so indicating on their Ballots and returning them as specified in this Disclosure Statement and on the Ballots.**

**BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK**

Dated:    December 7, 2009

HENDRICKS FURNITURE GROUP, LLC

By:    _____
Chadwick D. Hendricks, President


CLASSIC MOVING & STORAGE, INC.

By:    _____
Larry G. Hendricks, President


NORRIS FURNITURE AND INERTIORS, INC.

By:    _____
Larry G. Hendricks, President


RAYBURN COOPER & DURHAM, P.A.
Albert F. Durham, Esq.
Paul R. Baynard, Esq.
Shelley K. Abel., Esq.
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina  28202-1675
Telephone:        (704) 334-0891

Counsel for Hendricks Furniture Group, LLC, et al.,
Debtors and Debtors In Possession

**EXHIBIT A**

First Amended Joint Consolidated Plan of Reorganization of Hendricks
Furniture Group, LLC and its Affiliated Debtors and Debtors-in-Possession Proposed
by Hendricks Furniture Group, LLC and its Affiliated Debtors and Debtors-in-Possession
dated December 7, 2009

**[filed separately]**

**EXHIBIT B**

Financial Projections

EXHIBIT B

**Hendricks Furniture Group, LLC**
**Income Statement**

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Written Sales | 33,553,217 | 40,507,531 | 45,742,011 | 47,114,272 | 48,527,700 | 49,983,531 | 51,483,037 | 53,027,528 | 54,618,354 | 56,256,904 |
| Net Sales | 41,075,580 | 39,979,958 | 45,645,116 | 46,662,456 | 48,266,884 | 49,713,379 | 51,203,201 | 52,737,646 | 54,318,048 | 55,945,784 |
| Total Cost of Goods Sold | 30,365,383 | 28,332,559 | 31,703,164 | 32,560,166 | 33,535,957 | 34,540,975 | 35,576,095 | 36,642,219 | 37,740,274 | 38,871,215 |
| Gross Profit | 10,710,187 | 11,647,399 | 13,941,952 | 14,302,290 | 14,730,927 | 15,172,405 | 15,627,106 | 16,095,426 | 16,577,774 | 17,074,569 |
| *Gross Profit %* | 26.1% | 29.1% | 30.5% | 30.5% | 30.5% | 30.5% | 30.5% | 30.5% | 30.5% | 30.5% |
| Total Operating Expenses | 14,986,514 | 12,826,590 | 13,692,480 | 13,798,155 | 14,136,340 | 14,432,383 | 14,762,730 | 15,108,537 | 15,470,617 | 15,841,402 |
| Net Other Income (Expense) [1] | (10,884,126) | 4,057,424 | | | | | | | | |
| Income (Loss) From Continuing Operations | (15,160,453) | 2,878,233 | 249,472 | 504,135 | 594,587 | 740,022 | 864,375 | 986,889 | 1,107,158 | 1,233,167 |
| Restructuring and Non-Recurring Expenses | (3,195,609) | - | - | - | - | - | - | - | - | - |
| Discontinued Operations | (5,734,937) | - | - | - | - | - | - | - | - | - |
| Consolidated Net Income Before Tax | (24,130,999) | 2,878,233 | 249,472 | 504,135 | 594,587 | 740,022 | 864,375 | 986,889 | 1,107,158 | 1,233,167 |
| Franchise Taxes | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 |
| Income Taxes (40%) | - | - | - | - | - | - | - | - | - | - |
| Consolidated Net Income | (24,195,999) | 2,813,233 | 184,472 | 439,135 | 529,587 | 675,022 | 799,375 | 921,889 | 1,042,158 | 1,168,167 |
| Less: COD Income [1] | (24,195,999) | 2,813,233 | 184,472 | 439,135 | 529,587 | 675,022 | 799,375 | 921,889 | 1,042,158 | 1,168,167 |
| Plus: Related Party Accounts Receivable Loss [2] | 10,249,341 | (4,057,424) | - | - | - | - | - | - | - | - |
| Plus: Classic EBITDA | (496,766) | (1,528) | 222,112 | 232,545 | 239,515 | 246,694 | 254,089 | 261,705 | 269,548 | 277,627 |
| Plus: Interest Expense | 1,081,230 | 1,133,759 | 1,089,471 | 1,034,900 | 1,016,892 | 946,072 | 898,568 | 855,206 | 816,461 | 774,417 |
| Plus: Income Taxes | - | - | - | - | - | - | - | - | - | - |
| Plus: Depreciation | 879,674 | 879,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 |
| HFG EBITDA + Classic EBITDA | (12,482,520) | 765,948 | 2,373,964 | 2,584,488 | 2,663,903 | 2,745,696 | 2,829,940 | 2,916,706 | 3,006,075 | 3,096,119 |

Note 1: Cancellation of Debt ("COD") Income is related to the estimated discharge of unsecured claims (Classic's estimated COD income is reported separately)

Note 2: Loss related to the write-off of Accounts Receivable balances due from Norris Furniture and Classic Moving & Storage to HFG

EXHIBIT B

Hendricks Furniture Group, LLC

## BALANCE SHEET

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | |
| CASH | 566,419 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| ACCOUNTS RECEIVABLE | 395,984 | 395,984 | 395,984 | 395,984 | 395,984 | 395,984 | 395,984 | 395,984 | 395,984 | 395,984 |
| ADVANCES TO EMPLOYEES | 6,384 | 4,184 | 1,784 | | | | | | | |
| INVENTORY, NET | 13,084,058 | 12,516,706 | 11,996,150 | 11,913,377 | 11,913,377 | 11,913,377 | 11,913,377 | 11,913,377 | 11,913,377 | 11,913,377 |
| PREPAID EXPENSES | 353,492 | 325,159 | 325,159 | 325,159 | 325,159 | 325,159 | 325,159 | 325,159 | 325,159 | 325,159 |
| OTHER CURRENT ASSETS | 219,612 | 219,612 | 219,612 | 219,612 | 219,612 | 219,612 | 219,612 | 219,612 | 219,612 | 219,612 |
| TOTAL CURRENT ASSETS | 14,625,949 | 13,486,645 | 12,963,689 | 12,879,132 | 12,879,132 | 12,879,132 | 12,879,132 | 12,879,132 | 12,879,132 | 12,879,132 |
| **PROPERTY & EQUIPMENT** | | | | | | | | | | |
| LAND | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 | 1,250,292 |
| BUILDINGS | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 | 17,741,153 |
| FURNITURE & FIXTURES | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 | 2,162,976 |
| COMPUTER EQUIPMENT | 855,159 | 855,159 | 855,159 | 855,159 | 855,159 | 855,159 | 855,159 | 855,159 | 855,159 | 855,159 |
| OTHER EQUIPMENT | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 | 1,808,188 |
| VEHICLES | 88,185 | 88,185 | 88,185 | 88,185 | 88,185 | 88,185 | 88,185 | 88,185 | 88,185 | 88,185 |
| LEASEHOLD IMPROVEMENTS | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 | 2,576,900 |
| COMPUTER SOFTWARE (NET OF AMORT) | 408,693 | 408,693 | 408,693 | 408,693 | 408,693 | 408,693 | 408,693 | 408,693 | 408,693 | 408,693 |
| ACCUMULATED DEPRECIATION | (13,384,282) | (14,268,170) | (15,140,078) | (16,017,986) | (16,895,894) | (17,773,802) | (18,651,710) | (19,529,618) | (20,407,526) | (21,285,434) |
| NET PROPERTY & EQUIPMENT | 13,507,264 | 12,623,376 | 11,751,468 | 10,873,560 | 9,955,652 | 9,117,744 | 8,238,836 | 7,361,928 | 6,484,020 | 5,606,112 |
| **OTHER ASSETS** | | | | | | | | | | |
| CASH VALUE OF LIFE INSURANCE | 565,691 | 565,691 | 565,691 | 565,691 | 565,691 | 565,691 | 565,691 | 565,691 | 565,691 | 565,691 |
| INVESTMENT IN NAJA | 991,244 | 991,244 | 991,244 | 991,244 | 991,244 | 991,244 | 991,244 | 991,244 | 991,244 | 991,244 |
| TOTAL OTHER ASSETS | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 | 1,556,935 |
| **TOTAL ASSETS** | 29,690,168 | 27,672,956 | 26,272,092 | 25,309,627 | 24,431,719 | 23,553,811 | 22,675,903 | 21,797,995 | 20,920,087 | 20,042,179 |

EXHIBIT B

## Hendricks Furniture Group, LLC

### BALANCE SHEET

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | |
| ACCOUNTS PAYABLE - TRADE | 1,090,000 | 1,353,997 | 1,359,251 | 1,563,365 | 1,563,365 | 1,563,365 | 1,563,365 | 1,563,365 | 1,563,365 | 1,563,365 |
| ACCOUNTS PAYABLE - INTERCOMPANY | (211,680) | (247,008) | (46,820) | 185,725 | 406,016 | 554,032 | 706,486 | 863,508 | 1,025,237 | 1,191,814 |
| LINE OF CREDIT | 5,268,380 | 5,424,667 | 4,985,669 | 4,479,299 | 4,261,398 | 3,721,549 | 2,917,679 | 2,384,017 | 1,844,003 | 1,121,992 |
| ACCRUED SALARY | 289,300 | 289,300 | 289,300 | 289,300 | 289,300 | 289,300 | 289,300 | 289,300 | 289,300 | 289,300 |
| ACCRUED SALES TAX | 172,152 | 190,948 | 222,540 | 229,216 | 229,216 | 229,216 | 229,216 | 229,216 | 229,216 | 229,216 |
| ACCRUED INSURANCE | 463,766 | - | - | - | - | - | - | - | - | - |
| OTHER ACCRUED EXPENSES | 468,266 | 468,266 | 468,266 | 468,266 | 468,266 | 468,266 | 468,266 | 468,266 | 468,266 | 468,266 |
| CUSTOMER DEPOSITS | 3,496,500 | 3,625,659 | 3,591,383 | 3,663,064 | 3,663,064 | 3,663,064 | 3,663,064 | 3,663,064 | 3,663,064 | 3,663,064 |
| Sub-total Post Petition Current Liabilities | 11,036,683 | 11,111,829 | 10,869,589 | 10,876,235 | 10,880,626 | 10,488,793 | 9,837,377 | 9,460,797 | 9,082,452 | 8,528,927 |
| **TOTAL CURRENT LIABILITIES** | 11,036,683 | 11,111,829 | 10,869,589 | 10,876,235 | 10,880,626 | 10,488,793 | 9,837,377 | 9,460,797 | 9,082,452 | 8,526,927 |
| **LONG-TERM DEBT** | | | | | | | | | | |
| LONG-TERM DEBT | 5,843,788 | 5,737,948 | 5,632,109 | 5,508,268 | 5,420,428 | 5,314,588 | 5,208,748 | 5,102,908 | 4,997,088 | 4,891,228 |
| LT DEBT - SHERRILL FURNITURE | 1,949,082 | 1,724,244 | 1,282,476 | 775,874 | 263,276 | - | - | - | - | - |
| NP OFFICE/WAREHOUSE (BB&T MORTGAGE) | 6,184,220 | 6,184,220 | 5,964,220 | 5,724,220 | 5,484,220 | 5,244,220 | 5,004,220 | 4,764,220 | 4,524,220 | 4,284,220 |
| ASSUMED PRE-PETITION LEDGER BALANCES (BB&T) | - | - | - | - | - | - | - | - | - | - |
| BB&T TERM LOAN - NOTE C | 7,424,000 | 7,424,000 | 7,304,000 | 7,184,000 | 7,064,000 | 6,944,000 | 6,824,000 | 6,704,000 | 6,584,000 | 6,464,000 |
| BB&T TERM LOAN - NOTE D | 2,834,884 | 3,076,306 | 3,263,090 | 3,410,045 | 3,568,373 | 3,735,599 | 3,880,834 | 3,919,896 | 3,926,937 | 3,900,110 |
| TOTAL LONG-TERM DEBT | 24,236,074 | 24,146,618 | 23,425,894 | 22,602,406 | 21,798,298 | 21,238,407 | 20,817,802 | 20,491,024 | 20,032,235 | 19,539,558 |
| **PREPETITION UNSECURED CLAIMS** | 17,397,424 | 12,815,000 | 12,175,000 | 11,875,000 | 11,575,000 | 11,275,000 | 10,883,915 | 10,209,257 | 9,450,017 | 8,775,000 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| CAPITAL STOCK | 28,022 | 28,022 | 28,022 | 28,022 | 28,022 | 28,022 | 28,022 | 28,022 | 28,022 | 28,022 |
| PIK INTEREST CONTRA - NOTE D | - | (243,710) | (506,082) | (780,841) | (1,068,619) | (1,369,825) | (1,684,003) | (2,005,783) | (2,333,465) | (2,652,330) |
| PAID-IN CAPITAL | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 | 9,311,633 |
| RETAINED EARNINGS | (32,309,670) | (32,309,670) | (29,466,437) | (28,311,985) | (28,872,830) | (28,343,242) | (27,668,221) | (26,868,845) | (25,946,956) | (24,904,799) |
| CURRENT INCOME (LOSS) | - | 2,813,233 | 184,472 | 439,135 | 509,587 | 675,022 | 739,375 | 921,989 | 1,042,158 | 1,168,167 |
| TOTAL STOCKHOLDERS' EQUITY | (22,970,014) | (20,400,491) | (20,228,390) | (20,024,015) | (19,822,205) | (19,448,390) | (18,963,192) | (18,363,083) | (17,644,608) | (16,799,050) |
| TOTAL LIAB. & EQUITY | 23,690,167 | 27,672,956 | 26,272,092 | 25,309,627 | 24,431,719 | 23,553,811 | 22,675,903 | 21,797,995 | 20,920,087 | 20,042,179 |

EXHIBIT B

**Hendricks Furniture Group, LLC**

**STATEMENT OF CASH FLOWS**

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | |
| NET INCOME (LOSS) | (24,110,418) | 2,813,233 | 184,472 | 439,135 | 523,587 | 675,022 | 799,375 | 921,889 | 1,042,158 | 1,168,167 |
| **NON CASH ITEMS:** | | | | | | | | | | |
| DEPRECIATION | (407,428) | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 | 877,908 |
| RELATED COMPANY AR LOSS | 10,249,341 | | | | | | | | | |
| **CHANGE IN ASSETS & LIABILITIES** | | | | | | | | | | |
| OTHER RECEIVABLES - TRADE | 119,309 | 2,200 | 2,400 | 1,784 | | | | | | |
| OTHER RECEIVABLES | 5,189 | | | | | | | | | |
| INVENTORY | 10,359,070 | 567,382 | 520,556 | 82,774 | | | | | | |
| PREPAID EXPENSES | 920,191 | 28,334 | | | | | | | | |
| OTHER ASSETS | 50,482 | | | | | | | | | |
| ACCOUNTS PAYABLE TRADE | 2,012,233 | 263,997 | 5,254 | 204,114 | | | | | | |
| ACCOUNTS PAYABLE - OTHER | (1,933,391) | (35,328) | 200,188 | 232,545 | | | | | | |
| ACCOUNTS RECEIVABLE - OTHER | 3,886,397 | | | | 220,291 | 148,017 | 152,453 | 157,023 | 161,729 | 166,576 |
| ACCRUED AND OTHER EXPENSES | (882,455) | (438,969) | 25,591 | 6,676 | | | | | | |
| CUSTOMER DEPOSITS | (6,042,693) | 129,159 | (4,276) | 41,681 | | | | | | |
| CASH FLOW FROM OPERATING ACTIVITIES | (5,723,375) | 4,207,886 | 1,812,094 | 1,886,617 | 1,627,768 | 1,700,946 | 1,829,737 | 1,956,820 | 2,081,795 | 2,212,651 |
| **INVESTING ACTIVITIES** | | | | | | | | | | |
| PURCHASE OF FIXED ASSETS | (30,101) | | | | | | | | | |
| DISPOSAL OF FIXED ASSETS | 3,718,765 | | | | | | | | | |
| CASH FLOW FROM INVESTING ACTIVITIES | 3,688,664 | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | |
| BORROWINGS (REPMT) OF LOC | (2,696,831) | 156,287 | (438,998) | (506,370) | (217,900) | (539,849) | (803,869) | (533,603) | (540,074) | (722,101) |
| BORROWINGS (REPMT) OF LONG-TERM DEBT | (6,542,753) | (105,840) | (105,840) | (105,840) | (105,840) | (105,840) | (105,840) | (105,840) | (105,840) | (105,840) |
| BORROWINGS (REPMT) OF LT DEBT - SHERRILL | | (224,838) | (461,768) | (488,603) | (512,597) | (283,276) | | | | |
| BORROWINGS (REPMT) - DIP CONVERSION (HENDRICKS) | (76,000) | | | | | | | | | |
| BORROWINGS (REPMT) - NP OFFICEWISE (BB&T MORTGAGE) | 6,184,220 | | (220,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) | (240,000) |
| BORROWINGS (REPMT) OF BB&T TERM LOAN - NOTE G | 3,000,000 | | (120,000) | (120,000) | (120,000) | (120,000) | (120,000) | (120,000) | (120,000) | (120,000) |
| BORROWINGS (REPMT) OF BB&T TERM LOAN - NOTE D | | 241,222 | 188,883 | 146,955 | 156,329 | 169,226 | 145,235 | 39,061 | 7,041 | (26,827) |
| BORROWINGS (REPMT) OF PREPETITION UNSECURED CLAIMS | | (4,572,424) | (640,000) | (300,000) | (300,000) | (300,000) | (391,085) | (674,658) | (759,240) | (675,017) |
| ADDITIONAL PAID IN CAPITAL | 2,099,834 | | | | | | | | | |
| CAPITAL STOCK | 4,722 | | | | | | | | | |
| PIK INTEREST CONTRA - NOTE D | | | 250,000 | | | | | | | |
| OOB - RETAINED EARNINGS | 952,893 | (243,710) | (282,372) | (274,760) | (287,777) | (301,206) | (314,178) | (321,780) | (333,682) | (322,866) |
| CASH FLOW FROM FINANCING ACTIVITIES | 2,925,816 | (4,749,303) | (1,812,094) | (1,886,617) | (1,627,768) | (1,700,946) | (1,829,737) | (1,956,820) | (2,081,795) | (2,212,651) |
| NET INCREASE (DECREASE) IN CASH | 881,105 | (541,417) | | | | | | | | |
| CASH AT BEGINNING OF PERIOD | (314,688) | 566,419 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| CASH AT END OF PERIOD | 566,417 | 25,001 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |

**Classic Moving & Storage, Inc.**
**Income Statement**

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| HFG Delivered Sales | 8,062,948 | 4,760,474 | 5,435,033 | 5,579,984 | 5,747,210 | 5,919,445 | 6,096,839 | 6,279,545 | 6,467,724 | 6,661,539 |
| Other Sales | 446,845 | 1,080,000 | 1,080,000 | 1,112,400 | 1,145,772 | 1,180,145 | 1,215,550 | 1,252,016 | 1,289,576 | 1,328,264 |
| Net Sales | 8,509,793 | 5,840,474 | 6,515,033 | 6,692,384 | 6,892,982 | 7,099,590 | 7,312,388 | 7,531,561 | 7,757,301 | 7,989,803 |
| | | | | | | | | | | |
| Total Operating Expenses | 8,149,873 | 5,842,002 | 6,292,921 | 6,459,839 | 6,653,467 | 6,852,896 | 7,058,299 | 7,269,857 | 7,487,752 | 7,712,176 |
| Net Other Income (Expense) | (617,862) | 125,498 | (118,879) | - | - | - | - | - | - | - |
| Net Income (Loss) | (257,942) | 123,960 | 103,733 | 232,545 | 239,515 | 246,694 | 254,089 | 261,705 | 269,548 | 277,627 |
| | | | | | | | | | | |
| Restructuring and Non-Recurring Expenses | (393,750) | - | - | - | - | - | - | - | - | - |
| Consolidated Net Income Before Income Tax | (651,692) | 123,960 | 103,733 | 232,545 | 239,515 | 246,694 | 254,089 | 261,705 | 269,548 | 277,627 |
| | | | | | | | | | | |
| Income Taxes | - | - | - | - | 19,224 | 98,678 | 101,635 | 104,682 | 107,819 | 111,051 |
| | | | | | | | | | | |
| **Consolidated Net Income** | (651,692) | 123,960 | 103,733 | 232,545 | 220,291 | 148,017 | 152,453 | 157,023 | 161,729 | 166,576 |
| | | | | | | | | | | |
| Go Forward Summary | | | | | | | | | | |
| Net Income | (651,692) | 123,960 | 103,733 | 232,545 | 220,291 | 148,017 | 152,453 | 157,023 | 161,729 | 166,576 |
| Less: COD Income [1] | - | (280,000) | - | - | - | - | - | - | - | - |
| Plus: Income Taxes | - | - | - | - | 19,224 | 98,678 | 101,635 | 104,682 | 107,819 | 111,051 |
| Plus: Depreciation | 154,926 | 154,512 | 118,379 | - | - | - | - | - | - | - |
| EBITDA | (496,766) | (1,528) | 222,112 | 232,545 | 239,515 | 246,694 | 254,089 | 261,705 | 269,548 | 277,627 |

Note 1: Cancellation of Debt ("COD") Income is related to the estimated discharge of Class BB unsecured claims

EXHIBIT B

**Classic Moving & Storage, Inc.**

## BALANCE SHEET

### ASSETS

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | | | | | | |
| CASH | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| ACCOUNTS RECEIVABLE | 137,036 | 137,036 | 137,036 | 137,036 | 137,036 | 137,036 | 137,036 | 137,036 | 137,036 | 137,036 |
| ADVANCES TO EMPLOYEES | 1,400 | 200 | | | | | | | | |
| TOTAL CURRENT ASSETS | 143,436 | 142,236 | 142,036 | 142,036 | 142,036 | 142,036 | 142,036 | 142,036 | 142,036 | 142,036 |
| **PROPERTY & EQUIPMENT** | | | | | | | | | | |
| FURNITURE & FIXTURES | 21,756 | 21,756 | 21,756 | 21,756 | 21,756 | 21,756 | 21,756 | 21,756 | 21,756 | 21,756 |
| COMPUTER EQUIPMENT | 114,002 | 114,002 | 114,002 | 114,002 | 114,002 | 114,002 | 114,002 | 114,002 | 114,002 | 114,002 |
| OTHER EQUIPMENT | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 | 1,507,530 |
| VEHICLES | 121,599 | 121,599 | 121,599 | 121,599 | 121,599 | 121,599 | 121,599 | 121,599 | 121,599 | 121,599 |
| LEASEHOLD IMPROVEMENTS | 61,950 | 61,950 | 61,950 | 61,950 | 61,950 | 61,950 | 61,950 | 61,950 | 61,950 | 61,950 |
| COMPUTER SOFTWARE (NET OF AMORT) | 78,428 | 78,428 | 78,428 | 78,428 | 78,428 | 78,428 | 78,428 | 78,428 | 78,428 | 78,428 |
| ACCUMULATED DEPRECIATION | (1,619,498) | (1,774,010) | (1,905,265) | (1,905,265) | (1,905,265) | (1,905,265) | (1,905,265) | (1,905,265) | (1,905,265) | (1,905,265) |
| NET PROPERTY & EQUIPMENT | 285,767 | 131,255 | | | | | | | | |
| **OTHER ASSETS** | | | | | | | | | | |
| ACCOUNTS RECEIVABLE - INTERCOMPANY | (211,680) | (247,008) | (46,820) | 185,725 | 406,016 | 554,032 | 706,486 | 863,508 | 1,025,237 | 1,191,814 |
| OTHER CURRENT ASSETS | (211,680) | (247,008) | (46,820) | 185,725 | 406,016 | 554,032 | 706,486 | 863,508 | 1,025,237 | 1,191,814 |
| TOTAL OTHER ASSETS | 217,523 | 26,483 | 95,216 | 327,761 | 548,052 | 686,068 | 848,522 | 1,005,544 | 1,167,273 | 1,333,850 |
| **TOTAL ASSETS** | 217,523 | 26,483 | 95,216 | 327,761 | 548,052 | 686,068 | 848,522 | 1,005,544 | 1,167,273 | 1,333,850 |

EXHIBIT B

**Classic Moving & Storage, Inc.**

## BALANCE SHEET

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | |
| ACCOUNTS PAYABLE - TRADE POST | 10,187 | 10,187 | 10,187 | 10,187 | 10,187 | 10,187 | 10,187 | 10,187 | 10,187 | 10,187 |
| ACCRUED SALARY | 50,824 | 50,824 | 50,824 | 50,824 | 50,824 | 50,824 | 50,824 | 50,824 | 50,824 | 50,824 |
| Sub-total Post Petition Current Liabilities | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 |
| OTHER ACCRUED EXPENSES | - | - | - | - | - | - | - | - | - | - |
| PREPETITION UNSECURED CLAIMS | - | - | - | - | - | - | - | - | - | - |
| Sub-total Pre Petition Current Liabilities | - | - | - | - | - | - | - | - | - | - |
| TOTAL CURRENT LIABILITIES | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 | 61,011 |
| **LONG-TERM DEBT** | | | | | | | | | | |
| PREPETITION UNSECURED CLAIMS | 745,067 | 430,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 |
| LONG-TERM DEBT - Post | | | | | | | | | | |
| TOTAL LONG-TERM DEBT | 745,067 | 430,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 | 395,067 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| CAPITAL STOCK | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| PAID-IN CAPITAL | - | - | - | - | - | - | - | - | - | - |
| RETAINED EARNINGS | (588,055) | (588,055) | (465,095) | (361,382) | (128,817) | 91,474 | 238,490 | 391,944 | 548,966 | 710,695 |
| CURRENT INCOME (LOSS) | - | 123,980 | 103,733 | 233,545 | 220,291 | 148,017 | 152,453 | 157,023 | 161,729 | 166,576 |
| TOTAL STOCKHOLDERS' EQUITY | (588,555) | (464,595) | (360,862) | (128,317) | 91,974 | 239,990 | 392,444 | 549,466 | 711,195 | 877,772 |
| TOTAL LIAB. & EQUITY | 217,523 | 26,481 | 95,214 | 327,761 | 548,052 | 696,068 | 848,522 | 1,005,544 | 1,167,273 | 1,333,850 |

EXHIBIT B

**Classic Moving & Storage, Inc.**

## STATEMENT OF CASH FLOWS

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | |
| NET INCOME (LOSS) | (651,716) | 123,980 | 103,733 | 232,545 | 220,291 | 148,017 | 152,453 | 157,023 | 161,729 | 166,576 |
| **NON CASH ITEMS:** | | | | | | | | | | |
| DEPRECIATION | 154,926 | 154,512 | 131,255 | - | - | - | - | - | - | - |
| **CHANGE IN ASSETS & LIABILITIES** | | | | | | | | | | |
| ACCOUNTS RECEIVABLE - TRADE | (11) | - | - | - | - | - | - | - | - | - |
| OTHER RECEIVABLES | 3,015 | - | 200 | - | - | - | - | - | - | - |
| INVENTORY | - | 1,200 | - | - | - | - | - | - | - | - |
| PREPAID EXPENSES | 50,733 | - | - | - | - | - | - | - | - | - |
| OTHER ASSETS | 211,680 | 35,328 | (200,188) | (232,545) | (220,291) | (148,017) | (152,453) | (157,023) | (161,729) | (166,576) |
| ACCOUNTS PAYABLE TRADE-POST | 10,187 | - | - | - | - | - | - | - | - | - |
| ACCOUNTS PAYABLE - PRE | 535,911 | - | - | - | - | - | - | - | - | - |
| ACCOUNTS PAYABLE - OTHER | (567,540) | - | - | - | - | - | - | - | - | - |
| ACCRUED AND OTHER EXPENSES | 282,938 | - | - | - | - | - | - | - | - | - |
| CUSTOMER DEPOSITS-POST | - | - | - | - | - | - | - | - | - | - |
| CUSTOMER DEPOSITS-PRE | - | - | - | - | - | - | - | - | - | - |
| **CASH FLOW FROM OPERATING ACTIVITIES** | 1,723 | 315,000 | 35,000 | - | - | - | - | - | - | - |
| **INVESTING ACTIVITIES** | | | | | | | | | | |
| PURCHASE OF FIXED ASSETS | (8,341) | - | - | - | - | - | - | - | - | - |
| DISPOSAL OF FIXED ASSETS | 384 | - | - | - | - | - | - | - | - | - |
| **CASH FLOW FROM INVESTING ACTIVITIES** | (7,957) | - | - | - | - | - | - | - | - | - |
| **FINANCING ACTIVITIES** | | | | | | | | | | |
| BORROWINGS (REPAYMENT) OF DIP FINANCING | - | - | - | - | - | - | - | - | - | - |
| BORROWINGS (REPAYMENT) OF PREPETITION UNSECURED CLAIMS | - | - | - | - | - | - | - | - | - | - |
| BORROWINGS (REPAYMENT) OF POST LONG TERM DEBT | - | (315,000) | (35,000) | - | - | - | - | - | - | - |
| BORROWINGS (REPAYMENT) OF PRE LONG TERM DEBT | - | - | - | - | - | - | - | - | - | - |
| ADDITIONAL PAID IN CAPITAL | - | - | - | - | - | - | - | - | - | - |
| COB - RETAINED EARNINGS | - | - | - | - | - | - | - | - | - | - |
| **CASH FLOW FROM FINANCING ACTIVITIES** | - | (315,000) | (35,000) | - | - | - | - | - | - | - |
| **NET INCREASE (DECREASE) IN CASH** | (6,234) | - | - | - | - | - | - | - | - | - |
| CASH AT BEGINNING OF PERIOD | 11,231 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| CASH AT END OF PERIOD | 4,997 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |

**Hendricks Furniture Group, LLC**
**Classic Moving & Storage, Inc.**
**Combined Estimated Classes 7 and 8 Distributions**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Debt Service [1] | 1,464,437 | 2,017,079 | 1,997,343 | 1,995,407 | 1,675,111 | 1,364,408 | 1,321,046 | 1,282,201 | 1,240,257 |
| EBITDA to Debt Service Coverage Ratio (1.25 to 1.00 Ratio) | 0.52 | 1.18 | 1.30 | 1.34 | 1.64 | 2.07 | 2.21 | 2.34 | 2.50 |
| Minimum Amount Due Under EBITDA Calculation or Minimum Payment | | 291,667 | 500,000 | 500,000 | 500,000 | 651,808 | 1,124,430 | 1,265,400 | 1,403,199 |
| BB&T - Annual Amount | | 72,917 | 125,000 | 125,000 | 125,000 | 162,952 | 281,108 | 316,350 | 350,800 |
| BB&T - Cumulative Amount | | 72,917 | 197,917 | 322,917 | 447,917 | 610,869 | 891,976 | 1,208,326 | 1,559,126 |
| Unsecured Creditors Class 8C - Annual Amount | | 175,000 | 300,000 | 300,000 | 300,000 | 391,085 | 674,658 | 759,240 | 675,017 |
| Unsecured Creditors Class 8C - Cumulative Amount [3] | | 175,000 | 475,000 | 775,000 | 1,075,000 | 1,466,085 | 2,140,743 | 2,899,983 | 3,575,000 |
| Estimated Recovery of Allowed Claims [3,5] | 0.0% | 1.6% | 4.3% | 7.0% | 9.8% | 13.3% | 19.5% | 26.4% | 32.5% |
| Payments to Unsecured Creditors Class 8B | 500,000 | 500,000 | - | - | - | - | - | - | - |
| Estimated Recovery of Allowed Claims [4] | 10.0% | 20.0% | - | - | - | - | - | - | - |
| Payments to Unsecured Creditors Class 7 (8A) | 50,000 | - | - | - | - | - | - | - | - |
| Estimated Recovery of Allowed Claims [5] | 25.0% | - | - | - | - | - | - | - | - |

Note 1: Debt service consists of only principal and cash interest payments (does not include PIK interest)

Note 2: Assumes final distribution in 2018 reflects amount need to reach the 32.5% minimum recovery

Note 3: Assumes creditors with allowed claims in the amount of approximately $11.0M elect to participate in Class 8C (includes HFG, CMS, and Norris)

Note 4: Assumes creditors with allowed claims in the amount of approximately $5.0M elect to participate in Class 8B (includes HFG, CMS, and Norris)

Note 5: Assumes creditors with allowed claims in the amount of approximately $387K elect to participate in Class 7 (8A)

**EXHIBIT C**

Liquidation Analysis

*Hendricks Furniture Group, LLC, et. al.*
*Hypothetical Liquidation Analysis*
*Assumptions*

THIS LIQUIDATION ANALYSIS (THE "HYPOTHETICAL LIQUIDATION ANALYSIS") IS
BEING PROVIDED AS PART OF THE DISCLOSURE STATEMENT FILED BY THE DEBTORS.
IT IS EXPRESSLY CONDITIONED ON THE ASSUMPTIONS SET FORTH BELOW.  THIS
ANALYSIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE FIRST AMENDED JOINT
CONSOLIDATED PLAN OF REORGANIZATION OF HENDRICKS FURNITURE GROUP,
LLC AND ITS AFFILIATE DEBTORS AND DEBTORS-IN-POSSESSION DATED DECEMBER
7, 2009 (THE "PLAN")[1]. THE DEBTORS MAY FURTHER MODIFY, SUPPLEMENT OR
AMEND THIS LIQUIDATION ANALYSIS PRIOR TO THE APPROVAL OF THE DISCLOSURE
STATEMENT.  NO DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE
BANKRUPTCY COURT.   NO CREDITOR OR PARTY IN INTEREST SHOULD TREAT THIS
LIQUIDATION ANALYSIS AS ESTABLISHING OR ESTIMATING THE VALUE OF ANY
CLAIM IN THE DEBTORS' BANKRUPTCY CASES SINCE IT BASED UPON A
HYPOTHETICAL CHAPTER 7 FORCED SALE OF ASSETS.

THIS LIQUIDATION ANALYSIS HAS PREPARED SOLELY FOR THE PURPOSES OF
ESTIMATING THE PROCEEDS AVAILABLE IN A HYPOTHETICAL CHAPTER 7 FORCED
SALE LIQUIDATION IN WHICH NO BUYER WILLING TO PAY A GOING CONCERN VALUE
COULD BE OBTAINED. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS,
INCLUDING, WITHOUT LIMITATION, THESE VALUATION ASSUMPTIONS IS INTENDED
TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS AS TO THE
VALUES STATED OR FOR ANY OTHER PURPOSE NOR IS IT INTENDED TO BIND ANY
PARTY.

THIS HYPOTHETICAL LIQUIDATION ANALYSIS IS DEPENDENT ON A NUMBER OF
ESTIMATES AND ASSUMPTIONS THAT AND CANNOT BE READ APART FROM THESE
ASSUMPTIONS.  ACTUAL RESULTS ARE INHERENTLY SUBJECT TO ECONOMIC,
COMPETITIVE AND OTHER CONTINGENCIES BEYOND THE CONTROL OF THE
DEBTORS.  IT IS POSSIBLE THAT CERTAIN ASSUMPTIONS WITH RESPECT TO THE
LIQUIDATION PROCESS MAY BE SUBJECT TO CHANGE.  FOR ALL OF THE FOREGOING
REASONS THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE
HYPOTHETICAL LIQUIDATION ANALYSIS OR RECOVERY PERCENTAGES WOULD BE
REALIZED IF THE DEBTORS WERE, IN FACT, LIQUIDATED IN CHAPTER 7 CASES, AND
ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN IN THIS
HYPOTHETICAL ANALYSIS.

THIS HYPOTHETICAL LIQUIDATION ANALYSIS WAS PREPARED SEPARATELY AND
THEN REPORTED ON A CONSOLIDATED BASIS FOR ALL DEBTORS, RESULTING IN THE
ELIMINATION OF INTERCOMPANY CLAIMS, INCLUDING WITHOUT LIMITATION,
CLAIMS RESULTING FROM PRE-PETITION AND POST-PETITION ACTIVITIES, AS WELL
AS RECOGNIZING THE CROSS COLLATERALIZATION OF CERTAIN SECURED DEBT
AMONG THE SEPARATE DEBTORS AND ASSUMES THAT COMPLETION OF THE
LIQUIDATION AND DISTRIBUTIONS ARE MADE BY THE CHAPTER 7 TRUSTEE.

SECTION 1129(a)(7) OF THE BANKRUPTCY CODE PROVIDES THAT THE BANKRUPTCY
COURT SHALL NOT CONFIRM A PLAN OF REORGANIZATION AS TO CREDITORS AND
EQUITY INTEREST HOLDERS WHO DO NOT VOTE TO ACCEPT THE PLAN UNLESS IT
WILL PROVIDE SUCH CREDITORS AND EQUITY HOLDERS AT LEAST THE AMOUNT OR
VALUE THEY WOULD RECEIVE IF THE DEBTOR WERE LIQUIDATED IN A

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

{00172609 v 2}

**HYPOTHETICAL CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, COMMONLY REFERRED TO AS THE "BEST INTEREST OF CREDITORS TEST".**

**THE PROJECTED VALUE FOR CREDITORS FROM THE FORCED SALE LIQUIDATION OF THE DEBTORS' ASSETS IS SUBSTANTIALLY LESS THAN THE DEBTORS BELIEVE WOULD BE AVAILABLE FOR CREDITORS UPON A REORGANIZATION OF THE DEBTORS PURUSANT TO THE JOINT CONSOLIDATED PLAN.**

### *1.   General Assumptions*

1.  The liquidation process would be overseen by the Bankruptcy Court through a Chapter 7 Trustee.
2.  The Chapter 7 Debtors' Estates may or may not be substantively consolidated. Therefore a liquidation analysis was performed on an entity-by-entity basis and on a consolidated basis.
3.  The liquidation analysis presents estimated amounts that may be available for distribution under a hypothetical forced sale liquidation process. The assumptions set forth herein are considered reasonable for forced sale liquidation. It is assumed that the forced sale would occur within a 90-120 day period.
4.  A Chapter 7 Trustee may seek and receive the authority to conduct a sale over a 90-120 day period. Alternatively, the Trustee could immediately shut down the sales of inventory upon conversion to Chapter 7. Shut down of operations would severely and negatively impact the values that can be obtained for creditors and parties in interest.
5.  This Liquidation Analysis assumes that the Branch Banking & Trust Company's Claim ("BB&T Claim") retains its secured and/or its administrative priority status so that it is paid in full before general unsecured creditors would be paid any amount by the Chapter 7 Trustee.-BB&T may seek relief from the automatic stay to recover any Asset of the Debtors subject to its secured claim so that they can conduct a liquidation sale to control the disposition of such collateral or to avoid the cost of a Trustee. If BB&T is granted relief from stay and recovers its collateral then the potential for any distribution to other creditors may be limited to net collections of Avoidance Actions.
6.  By assuming a forced sale, this liquidation analysis does not project realizing the values that exist and could be obtained as proposed in the Joint Consolidated Plan. The Debtors believe that the going concern fair value of the Debtors is substantially more than the liquidation value estimated in this hypothetical analysis.
7.  Some of the amounts used in this hypothetical liquidation analysis are based on numbers provided by third parties. The Debtors have attempted to identify when such numbers are used. Use of such estimated numbers for this hypothetical analysis is not intended to be or constitute a concession or admission of the Debtors as to the propriety or reasonableness of such amounts. The Debtors expressly reserve all rights regarding such estimated claims, including, without limitation, the right to dispute or contest such amounts.
8.  The wind-down period for this analysis is assumed to be 90-120 days. In an actual liquidation the period could vary thereby impacting recoveries to creditors. The analysis is also based upon assumptions that may be subject to change in an actual liquidation of the Debtors. Accordingly, there can be no assurance that the values reflected in this analysis would be realized if the Debtors were, in fact, to undergo such liquidation.
9.  Certain Bar Dates have past, the Debtors have not yet completed the Claims analysis and reconciliation process. This process will likely result in changes to Administrative, Priority and General unsecured claims. These changes will require an update to this analysis.

### **2.   *Proceeds & Recoveries***

10.  Unles s otherwise stated, proceeds and recoveries were estimated based on the Debtor's October 31, 2009 general ledger balances.

11. Balance Sheet i tems were adjusted to Liquidating Book Values to provide an estimated recovery of the Debtor's Assets.

12. Ite ms not on any Company's Balance Sheet which would generate proceeds were identified in the analysis but were not included as recoverable proceeds.

13. The forced sale of the Debtors may utilize a liquidator to assist the Trustee to facilitate the forced sale. The sale process is projected to close within 90 - 120 days after it starts. The values listed are significantly less than fair value under a going concern sale.

14. The Debtors have identi fied that certain Avoidance Actions may exist but have not completed an analysis of such actions. No value has been attributed to such claims at this time.

### 3.   *Estimated Expense Assumptions*

15. The Trustee would be entitled to a fee pursuant to 11 U.S.C. §326(a) for all moneys disbursed or turned over by the Trustee in the cases to parties in interest, excluding the Debtors, but including the holders of secured claims.

16. The Trustee would engage professionals to assist in the liquidation of the Debtors' Assets, including, without limitation the following:

    i.  Legal counsel for general bankruptcy administration. Fees were estimated based upon an inventory liquidation period of 90 - 120 days with Chapter 7 court proceedings up to an additional twelve months.

    ii.  Accountants for financial reporting and tax returns.

17. Ho me Office Wind Down Costs

    i.  Any administrative estimates were based on the necessary employees and related costs to wind down the Estate during the liquidation period.

    ii.  Final Tax & Accounting

        1.  Preparation of the final books and tax filings

        2.  Preparation of the final accounting and reports to the Court.

### 4.   *Creditor Recovery*

18. Ad ministrative Priority Claims

    i.  The Chapter 11 administrative priority claims may include unpaid expenses and claims incurred in the Chapter 11.

    ii.  The Chapter 7 administrative priority claims would include the Trustee's Commission, the professionals retained by the Trustee, the cost of the winding down the Debtors for a limited period of time and related cost of liquidation by the Chapter 7 Trustee.

19. General Un secured Claims

    i.  The Debtors lease rejection claims have been estimated.

    ii.  Trade Claims are estimated based on a review of the claims scheduled by the Debtor.

**NO ADMISSION OR WAIVER OF RIGHTS: There is no admission or waiver of rights to object and contest any claim by the Debtors or any other party in interest as to any Claim estimated or identified in this Liquidation Analysis. All claims remain subject to a full reservation rights to all parties in interest to object to and dispute the nature, validity and/or amount of any claim.**

### 5.   *Specific Assumptions and Notes*

The liquidation analysis attached hereto contains specific assumptions which are further explained below:

20. Cas h at Closing represents the Debtors' cash on hand from all operating accounts as of October 31, 2009.

21. <u>Acco unts Receivables</u> – The Debtor's retail furniture operations only record a limited number of customer sales on account and therefore maintain a low level of accounts receivable. Based on the aging and quality of the credit, the Debtor believes the recovery would range between 10% and 60% of the reported book values. Classic Moving & Storage processes 3rd-party warehouse and delivery operations and maintains a various customer accounts. Based on the aging and quality of the credit, the Debtor believes the recovery would range between 50% and 80% of the reported book values.

22. <u>Acco unts Receivable – Related Party</u> – Norris Furniture & Interiors, Inc. maintained a receivable from a related party for $752,982 for purported advances between 1998 and 2001 and accrued interests for which this hypothetical liquidation analysis has estimated no recovery.

23. <u>Net  Recovery on Liquidated Inventory</u> – The Debtor believes inventory recoveries would be derived from GOB sales events at each of the retail locations net of selling expenses and agency fees or commissions to an Agent. The Trustee would conduct a warehouse event at the Conover location. The Debtor has estimated net recoveries after all sales related expenses and fees to range between 50% and 60% of the reported book values.

24. <u>Sales Tax, Utilit y and Landlord Deposits</u> – The Debtor has certain deposits placed with taxing authorities for sales taxes, utility service providers and landlords. It assumed some of these deposits would offset any potential administrative claim and would yield recoveries between 25% and 90%.

25. <u>Tra demarks and Furniture, Fixtures and Equipment</u> – The Debtor has estimated recoveries based on its experiences in liquidating store locations and consideration from a 3rd-party appraisal for certain fixed assets.

26. <u>Real Estate Net o f First Mortgage</u> – The Debtor estimated recoveries from real property based on applying discount factors ranging from 40% to 50% of the 2006 3rd-party appraisals issued. Certain unpaid real estate taxes have also been deducted from estimated recoveries as prescribed by the Bankruptcy Code. BB&T also has perfected Deeds of Trust on parcels of land in Guilford County, North Carolina as additional collateral to their secured loans. In addition to collateral constituting property of the Debtors' estates, certain of BB&T's debts are also secured by certain collateral owned by Larry and Jane Hendricks (the "Hendricks"), specifically a residence owned by the Hendricks in Mooresville, North Carolina. The Debtors believe that this residence is subject to a first Deed of Trust in favor of BB&T for a personal loan to the Hendricks in the approximate amount of $5.5 million. The Hendricks pledged any additional equity in this residence as collateral to BB&T at least to $10.0 million as a part of the Ninth Amendment dated June 1, 2009 to a Modification and Restatement of Loan Agreement dated June 1, 1998. Such collateral represents an additional potential source of recovery for BB&T, however it is unclear what the market value of the collateral is, and whether there is significant equity in the collateral at this time that would provide a meaningful recovery to BB&T. The Hendricks pledged an interest in a condominium located in Burlington, Vermont as additional collateral to BB&T for the 2007 Loan Agreement as defined in Section III, A, 1(c) of the Disclosure Statement. However, the value of such encumbrances is uncertain. Therefore, this potential additional source of recovery has been disregarded for purposes of this liquidation analysis but is included herein for disclosure.

27. <u>Cas h Value of Key Man Life Insurance</u> – The Debtor maintains a key man life insurance policy on Larry Hendricks for which the reported book value has been pledged as collateral to BB&T.

28. Chapter 11 Professional Fee C arveout – In accordance with the Debtor-in-Possession ("DIP") loan documents, $350,000 has been set aside to reimburse professional expenditures approved by the court.

29. Wind Do wn Expenses – The Debtor has estimated Chapter 7 trustee fees in accordance with U.S.C 326 and other customary and necessary professional and operating expenses to effectively wind down the estate over a 90 – 120 day period (all individual Debtor obligations are reported separately and then combined; however, only accounted for once in consolidation).

30. Senior Secured Cla ims – Tier One – The Debtor has reported book values for its senior secured claimants in accordance with the prevailing loan documents.

31. BB&T Merchant Services Claims – The Debtor has reported book values for the customer deposits processed by BB&T Merchant Services in accordance with the prevailing loan documents.

32. Senior Secured Cla ims – Tier Two – The Debtor has reported book values for its post-petition DIP financing in accordance with the prevailing loan documents.

33. Senior Secured Cla ims – Tier Three – The Debtor has reported book values for its post-petition DIP financing in accordance with the prevailing loan documents.

34. Ad ministrative Claims – The Debtor has estimated to the best of its knowledge all administrative claims arising from sales taxes, accrued wages, accounts payable, non-credit card customer deposits and professional fees in excess of the DIP Carveout.

35. Unsec ured Priority Claims – The Debtor has estimated to the best of its knowledge all unsecured priority claims arising from accrued wages, corporate taxes, self funded health insurance run-off costs, real estate and state sales taxes, and customer deposits subject to 507(a) limitations.

36. General Un secured Claims – The Debtor has estimated the general unsecured claimants as scheduled by the Debtors or as filed with the court.

37. Non -Priority 507 (a) Claims – The Debtor has estimated to the best of its knowledge all non-priority 507(a) claims arising from the deficiency of the priority classification.

38. Section 502(b)( 6) Claims – The Debtor used filed landlord claims for locations for which the leases were rejected prior to September 1, 2009 as the listed amounts before any consideration of lease mitigation adjustments or possible objections to the claims as filed.

39. Other Exec utory Non-Real Estate Contract Rejection Claims – The Debtor has not yet quantified executory non-real estate contract rejection claims, and therefore amounts of such claims are not reflected in this analysis.

DRAFT

## Hendricks Furniture Group et al
## Hypothetical Liquidation Analysis
### DOLLARS IN THOUSANDS (000)

| Description | Note | HFG | Norris | Classic | Consolidated |
|---|---|---|---|---|---|
| **A. PROCEEDS FROM SALE OF ASSETS** | | | | | |
| Cash at Closing | 1 | 1,469.9 | - | - | 1,469.9 |
| Accounts Receivable Collections | 2 | 172.1 | 9.2 | 56.5 | 237.8 |
| Accounts Receivable - Related Parties | 3 | - | - | - | - |
| Recovery on Inventory | 4 | | | | |
| Net Proceeds from GOB Store Sales | | 8,482.7 | - | - | 8,482.7 |
| Recovery % of Cost | | 60.0% | | | |
| Sales tax, Utilities and Landlord Deposits | 5 | 137.7 | 142.8 | 0.1 | 280.5 |
| Subtotal | | 10,262.5 | 152.0 | 56.5 | 10,471.0 |
| Trademarks and FF&E | 6 | 458.0 | 27.9 | 146.7 | 632.6 |
| Real Estate net of First Mortgage | 7 | 606.9 | - | - | 606.9 |
| Cash Value of Key Man Life Insurance | 8 | 556.8 | | | 556.8 |
| Subtotal | | 1,621.6 | 27.9 | 146.7 | 1,796.2 |
| **GROSS PROCEEDS FROM ASSET SALE BEFORE "DIP CARVEOUT"** | | 11,884.1 | 179.9 | 203.2 | 12,267.2 |
| Chapter 11 Professional fees "Carveout" per DIP | 9 | 350.0 | - | - | 350.0 |
| **GROSS PROCEEDS FROM ASSET SALE AFTER "DIP CARVEOUT"** | | 11,534.1 | 179.9 | 203.2 | 11,917.2 |
| **B. WIND DOWN EXPENSES** | | | | | |
| Estimated Chapter 7 Trustee Fees | 10 | 379.8 | 12.2 | 13.4 | 405.4 |
| Estimated Chapter 7 Professional Fees | 10 | 75.0 | 25.0 | 50.0 | 150.0 |
| Estimated Chapter 7 Operating Expenses | 10 | 25.0 | - | 25.0 | 50.0 |
| Other | 10 | | | | |
| Subtotal | | 479.8 | 37.2 | 88.4 | 605.4 |
| **PROCEEDS BEFORE DISTRIBUTION** | | 11,054.3 | 142.6 | 114.8 | 11,311.8 |
| **C. SENIOR SECURED CLAIMS - TIER ONE** | | | | | |
| BB&T Pre-Petition Line of Credit | 11 | 11,879.0 | 11,879.0 | - | 11,879.0 |
| BB&T Bridge Term Loan | 11 | 3,000.0 | | | 3,000.0 |
| Workers Compensation Insurance Letter of Credit | 11 | 550.0 | | | 550.0 |
| Trade Creditors Leder   Balance with BB&T Factoring Group | 11 | 400.0 | | | 400.0 |
| BB&T Merchant Services Post Petition Customer Deposits Refund Estimate | 12 | 2,473.6 | | | 2,473.6 |
| BB&T Merchant Services Pre Petition Customer Deposits Refund Estimate | 12 | 876.9 | 174.6 | | 1,051.5 |
| Subtotal | | 19,179.5 | 12,053.6 | - | 19,354.1 |
| **SHORT-FALL IN SATISFYING SENIOR SECURED CLAIM - TIER ONE** | 12 | (8,125.2) | (11,910.9) | | (8,042.3) |
| **ESTIMATED RECOVERY FOR TIER ONE** | | 58% | 1% | | 58% |
| **NET PROCEEDS AFTER TIER ONE** | | - | - | 114.8 | 114.8 |

DRAFT

**Hendricks Furniture Group et al**
**Hypothetical Liquidation Analysis**
*DOLLARS IN THOUSANDS (000)*

| Description | Note | HFG | Norris | Classic | Consolidated |
|---|---|---|---|---|---|
| **D. DEBTOR-IN-POSSESSION FINANCING - TIER TWO** | | | | | |
| BB&T Sponsored DIP Participation | 13 | 2,449.1 | 2,449.1 | 2,449.1 | 2,449.1 |
| **ESTIMATED RECOVERY FOR TIER TWO** | | 0% | 0% | 5% | 5% |
| **NET PROCEEDS AFTER TIER TWO** | | - | - | - | - |
| **E. DEBTOR-IN-POSSESSION FINANCING - TIER THREE** | | | | | |
| Other DIP Participation | 14 | 500.0 | 500.0 | 500.0 | 500.0 |
| **F. ADMINISTRATIVE CLAIMS** | 15 | 1,766.3 | - | 110.0 | 1,876.3 |
| **G. UNSECURED CLAIMS** | | | | | |
| Priority Claims | 16 | 1,083.5 | 26.7 | 182.7 | 1,292.9 |
| General Unsecured Claims: | | | | | |
| Accounts Payable | 17 | 9,212.5 | 912.0 | 1,143.5 | 11,268.0 |
| Non-Priority amount of 507 (a) Claim | 18 | 133.1 | - | - | 133.1 |
| 502(b)(6) landlord claims | 19 | 6,258.5 | 666.8 | 62.5 | 6,987.8 |
| Other executory non-real estate contract rejection claims | 20 | Unknown | Unknown | Unknown | Unknown |
| Subtotal | | 15,604.1 | 1,578.8 | 1,206.0 | 18,388.9 |
| Total Unsecured Claims | | 16,687.6 | 1,605.5 | 1,388.7 | 19,681.8 |