**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HENDRICKS FURNITURE GROUP, LLC,[1] | ) | Case No. 09-50790 |
| et. al. | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |


**FIRST AMENDED JOINT CONSOLIDATED PLAN OF REORGANIZATION OF
HENDRICKS FURNITURE GROUP, LLC AND ITS AFFILIATE DEBTORS
AND DEBTORS-IN-POSSESSION PROPOSED BY HENDRICKS FURNITURE GROUP, LLC AND ITS
AFFILIATE DEBTORS**


Dated: December 7, 2009


RAYBURN COOPER & DURHAM, P.A.
Albert F. Durham, Esq.
Paul R. Baynard, Esq.
Shelley K. Abel., Esq.
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina  28202-1675
(704) 334-0891

Counsel for Hendricks Furniture Group, LLC, et al.,
Debtors and Debtors In Possession

---

[1]   The jointly administered cases are those of the following: Hendricks Furniture Group, LLC, d/b/a Boyles Distinctive Furniture and d/b/a NaJa Oriental Rugs, Case no. 09-50790; Classic Moving & Storage, Inc., Case no. 09-50791; and Norris Furniture and Interiors, Inc.. Case no. 09-50792.

INTRODUCTION ...................................................................................................................5

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW...................................................................................................................................7

1.1     **Scope of Definitions** ...............................................................................................7

1.2     **Definitions** ...............................................................................................................7

1.3     **Rules of Interpretation, Computation of Time and Governing Law.** ...............15

   (a)     **Rules of Interpretation** .................................................................................15

   (b)     **Computation of Time**....................................................................................15

   (c)     **Exhibits and Schedules** ...............................................................................15

1.4     **Governing Law** .....................................................................................................15

ARTICLE II METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS AND GENERAL PROVISIONS ...................................................................................................................................15

2.1     **General Rules of Classification**...........................................................................15

2.2     **Holders of Claims Entitled to Vote**....................................................................15

2.3     **Non-Consensual Confirmation**...........................................................................15

2.4     **Special Provision Regarding Unimpaired Claims** .............................................16

2.5     **Bar Dates for Administrative Claims**..................................................................16

2.6     **Bar Date for Fee Claims** ......................................................................................16

2.7     **Bar Dates for Unsecured Claims** .........................................................................16

2.8     **Less Favorable Treatment** ...................................................................................17

2.9     **Corrective Actions** ...............................................................................................17

ARTICLE III UNCLASSIFIED CLAIMS ........................................................................................17

3.1     **Administrative Claims** .........................................................................................17

3.2     **Priority Tax Claims**..............................................................................................17

3.3     **Fee Claims** ............................................................................................................18

3.4     **DIP Lender Claims**                                                                                22

ARTICLE IV CLASSIFICATION AND TREATMENT OF PRIORITY, SECURED AND UNSECURED CLAIMS AND EQUITY INTERESTS....................................................................................18

4.1     **Class 1 (Priority Non-Tax Claims)**.....................................................................18

4.2     **Class 2 (Secured Claims)**.....................................................................................19

4.3     **Class 3 (Customer Deposit Claims)**                                                                 19

4.4     **Class 4 (Workers Compensation Claims)**                                                          20

4.5     **Class 5 (GE Commercial Finance Secured Claims)**...........................................21

4.6     **Class 6 (BB&T Claims)**........................................................................................21

4.7     **Class 7 (Convenience Class Claims)**                                                                26

4.8     **Class 8 (Unsecured Claims)** .................................................................................27

4.9     **Class 9 (Equity Interests)** .....................................................................................32

ARTICLE V IMPLEMENTATION .................................................................................................34

  **5.1**    **Assets of the Estates** ........................................................................................34

    (a)    **Vesting of Assets** ......................................................................................34

    (b)    **Retention of Rights, Causes of Actions and Defenses** ...........................34

  **5.2**    **Distributions**.....................................................................................................35

    (a)    **Funding of Distributions** .........................................................................35

    (b)    **Responsibility for Distributions** .............................................................37

    (c)    **Special Provisions for Payment of DIP Claims**………………………………….    37

    (d)    **Pre-Petition Related-Party Claims**…………………………………………    38

    (e)    **Intra-Company Credit Facility** ………………………………………………    38

  **5.3**    **Debtors Post-Confirmation** ............................................................................38

    (a)    **Continued Corporate Existence** ...............................................................38

    (b)    **Restructuring Transactions** ......................................................................38

    (c)    **Management** .............................................................................................38

    (d)    **Advisory Committee** ………………………………………………………    39

    (e)    **Corporate Action and Other Documents and Actions**.............................39

    (f)    **Membership Interest and/or Stock of Debtors** .......................................39

  **5.4**    **Substantive Consolidation**    39

  **5.5**    **Dissolution of the Creditors' Committee**    40

  **5.6**    **Exit Financing**    40

ARTICLE VI GENERAL PROVISIONS REGARDING TREATMENT OF CLAIMS AND INTERESTS AND
DISTRIBUTIONS UNDER THE PLAN ......................................................................................40

  **6.1**    **Reserves**..........................................................................................................40

    (a)    **Disputed Claim Reserve** ..........................................................................40

    (b)    **Transmittal of Distributions and Notices** ...............................................41

  **6.2**    **Unclaimed Distributions** ...............................................................................41

  **6.3**    **Setoffs** ............................................................................................................42

  **6.4**    **Withholding Taxes and Expenses of Distribution**.........................................42

  **6.5**    **Allocation of Plan Distributions Between Principal and Interest**..................42

  **6.6**    **Method of Cash Distributions**........................................................................42

  **6.7**    *De Minimis* **Distributions and Fractional Shares**........................................42

  **6.8**    **Exemption from Certain Transfer Taxes** ......................................................42

ARTICLE VII EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............................42

  **7.1**    **Assumption or Rejection of Executory Contracts and Unexpired Leases**...................42

  **7.2**    **Bar Date for Rejection Damages** ...................................................................43

**7.3**     **Procedures for the Determination of Cure Amounts** ................................................43

**7.4**     **Indemnification Obligations** ……………………………………………………     56

ARTICLE VIII DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND ACTIONS .....................43

**8.1**     **Objections to Claims** ..............................................................................................43

**8.2**     **Estimation of Claims** ..............................................................................................44

**8.3**     **Amendments to Claims** ...........................................................................................44

**8.4**     **Authority to Settle Disputed Claims and Causes of Action** ................................44

**8.5**     **Recourse** ................................................................................................................44

ARTICLE IX CONDITIONS PRECEDENT ...........................................................................................44

**9.1**     **Conditions to Confirmation** ...................................................................................45

**9.2**     **Conditions to Effective Date** ..................................................................................45

**9.3**     **Waiver of Conditions** .............................................................................................45

ARTICLE X EFFECTS OF PLAN CONFIRMATION .............................................................................45

**10.1**    **Discharge** ...............................................................................................................45

**10.2**    **Special Discharge Provisions for Class 8 Claims**                                             46

**10.3**    **Retention of Causes of Action/Reservation of Rights** .........................................46

**10.4**    **Term of Injunctions or Stays** ................................................................................47

**10.5**    **Exculpation** ...........................................................................................................47

**10.6**    **Injunction** .............................................................................................................47

**10.7**    **Insurance Preservation** ..........................................................................................48

ARTICLE XI ADMINISTRATIVE PROVISIONS ....................................................................................48

**11.1**    **Retention of Jurisdiction** .......................................................................................48

**11.2**    **Amendments** ...........................................................................................................49

        (a)     **Preconfirmation Amendment** ...................................................................49

        (b)     **Postconfirmation Amendment Not Requiring Resolicitation** .................50

        (c)     **Postconfirmation/Preconsummation Amendment Requiring Resolicitation** ...........................50

**11.3**    **Severability of Plan Provisions** .............................................................................50

**11.4**    **Successors and Assigns** ..........................................................................................50

**11.5**    **Effectuating Documents and Further Transactions** .............................................50

**11.6**    **Confirmation Order and Plan Control** .................................................................50

**11.7**    **Payment of Statutory Fees** ....................................................................................50

**11.8**    **Withdrawal or Modification of Plan** .....................................................................50

**11.9**    **Payment Dates** .......................................................................................................51

**11.10**   **Notices** ..................................................................................................................51

**11.11**   **No Admissions and Reservation of Rights** ...........................................................52

ARTICLE XII CONFIRMATION REQUEST ...........................................................................................52

**PURSUANT TO SECTION 1125 OF THE CODE, NOTHING CONTAINED IN THIS PLAN SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THIS PLAN UNTIL SUCH TIME AS THE DEBTORS' DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AND DISTRIBUTED, WITH APPROPRIATE BALLOTS, TO ALL HOLDERS OF IMPAIRED CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN.   THE DEBTORS RESERVE THE RIGHT TO FILE AMENDMENTS AND/OR MODIFICATIONS TO THE PLAN AND DISCLOSURE STATEMENT FROM TIME TO TIME UNTIL A DISCLOSURE STATEMENT AND PLAN PROPOSED BY THE DEBTORS IS APPROVED BY THE BANKRUPTCY COURT.   REFERENCE IS MADE TO SUCH DISCLOSURE STATEMENT FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION, THE DEBTORS' HISTORY, BUSINESSES, PROPERTIES, RESULTS OF OPERATIONS AND A SUMMARY AND ANALYSIS OF THIS PLAN.   ALL HOLDERS OF CLAIMS AND INTEREST HOLDERS ARE HEREBY ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THIS PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

**THIS PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.   PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES, WHETHER DEBT OR EQUITY, OF THE DEBTORS SHOULD EVALUATE THIS PLAN IN LIGHT OF THE PURPOSES FOR WHICH IT WAS PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTUAL, THREATENED OR POTENTIAL ACTIONS, THIS PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER OF ANY RIGHTS OR CLAIMS OF THE DEBTORS.**

**NO REPRESENTATIONS ARE MADE OR INTENDED REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST.   HOLDERS OF CLAIMS OR INTEREST ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS WITH RESPECT TO TAX CONSEQUENCES OF THE PLAN AND THE TREATMENT OF DISTRIBUTIONS MADE UNDER THE PLAN.**

## INTRODUCTION

The Chapter 11 Cases of Hendricks Furniture Group, LLC and its Affiliated Debtors have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.   Based upon the existence of Pre-Petition Related-Party Claims and purported Guaranties by Hendricks Furniture Group, LLC, the Debtors have requested that assets and liabilities of the Estates of the Debtors be substantively consolidated for purposes of Distributions, and the Plan requests the Bankruptcy Court to confirm the Plan as a Plan providing for such substantive consolidation of certain assets and claims for some or all of the Debtors.   To the extent that any Debtor's Estate is not chosen for or included in substantive consolidation, the Plan will be treated as a joint Plan for such Debtors and their treatment under the plan will be separately set out in the Plan based on the assets of those Debtors' respective Estates.

For the Debtors whose assets and liabilities will be substantively consolidated for purpose of Distributions, the Cash Distributions distributed to the Holders of Allowed Class 8 Claims will continue as set forth in the Plan without interest after the Petition Date.   However, the ultimate recovery to creditors under the Plan will

depend upon a variety of factors many of which are outside of the control of the Debtors and the ultimate recovery could be more or less than that estimated.

        Reference is made to the Disclosure Statement for a discussion of, among other things, the Debtors' history, businesses, historical financial information and properties, and for a summary of the Plan.  All creditors entitled to vote on the Plan should review the Disclosure Statement before voting to accept or reject the Plan. In addition, there are other agreements and documents that have been or will be filed which are referenced in the Plan or the Disclosure Statement and will be available for review.  No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved by the Bankruptcy Court, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

        The Debtors reserve their respective rights to seek confirmation of a different plan of reorganization if this Plan is not confirmed (this reservation of rights also includes any amendments of the Debtors' schedules).  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan as set forth herein. In the event this Plan is not confirmed, its filing shall not be deemed to have been a waiver of the Debtors' exclusive periods in which to file a Plan and solicit acceptances thereof.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

1.1    **Scope of Definitions.**  For purposes of the Plan, all capitalized terms not otherwise defined shall have the meaning ascribed to them in Article I of the Plan, except as expressly provided or unless the context clearly requires otherwise.  Any term used in initially capitalized form in the Plan that is not defined herein but that is used in the Code shall have the meaning ascribed to such term in the Code.

1.2    **Definitions**.

1.    **Administrative Claim** means a cost or expense of the type described in Code section 503 and all fees and charges assessed against the Estates pursuant to section 1930 of title 28 of the United States Code. The definition of Administrative Claim does not include a Fee Claim as used in this Plan.

2.    **Administrative Claim Bar Date Order** means the Bankruptcy Court's Order (I) Establishing Administrative Bar Date for Filing Requests for Payment of Administrative Expenses, Including, Without Limitation, Claims Asserted Under Section 503(b)(9), (II) Approving Request for Payment Form, (III) Approving Bar Date Notice, (IV) Approving Mailing and Publication Procedures and (V) Providing Certain Supplemental Relief, dated July 16, 2009 which established the bar date for Administrative Claims relating to, or arising in, the period from the Petition Date through July 31, 2009, which set the Administrative Bar Date (as defined in the Administrative Claim Bar Date Order ) as August 31, 2009.

3.    **Advisory Committee** means a committee proposed by the Debtors and approved initially by the Court in the Confirmation Order or by separate Order to assist the Reorganized Debtors in the strategic operation of their businesses after the Effective Date.

4.    **Affiliate Debtor(s)** means, in the singular or plural form, one or more, as dictated by the context in which the definition is used, of the debtors and debtors-in-possession, that qualify as affiliates pursuant to the definition set forth in 11 U.S.C. §101(2) consisting of: (a) Norris Furniture and Interiors, Inc., a Florida corporation and (b) Classic Moving and Storage, Inc., a North Carolina Corporation.

5.    **Allowed or Allowed Claim** means or refers to, as dictated by the context in which the definition is used, a Claim to the extent (a) such Claim is scheduled, including any amendments to the Schedules, by a Debtor pursuant to the Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined or disputed and is not removed from the Schedules by an amendment to such Schedules by a Debtor; or (b) (i) a proof of such Claim has been timely filed, or deemed timely filed with the Bankruptcy Court pursuant to the Code, the Bankruptcy Rules and/or any applicable Final Orders of the Bankruptcy Court, or late filed with leave of the Bankruptcy Court, and (ii) either (A) is not objected to within the period fixed by the Code, the Bankruptcy Rules and/or applicable orders of the Bankruptcy Court, including, without limitation the Confirmation Order and this Plan; or (B) has otherwise been allowed by a Final Order.  An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes Allowed when the context so requires; and (z) shall be net of any valid setoff amount based on a valid offset right. Unless otherwise expressly provided herein, in the Confirmation Order or in another Final Order of the Bankruptcy Court, the term "Allowed Claim" shall not, for the purposes of computation of Distributions under the Plan include (i) interest, penalties, late charges or fees accruing from and after the Petition Date, pursuant to section 1123(a)(4) of the Code, (ii) any non-compensatory penalties, fines, punitive damages, exemplary damages, multiple damages, or any other claims or obligations that do not compensate for actual losses incurred or (iii) any other amounts not allowable under the Code or applicable law, including, without limitation, any Claim subject to disallowance, in whole or part, in accordance with Section 502(d) of the Code.

6.    **Allowed Amount** means an amount equal to that portion (including, when appropriate, the whole) of a Claim that is an Allowed Claim and not a Disputed Claim or Disallowed Claim.

7.        **Assets** means all property in which any of the Estates has an interest, within the meaning of Code section 541, as of the Effective Date.

8.        **Avoidance Actions** mean any and all claims, rights, defenses or other Causes of Action of any Debtor or its Estate arising under any section of chapter 5 of the Code or other applicable law, including, without limitation, sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code or under similar or related state or federal statues and common law, including fraudulent transfer laws and principles of equitable subordination, whether or not litigation has been commenced to prosecute such Causes of Action as of the Effective Date or such actions are described in the Disclosure Statement or the Debtors' Schedules and Statements of Financial Affairs, all as may be amended or supplemented.

9.        **Ballot** means the ballot distributed to each eligible Holder of a Claim by the Balloting Agent, on which ballot such Holder may, inter alia, vote for or against the Plan.

10.        **Ballot Deadline** means the date and time set by the Bankruptcy Court by which the Balloting Agent must receive all Ballots.

11.        **Balloting Agent** means the Finley Group or another entity designated by the Bankruptcy Court to distribute, collect and tabulate Ballots from Holders.

12.        **Bankruptcy Court** means the United States Bankruptcy Court for the Western District of North Carolina, having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference made pursuant to section 157 of title 28 of the United States Code, the United States District Court for the Western District of North Carolina.

13.        **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as now in effect or hereafter amended.

14.        **Bar Date Order** means the Bankruptcy Court's Order Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof, dated July 16, 2009 which established the bar date for certain Unsecured Claims as August 31, 2009.

15.        **BB&T** means Branch Bank and Trust Company.

16.        **BB&T Claims** means all claims of BB&T against the Debtors.

17.        **BB&T Loan Documents** means all notes, loan agreements and related documents between BB&T and any and all of the Debtors.

18.        **Business Day** means any day except a Saturday, Sunday, "legal holiday" as such term is defined in Bankruptcy Rule 9006(a) and any other day on which commercial banks in North Carolina are authorized or required to remain closed.

19.        **Cash** means legal tender of the United States of America or equivalents thereof which may be conveyed by check or wire transfer.

20.        **Causes of Action** mean any and all actions, proceedings, accounts, controversies, agreements, promises, claims, and rights of each Debtor and its Estate including, without limitation, rights to payment or claims, defenses, offsets, recoupments, actions in law or equity or other causes of action, choses in action, suits, damages, rights to legal or equitable remedies, judgments, third-party claims, counterclaims and cross claims, including, without limitation all Avoidance Actions, and all possible actions whether or not described in the Disclosure Statement as amended or supplemented, the Debtors' Schedules and Statement of Financial Affairs as amended, any exhibits or schedules to the Plan or Disclosure Statement as amended or supplemented and whether arising under the Code or federal, state, or common law, including, without  limitation, such matters which constitute property of any Estate within the meaning of section 541 of the Code, but all regardless of whether any of the foregoing matters are subject to pending litigation or proceedings at the Effective Date or are brought after such dates.

21.      **Chapter 11 Case(s)** means, in the singular or plural form, one or more, as dictated by the context in which the definition is used, of the chapter 11 cases of the Debtors pending before the Bankruptcy Court.

22.      **Claim** shall have the meaning ascribed to such term in section 101(5) of the Code

23.      **Claims Objection Deadline** means the later of: (a) the close of business on the 120th day following the Effective Date or (b) sixty (60) days after the filing of any Claim, including any rejection Claim; provided, however, that the deadline may be extended upon a showing of cause pursuant to an ex-parte motion or motion upon limited notice as applicable, by either the Debtors or the Committee provided further, the any Claim filed after the applicable Claims Bar Date shall automatically be treated as a Disputed Claim under the Plan.

24.      **Class** means a category of Holders of Claims or Interests as described in the Plan.

25.      **Class 8 Distribution** means the Distribution to be made to the Holders of Allowed Class 8 Claims pursuant to Section 4.8 of the Plan.

26.      **Classic** means Classic Moving and Storage, Inc., a North Carolina corporation.

27.      **Code** means title 11 of the United States Code, as now in effect as to these Chapter 11 Cases or as hereafter amended.

28.      **Committee** means the Official Committee of Unsecured Creditors in the Chapter 11 Cases of the Debtors appointed by the Bankruptcy Court by an order entered on July 2, 2009, as reconstituted from time to time.

29.      **Confirmation Date** means the date the Bankruptcy Court enters the Confirmation Order on its docket.

30.      **Confirmation Hearing** means the hearing or hearings pursuant to which the Bankruptcy Court enters the Confirmation Order.

31.      **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Code.

32.      **Convenience Claim** means (a) an Unsecured Claim for which the Allowed amount of such Claim is equal to or less than $1,000.00 or (b) any Unsecured Claim in an amount greater than $1,000.00 who's Holder has agreed to voluntarily reduce such Claim to $1,000.00 in accordance with the Plan.

33.      **Creditors' Fund** means the fund created by pooled assets of the Debtors to make distributions to the Holders of Allowed Unsecured Claims as set forth in Section 5.2(a)(ii) of the Plan.

34.      **Debtors** means HFG and the Affiliate Debtors.

35.      **Debt Service** means, with respect to the Debtors or the Reorganized Debtors, current maturities of long term debt plus cash Interest Expense.

36.      **Debt Service Coverage Ratio** means the ratio of EBITDA to Debt Service.

37.      **DIP Facility** means the post-petition financing facility with BB&T and non-BB&T DIP Lenders including all documents related thereto and all orders of the Court each as amended and supplemented.

38.      **DIP Orders** means all orders entered approving and facilitating the DIP Facility, including, without limitation, the orders entered on June 11, 2009 and July 2, 2009.

39.      **Disallowed or Disallowed Claim** means or refers to, as dictated by the context in which the definition is used, a Claim or any portion thereof that (a) has been disallowed or expunged by an order of the Bankruptcy Court, (b) is scheduled at zero or as contingent, disputed or unliquidated and as to which no Proof of Claim has been timely filed pursuant to the Bar Date Order or deemed timely filed with the Bankruptcy Court pursuant to either the Code or any order of the Bankruptcy Court or (c) is not scheduled by the Debtors in the Schedules of Assets and Liabilities and as to which (i) no Proof of Claim or request for payment has been timely

filed pursuant to the Bar Date Order, Administrative Bar Date Order, this Plan or the Confirmation Order or is not deemed timely filed with the Bankruptcy Court pursuant to either the Code or any order of the Bankruptcy Court, or (ii) no request for payment of a Fee Claim has been timely filed by the applicable deadline pursuant to the Plan or deemed timely filed with the Bankruptcy Court pursuant to either the Code or any order of the Bankruptcy Court.

40.     **Disbursing Agent** means the individual or entity approved by the Court to control the Creditors' Fund and to make the Distributions to the Holders of Allowed Class 8C Claims.

41.     **Disbursing Agent Agreement** means the agreement between the Debtors and the Disbursing Agent describing the terms and conditions of the Disbursing Agent's employment and duties.

42.     **Disclosure Statement** means the Disclosure Statement that relates to this Plan, as such Disclosure Statement may be amended, modified, or supplemented (and all exhibits and schedules annexed thereto or referred to therein),  and is approved by the Bankruptcy Court under section 1125 of the Code and Rule 3018 of the Rules of Bankruptcy Procedure.

43.     **Disclosure Statement Order** means the order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Code.

44.     **Dispute Resolution Procedures** means the procedures agreed to among BB&T, the Disbursing Agent and the Reorganized Debtors to resolve any disputes as to whether a qualifying payment is due under the Plan based upon the Net Amount Distributable From EBITDA Calculation and the Debt Service Coverage Ratio of not less that 1.25 to 1.00 for the applicable measuring period.

45.     **Disputed Claims Reserve** means the Reserve or Reserves established under Section 6.1(a) of the Plan funded by the Debtors.

46.     **Disputed or Disputed Claim** means or refers to, as dictated by the context in which the definition is used, that portion (including, when appropriate, the whole) of a Claim that is neither an Allowed Claim nor a Disallowed Claim.  For the purposes of the Plan, a Claim shall be considered a Disputed Claim (a) before the time that an objection has been or may be filed if: (i) the amount or classification of the Claim specified in the relevant proof or request for payment of the Claim exceeds the amount or is different from the classification of any corresponding Claim scheduled by the relevant Debtor in its Schedules of Assets and Liabilities; (ii) any corresponding Claim scheduled by the relevant Debtor has been scheduled as disputed, contingent or unliquidated; or (iii) no corresponding Claim has been scheduled by the relevant Debtor in its Schedules of Assets and Liabilities; (b) if such Claim is the subject of an objection not yet resolved by a Final Order (c)if an Avoidance Action asserted against the Holder of such Claim has not been resolved by a Final Order.

47.     **Distribution Address** means (a) the address indicated on a properly filed proof of Claim as of the Confirmation Date or (b) if no proof of Claim has been filed, then the address set forth in the relevant Schedule of Assets and Liabilities for that Person as of the Confirmation Date or (c) a notice of change of address is filed with the Bankruptcy Court. A Holder of a Claim may designate a Distribution Address different than provided in (a) or (b) above after the closing of the Chapter 11 Cases by notifying the Debtors and the Disbursing Agent if the Claim asserted is a Class 8 Claim, of the new Distribution Address in writing and provided sufficient proof that it is entitled to receive Distributions at a new address.  Any change of Distribution Address must be provided to the necessary parties by either by registered or certified mail or by some similar verifiable notification process in order to be effective.  Such notification shall be effective only upon receipt and verification.

48.     **Distribution(s)** means the distributions made in accordance with this Plan.

49.     **Effective Date** means the first Business Day that occurs after the later of (a) the day on which each condition set forth in Sections 9.1 and 9.2 hereof has been satisfied or waived as set forth in Section 9.3 and (b) the tenth (10th) day following the Confirmation Date or, if the effectiveness of the Confirmation Order has been stayed, the vacatur of such stay.

50.     **Equity Interest(s)** means the rights of each Holder of any equity security, including common stock and membership interest, issued by HFG or the Affiliated Debtors.

51.     **Estate(s)** means, in the singular form, the relevant estate of any Debtor created in its Chapter 11 Case pursuant to section 541 of the Code and, in the plural form, the jointly administered Estates of the Debtors.

52.     **Estimation Order** means an order of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018, estimating for voting, distribution or other proper purposes under the Code the Disputed Amount of a Disputed Claim.

53.     **Executory Contract Schedule** means the schedule of executory contracts and unexpired leases designated by the Debtors to be assumed as of the Effective Date of the Plan pursuant to sections 365 and 1123(b)(2) of the Code and Section 7.1 of this Plan.

54.     **Exit Financing** means the financing and all agreements and related documents and instruments evidencing a new financing to be obtained by the Reorganized Debtors as of the Effective Date, including revolving credit terms, term credit and letters of credit as determined by the Debtors to be reasonably necessary to satisfy the DIP Facility Claims, support other payments required to be made under the Plan and to fund working capital and general business purposes of the Reorganized Debtors following the Effective Date, and having terms agreed to by the Debtors, which terms shall be substantially in accordance with the treatment of BB&T Claims set forth in Section 4.6 of the Plan.

55.     **Fee Claim** means all claims subject to Bankruptcy Court approval under Code    §1129(a)(4), including claims of professionals, whether or not administrative claims, for the payment of fees and expenses incurred since the Petition Date in connection with the Debtors' estates or Assets.

56.     **Fee Order** means the Bankruptcy Court's Administrative Order, Pursuant To Sections 331 And 105 Of The Bankruptcy Code, Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals dated July 15, 2009, in the Chapter 11 Cases, as may have been amended or supplemented from time to time.

57.     **Final Order** means an order or judgment entered on the docket of the Bankruptcy Court, or any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal or seek review has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

58.     **Final Debtor-in-Possession Financing and Cash Collateral Order** or **FINAL DIP Order** means the Bankruptcy Court's Final Order Authorizing Debtors to: (A) Use Cash Collateral; (B) Obtain Post-Petition Financing; and (C) Grant Certain Liens and Provide Security and Other Relief to BB&T and the Non-BB&T Dip Lenders, dated July 1, 2009, as amended or modified or hereafter amended.

59.     **GE Commercial Finance** means GE Commercial Finance Business Property Corporation.

60.     **GE Commercial Finance Secured Claim** means the claim of GE Commercial Finance secured by real estate and improvements owned by HFG and located in Guilford County, North Carolina.

61.     **HFG** means Hendricks Furniture Group, LLC, a North Carolina limited liability company.

62.     **Holder** means a person or entity possessing a Claim or Interest by reason of legal or beneficial ownership of such Claim or Interest and means the person or entity reflected on the books and records of the Debtors as the owner of a Claim or Interest, the assignee of such a person to the extent satisfactory evidence of such assignment has been provided to the Debtors and filed with the Bankruptcy Court.

63.     **Impaired** shall have the meaning ascribed to such term in section 1124 of the Code.

64.     **Initial Cash Distribution** Means the Cash to be distributed to, or used to fund Disputed Claims Reserve or escrows for initial Distributions under the Plan to all Holders of Allowed Claims as and when such Holders are entitled to a Distribution.

65.     **Interest** means an Equity Interest in any of the Debtors, including outstanding shares of common stock or any other membership interest or right to convert into such an equity interest or acquire any equity interest in any Debtor.

66.     **Interest Expense** means, with respect to the Debtors or the Reorganized Debtors, the aggregate amount of all interest obligations payable in cash during the applicable period.

67.     **Lien** has the meaning ascribed to such term in section 101(37) of the Code including, but not limited to, liens, escrows, charges, pledges, encumbrances, rights of offset, and/or security interests of any other kind that encumber any Assets and unexpired leases that the Debtors elect to treat as secured financings in accordance with applicable law.

68.     **Member** means the party holding Equity Interest in the form of memberships in HFG.

69.     **Minimum Payment(s)** means the minimum monthly payment to be paid as a prepayment of the amount to be distributed under the Net Amount Distributable From EBITDA Calculation beginning on or before June 30, 2011 to the Disbursing Agent for deposit to the Creditors' Fund for the Holders of Allowed Class 8C Claims of $25,000 as provided in Section 4.8 herein and to BB&T of $10,417 for principal reduction of Notes D and C as provided in Section 4.6 herein provided that such Minimum Payments shall only be made if (a) the Reorganized Debtors are in compliance with any loan covenants of a senior secured lender, including, in compliance with all loan covenants of the New BB&T Loans and the New BB&T Loan Documents both immediately prior to and after making such Minimum Payment except for the Debt Service Coverage Ratio, which shall be satisfied at a ratio of 1.0 to 1.0 when measuring such ratio on the following dates based on the following periods: (1) for the fiscal year 2011, (i) measured on March 31, 2011 for the first 3 months of such fiscal year, (ii) measured on June 30, 2011 for the first 6 months of such fiscal year, (iii) measured on September 30, 2011 for the first 9 months of such fiscal year and (iv) measured on December 31, 2011 for the 12 months of such fiscal year; (2) for all periods thereafter, measured at the end of each fiscal quarter for the 12-month period ended as of such date, and (b) the Reorganized Debtors maintain a minimum net availability of $1.0 million under any revolving credit facility with any senior secured lender including the New BB&T Loans and the New BB&T Loan Documents both immediately prior to and after making such Minimum Payment.

70.     **Minimum Percentage Payment** means the minimum amount to be paid to the Holders of Allowed Claims in Class 8C necessary to pay a thirty-two and one-half (32.5%) percent of the total amount of Allowed Class 8C Claims (excluding the subordinated claims of N. Jane Hendricks).

71.     **NAJA** means NAJA Oriental Rugs and formerly NAJA Oriental Rugs, LLC.

72.     **Net Amount Distributable From EBITDA Calculation** means the amount available from operations of the Debtors or the Reorganized Debtors to be calculated on an annual basis beginning after the Effective Date of the Plan and based upon the Reorganized Debtors' fiscal year in an amount equal to eighty-five (85%) percent of the consolidated EBITDA for the fiscal year of the Reorganized Debtors in excess of the amount of EBITDA needed to achieve a Debt Service Coverage Ratio of 1.25 to 1.0.  For purposes of the Plan, EBITDA or Earnings Before Interest Taxes Depreciation Amortization shall mean the Reorganized Debtors' Consolidated Net Income as reported in its GAAP Financial Statements plus interest expense, plus income taxes made available for pass through tax obligations, plus depreciation, plus amortization, less any cancelation of debt income and any non-cash income included in net income.

73.     **New BB&T Loans** means the loans made and deemed made by BB&T as contemplated by the treatment of BB&T's Claims in Section 4.6.

74.     **New BB&T Loan Documents** means the notes, loan agreements and related documents evidencing the new BB&T Loans.

75.     **Non-BB&T DIP Lenders** means the non-BB&T parties to the DIP Facility, which include Sherrill Furniture Company and Larry J. Hendricks and N. Jane Hendricks.

76.     **Norris** means Norris Furniture and Interiors, Inc., a Florida corporation.

77.     **Pass Through Tax Payments** means those distributions to pay tax claims incurred by any holder of an Equity Interest incurred solely on the basis of future taxable income of HFG as may be necessary to cover the taxes of those Members associated with their ownership of membership interest in HFG, after any HFG related tax attributes available to the Members have been utilized.

78.     **Petition Date(s)** means June 10, 2009 for the Debtors.

79.     **Plan** means this Plan of Reorganization, dated as of the date set forth on the first page hereof, for each of the Debtors, together with any amendments or modifications hereto as the Debtors (such amendments or modifications only being effective if approved by order of the Bankruptcy Court to the extent such approval is necessary).

80.     **Plan Supplement** means any additional documents provided as part of or in support of the Plan. Pre-Petition Related-Party Claimsmeans a Claim of a Debtor against another Debtor.

81.     **Pre-Petition Related-Party Claims**means a Claim of a Debtor against another Debtor.

82.     **Priority Non-Tax Claim** means a Claim entitled to priority pursuant to section 507(a) of the Code, other than: (i) an Administrative Claim; (ii) a Priority Tax Claim; and (iii) a Fee Claim.

83.     **Priority Tax Claim** means a Claim for taxes entitled to priority pursuant to section 507(a)(8) of the Code.

84.     **Ratable, Ratably, Ratable Share or Pro Rata** means, at any time, the proportion that the Allowed Amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in such Class, unless the Plan otherwise provides.

85.     **Reinstated or Reinstatement** means (a) leaving unaltered the legal, equitable or contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim unimpaired in accordance with section 1124(1) of the Code or (b) otherwise complying with section 1124(2) of the Code.

86.     **Reorganized Debtor(s)** means, in the singular or plural form, one or more, as dictated by the context in which the definition is used, HFG and such of the Affiliate Debtor(s) as are designated as surviving and reorganizing in this Plan on and after the Effective Date, and the entities that shall succeed to all rights and obligations of the Debtors under the Plan (unless such obligations or rights are seceded in whole or part to another entity).

87.     **Reserve or Reserves** means the accounts to be established on the Effective Date or thereafter and funded with Cash by the Debtors, including, but not limited to, the Disputed Claims Reserves, required to be established.

88.     **Restructuring Transaction(s)** means those transactions or other actions     (including without limitation, mergers, stock sales and transfers, asset sales and transfers, consolidations, joint ventures, restructures, dispositions, offerings, liquidations, or dissolutions) between or among one or more of the applicable Debtors may enter into on, prior to, or after the Effective Date whether in the ordinary course of business or outside the ordinary course of business of such Debtor in accordance with the Plan, including without limitation, actions (i) to effect a corporate restructuring of their respective businesses,  (ii) to realign the overall corporate structure of the Debtors and the Affiliate Debtors, (iii) to reincorporate certain of the Affiliate Debtors, (iv) to effect a dissolution or winding up of the corporate existence of some of the Debtors, or (v) to effect such transactions as are necessary to aid in the implementation of the Plan.   Restructuring Transactions shall not mean or apply to transactions with non-debtor parties.

89.     **Schedule of Assets and Liabilities** means a Debtor's schedule of assets and liabilities filed with the Bankruptcy Court pursuant to sections 521(1) and 1106(a)(2) of the Code, as amended, supplemented or modified.

90.     **Secured Claim** means an Allowed Claim to the extent it is secured by a Lien or subject to setoff under section 553 of the Code, as provided in section 506 of the Code, but shall not include the BB&T Claims.

91.     **Secured Tax Claims** means a Claim for taxes to the extent that it is a Secured Claim.

92.     **Statement of Financial Affairs** means, collectively, the statement of financial affairs, as amended, supplemented or modified, of each of the Debtors filed with the Bankruptcy Court pursuant to sections 521(1) and 1106(a)(2) of the Code.

93.     **Sherrill** means Sherrill Furniture Companies.

94.     **Substantive Consolidation Order** means an order providing for substantive consolidation of any of the Chapter 11 Cases entered pursuant to the Plan, including, without limitation, the Confirmation Order.

95.     **Subsequent Cash Distribution** means the Distributions to be distributed to, or used to fund (i) any Distributions after the Initial Cash Distribution; (ii) any Reserves; and/or (iii) to the extent of Net Cash Flow From Operations, the Creditors' Fund.

96.     **Transfer** means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including but not limited to any sale, assignment, lease, transfer, encumbrance, Lien, exchange, mortgage, pledge, hypothecation or other disposition, or the creation of a security interest, in whole or in part.

97.     **Unclaimed Property** means any Cash or other distributable property unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto in respect of such Holder's Allowed Claim.  Unclaimed Property shall, without limitation, include: (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, notwithstanding efforts by the Debtors to locate such address which were commercially reasonable under the circumstances.  Distributions of Cash that otherwise would be payable under the Plan to a Holder but for Section 6.7 of the Plan that never, collectively, exceed ten dollars ($10.00) and for which a request is not made within the one (1) year deadline shall become Unclaimed Property.

98.     **Unimpaired** shall have the meaning ascribed to such term in section 1124 of the Code.

99.     **United States Bankruptcy Administrator** means the office of the United States Bankruptcy Administrator for the Western District of North Carolina.

100.     **Unsecured Claim** means a Claim to the extent it is not entitled to priority under the Code and is not an Allowed Secured Claim.

101.     **Voting Class (es)** means, in the singular or plural form, one or more, as dictated by the context in which the definition is used, of the Classes entitled to vote on this Plan.

102.     **Worker Compensation Claims** means Claims of current or former employees of the Debtors for workers compensation coverage under applicable workers compensation laws, including pursuant to Workers Compensation Self-Insured Plan.

103.     **Workers Compensation Self-Insured Plan** means the Debtors' self-insured workers compensation plan that existed as of the Petition Date.

1.3     **Rules of Interpretation, Computation of Time and Governing Law.**

**(a)     Rules of Interpretation.**  For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (d) any reference in the Plan to an existing document or an exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (e) unless otherwise specified, all references in the Plan to articles, sections, clauses and exhibits are references to articles, sections, clauses and exhibits of or to the Plan; (f) the words "herein", "hereunder" and "hereto" and other words of similar import refer to this Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors, assigns and affiliates; (i) the rules of construction set forth in section 102 of the Code shall apply to the extent such rules are not inconsistent with any other provision in this Section; and (j) any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Code and/or the Bankruptcy Rules, if used therein.

**(b)     Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**(c)     Exhibits and Schedules.**  All exhibits or schedules to the Plan and any Plan Supplement are incorporated herein by reference and are a part of the Plan as if set forth in full herein and, to the extent not annexed hereto, such exhibits or schedules shall be filed with the Bankruptcy Court as authorized by the Court.

1.4     **Governing Law.**  Except to the extent that the Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations of all parties affected by the Plan shall be governed by, and construed and enforced in accordance with, (i) the laws of the State of North Carolina, without giving effect to the principles of conflicts of law thereof and (ii) the laws of the state of incorporation or organization of each Debtor shall govern corporate governance matters with respect to such Debtor, without giving effect to the principles of conflicts of law thereof.

## ARTICLE II

## METHOD OF CLASSIFICATION OF CLAIMS
## AND INTERESTS AND GENERAL PROVISIONS

2.1     **General Rules of Classification.**  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class or Subclass to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Confirmation Date.

2.2     **Holders of Claims Entitled to Vote.**  Each Holder of an Allowed Claim, or a Claim that has been temporarily allowed for voting purposes by Order under Bankruptcy Rule 3018(a), in an impaired Class shall be entitled to vote to accept or reject the Plan of the Debtors  as provided in such Order.

2.3     **Non-Consensual Confirmation.**  To the extent necessary, the Debtors hereby request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Code.  Subject to section 1127 of the Code, the Debtors reserve the right to modify the Plan to the extent that confirmation pursuant to section 1129(b) of the Code requires modification, provided such modifications are consistent with Article XI of the Plan.

2.4     **Special Provision Regarding Unimpaired Claims.**  Except as otherwise provided in the Plan, nothing herein shall affect the rights and defenses, both legal and equitable, of the Debtors, as the case may be, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

2.5     **Bar Dates for Administrative Claims.**  All parties seeking payment of an Administrative Claim as described in the Administrative Claim Bar Date Order must file with the Bankruptcy Court and serve upon the Debtors a request for payment of such Administrative Claim prior to the applicable deadline set forth below; provided, however, that parties seeking payment of postpetition ordinary course trade obligations, postpetition payroll obligations incurred in the ordinary course of a Debtors' postpetition business and amounts arising under agreements approved by the Bankruptcy Court or the Plan need not file such a request.

With respect to Administrative Claims, other than Fee Claims, relating to, or arising in, the period from the Petition Date through July 31, 2009 and before the Confirmation Date, except to the extent set forth in the Administrative Claim Bar Date Order, a Holder of such Administrative Claim must have filed a request for payment of such Claim by the applicable bar date in order to be eligible to receive Distributions under the Plan on account of such Administrative Claim.  See the Administrative Claim Bar Date Order for more information about how to comply with this deadline and to determine whether this deadline applies to you.  With respect to Administrative Claims (other than Fee Claims) not subject to the Administrative Claim Bar Date Order, including those Administrative Claims arising after July 31, 2009, a Holder of such Administrative Claim must file with the Bankruptcy Court and serve on the Debtors a request for payment of such Claim so as to be received on or before 4:00 p.m. (Eastern Time) on the date that is the first Business Day after the date that is **thirty (30) days after the Effective Date**, unless otherwise agreed to by the appropriate Debtor or Reorganized Debtor, without further approval by the Bankruptcy Court.  **Failure to comply with these deadlines shall forever bar the holder of an Administrative Claim from seeking payment thereof.**

**Any Holder of an Administrative Claim that does not assert such Claim in accordance with this Section shall have its Claim deemed Disallowed under this Plan and be forever barred from asserting such Claim against any of the Debtors, the Estates or their Assets.  Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.**

2.6     **Bar Date for Fee Claims.**  All proofs or applications for payment of Fee Claims must be filed with the Bankruptcy Court and served in accordance with the Fee Order by the date that is the first Business Day after the date that is sixty (60) days after the Effective Date unless otherwise agreed to by the Debtors, without further approval by the Bankruptcy Court.  Failure to comply with these deadlines shall forever bar the holder of a Fee Claim from seeking payment thereof.

**Any Holder of a Fee Claim that fails to file and serve an application in accordance with the Fee Order on or before such time as set forth in this sub-section of the Plan shall have their Claim be Disallowed under the Plan and be forever barred from asserting such Claim against any of the Debtors, the Estates, or their Assets.  Any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.**

2.7     **Bar Dates for Unsecured Claims.**  The bar date for certain Unsecured Claims was established by the Bar Date Order.  The bar date is August 31, 2009.  All proofs of Claim for certain Unsecured Claims were required to be filed with the Bankruptcy Court by the general claims bar date established by the Bankruptcy Court, which was August 31, 2009. **Any Holder of an Unsecured Claim that fails to file such a timely proof of Claim to the extent required by the Bar Date Order, applicable Code sections or Rules, or other orders of the Bankruptcy Court with the Court on or before such time shall have their Claim be deemed a Disputed Claim against any of the Debtors, the Estates or their Assets or alternatively, shall be deemed to have such Claim Allowed in an amount that was listed in the Schedules of Assets and Liabilities, as may be amended, filed by a Debtor in the amount scheduled so long as the Claim was not scheduled as disputed, contingent or unliquidated. Pursuant to the terms of the Bar Date Order, the Plan and the Confirmation Order, any such Claim and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim other than to seek to have such Claim**

**determined to be an Allowed Claim in the Bankruptcy Court.** Any Claim that is a Disputed Claim solely because it was filed after the Bar Dar shall be Allowed or Disallowed by an order of the Bankruptcy Court or by a stipulation between the Holder of such Claim, the Debtors or Reorganized Debtors and the Committee.

2.8    **Less Favorable Treatment.** Any other provision of the Plan notwithstanding, the Holder of an Allowed Claim may agree with the Debtors to receive other, less favorable treatment, than that provided in the Plan.

2.9    **Corrective Actions.** The Debtors are authorized to take such actions as necessary and appropriate to carry out the Plan, including, but not limited to, the correction of mistakes or other inadvertent actions in making distributions or transfers under the Plan. The Debtors may seek return of such transfers to the extent of any errors, notwithstanding that the transfer would otherwise be irrevocable under the Plan.

# ARTICLE III

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Code, Administrative Claims, Fee Claims and Priority Tax Claims, as described below, have not been classified.

3.1    **Administrative Claims.** Subject to the terms herein and unless otherwise agreed by the Holder of an Allowed Administrative Claim (in which event such other agreement shall govern), Allowed Administrative Claim shall be provided for as follows:

(a)    if such Claim is for goods sold or services rendered representing liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases involving customers, suppliers, trade or vendor Claims shall be paid by the Debtors or the Reorganized Debtors in the ordinary course in accordance with the terms and conditions of any Agreements relating thereto;

(b)    if such Claim is for amounts necessary to cure executory contracts and unexpired leases assumed by the Debtors in connection with the orderly operation of its business after the Effective Date shall be paid by the Debtors or the Reorganized Debtors as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

(c)    amounts due other Holders of other Allowed Administrative Claims, including, without limitation, Claims arising pursuant to Section 503(b)(9) of the Bankruptcy Code shall be paid as agreed between the parties, as soon as practicable after the Effective Date or as ordered by the Bankruptcy Court;

(d)    Administrative Claims of the United States Bankruptcy Administrator for fees pursuant to sections 1930(a)(6) and (7) of title 28 of the United States Code shall be paid in accordance with the applicable schedule for payment of such fees by Debtors; and

(e)    other Allowed Administrative Claims shall be paid in full in Cash on the later of (i) the Effective Date or as soon as practicable thereafter and (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

3.2    **Priority Tax Claims.** Subject to the terms herein, each Holder of an Allowed Priority Tax Claim shall be paid 100% of the unpaid amount of such Allowed Priority Tax Claim in Cash by the Debtors on or as soon as reasonably practicable after the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; provided, however, that at the option of the Debtors, the Debtors or the Reorganized Debtors may make (a) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, (b) equal to the Allowed Amount of such Priority Tax Claim, (c) over a period not exceeding five (5) years after Petition Date (the date of the order for relief for these cases), and (d) in a manner no less favorable than the most favorable

nonpriority unsecured claim provided for by the Plan (other than Class 7 Claims) as provided in Section 1129(a)(9)(C) of the Code. If the Debtors elect this option as to any Allowed Priority Tax Claim, then the payment of such Allowed Priority Tax Claim shall be made in installment payments of up to forty-eight (48) monthly installments with the first installment due on the later of: (i) the Initial Cash Distribution, (ii) 30 calendar days after the date on which an order allowing such Allowed Priority Tax Claim becomes a Final Order, and (iii) such other time as may be agreed to by the Holder of such Allowed Priority Tax Claim and the Debtors. Each installment shall include simple interest on the unpaid portion of such Allowed Priority Tax Claim, without penalty of any kind, at the statutory rate of interest provided for such taxes under applicable nonbankruptcy law; provided, however, that the Debtors shall reserve the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Allowed Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty. Any claim or demand for penalty relating to any Priority Tax Claim (other than a penalty of the type specified in section 507(a)(8)(G) of the Code) shall be disallowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty from the Debtors, the Estates, or their Assets.

3.3     **Fee Claims.**  Subject to the terms herein, each Holder of an Allowed Fee Claim shall be paid in the manner specified by the Bankruptcy Court in any order approving payment of such Fee Claim.

3.4     **DIP Lender Claims**.  Subject to the provisions of section 506(d) of the Code and the terms herein, each Holder of an Allowed DIP Lender Claim shall receive such treatment as is agreed between the Debtors and each DIP Lender or determined by Final Order of the Bankruptcy Court.

(a)     **BB&T** shall be paid in full its outstanding Allowed DIP Loan Claim on the Effective Date as set forth in Section 4.6 of the Plan or such other treatment as is agreed between BB&T and the Debtors and approved by the Bankruptcy Court.

(b)     **Sherrill** has agreed to accept a Note from the Reorganized Debtors for 4 years that is payable as follows:  Interest only at the rate of prime plus 2% until the earliest of (i) six months after the confirmation of a plan by the Bankruptcy Court or (ii) twelve months from the Petition Date and thereafter forty-eight (48) equal monthly installments of principal and interest until the Note is paid in full.  Sherrill has agreed not to assert a right to payment as an Administrative Expense Claim prior to Confirmation of a plan.  To the extent interest after the Petition Date is included in the Allowed Amount of any Secured Claim, such interest shall accrue at the rate agreed by the parties or fixed by the Court, compounded annually, unless otherwise provided by Final Order.

(c)     **Larry G. Hendricks and N. Jane Hendricks,** subject to the Confirmation of the Plan, in form and substance acceptable to them, shall purchase Equity in the Reorganized Debtors by converting their post-petition DIP Lender Claim in the amount of $500,000 to Equity as it existed as of the Petition Date or such treatment as is agreed between the Debtors and such parties and approved by the Bankruptcy Court.

## ARTICLE IV

## CLASSIFICATION AND TREATMENT OF PRIORITY, SECURED AND UNSECURED CLAIMS AND EQUITY INTERESTS

4.1     **Class 1 (Priority Non-Tax Claims)**:

Classification:  Class 1 consists of Priority Non-Tax Claims.

Treatment:  Subject to the terms herein and unless otherwise agreed by the Holder of an Allowed Priority Non-Tax Claim (in which event such other agreement shall govern), Allowed Class 1 Claim shall be paid as follows by (a) deferred Cash Distributions of a value, as of the Effective Date of the Plan, equal to the Allowed Amount of such Claim payable monthly beginning on the Initial Distribution Date up to three (3) months beginning on the Effective Date or (b) cash on the Initial Distribution Date as soon as practicable after the Effective Date equal to the Allowed Amount of such Claim.

<u>Voting</u>:  Class 1 is impaired to the extent deferred payments are made, and Holders of Allowed Class 1 Claims are entitled to vote.

4.2   **Class 2 (Secured Claims)**:

<u>Classification</u>:  Class 2 shall consist of all Allowed Secured Claims (including any secured claim of the Guilford County Tax Collector and the Catawba County Tax Collector but excluding BB&T's Claims and the GE Commercial Finance Secured Claim).

<u>Treatment</u>:

<u>Non-Tax Other Secured Claim</u>.  Subject to the provisions of sections 502(b) and 506(d) of the Code and the terms herein, each Holder of an Allowed Class 2 Claim shall, at the option of the Reorganized Debtors, be treated as follows:  (i) the Plan will leave unaltered the legal, equitable and contractual rights to which such Claim entitles the Holder thereof, (ii) return of the collateral securing such Claim, (iii) the proceeds, net of any cost of sale or liquidation, of the Debtors' interest in the relevant collateral, up to the Allowed Secured Amount of such Class 2 Claim; (iv) Cash in the Allowed Amount of such Secured Claim, in exchange for release of the lien securing such Claim, (v) Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) with payment in the ordinary course of business in accord with the terms and conditions of any agreement related thereto; (vi) such other treatment as is agreed to in writing between the Debtors or the Reorganized Debtors and the Holders of such Allowed Secured Claim; or (vii) such other treatment as is determined by Final Order of the Bankruptcy Court to provide the indubitable equivalent of such Allowed Secured Claim.  To the extent interest after the Petition Date is allowable and included in the Allowed Amount of any Secured Claim in Class 2; such interest shall accrue at the lower of a non-default contractual rate of interest provided for such Allowed Class 2 Claim or as otherwise provided by Final Order.

<u>Secured Tax Claim</u>.  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a different treatment, each Holder of an Allowed Secured Tax Claim shall receive at the option of the Debtors or Reorganized Debtors, (i) on the date of the Initial Distribution after the Effective Date or the date on which such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or (ii) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, (a) equal to the Allowed Amount of such Allowed Secured Tax Claim, (b) over a period not exceeding five (5) years after Petition Date (the date of the order for relief for these cases), and (c) in a manner no less favorable than the most favorable nonpriority unsecured claim provided for by the Plan (other than Class 7 Claims) as provided in Section 1129(a)(9)(C) of the Code.  If the Debtors elect the second option above as to any Allowed Secured Tax Claim, then the payment of such Allowed Secured Tax Claim shall be made in installment payments of up to forty-eight (48) monthly installments with the first installment due on the later of: (i) the Initial Cash Distribution, (ii) 30 calendar days after the date on which an order allowing such Allowed Secured Tax Claim becomes a Final Order, and (iii) such other time as may be agreed to by the Holder of such Allowed Secured Tax Claim and the Debtors.  Each installment shall include simple interest on the unpaid portion of such Allowed Secured Tax Claim, without penalty of any kind, at the statutory rate of interest provided for such taxes under applicable nonbankruptcy law; <u>provided</u>, <u>however</u>, that the Debtors shall reserve the right to pay any Allowed Secured Tax Claim, or any remaining balance of such Allowed Secured Tax Claim, in full, at any time on or after the Effective Date, without premium or penalty.

<u>Voting</u>: Class 2 is not impaired, and Holders of Allowed Class 2 Claims are not  entitled to vote.

4.3   **Class 3 (Customer Deposit Claims)**:

Classification:  Class 3 (Customer Deposit Claims) consists of all customers of the Debtors who paid deposits to or have credits or gift certificates with any of the Debtors whose Claims have not been satisfied prior to the Confirmation Date.

Treatment:  Each Holder of an Allowed Class 3 Claim shall receive the treatment set forth in 3(A) below with a right of certain Holders to elect treatment under 3(B) below.  **The Holder of an Allowed Class 3 Claims will receive a Right to Elect treatment under sub-classification 3B below and movement of their Claims to one or more other classes.**  The Claim of any Holder of a Class 3 Claim that does not elect to treatment under 3B below shall be treated under 3A below.

3A Treatment:    The Holder of an Allowed Class 3 Claim against the Debtors shall be treated under this sub-classification and given the option to complete their purchase transaction or use any credit balance or gift certificate with the Debtors or the Reorganized Debtors pursuant to the Debtors' customer practices in the ordinary course of business of the Reorganized Debtors. Such Holders will receive Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) of their Claim and (i) upon tender of delivery and final payment for the goods and merchandise purchased by such Holder from the Debtors, such Holder shall receive full credit for their respective deposit, credit balance or gift certificate or (ii) such other treatment as is determined by Final Order of the Bankruptcy Court. Such treatment shall be in full and complete satisfaction of the Holder's claims.

3B Treatment:    The Holder of an Allowed Class 3 Claim whose Claim results from (i) a prepayment deposit, (ii) a credit balance resulting directly from a prepayment deposit or (iii) a gift certificate, who voluntarily elects not to complete their purchase transaction or use of such qualified credit balance or gift certificate with the Debtors and who demands a refund from the Debtors will be allowed to elect out of the treatment of Allowed Class 3 Claims.  Such Holders as identified  in (i-iii) of the preceding sentence may have one or more of the following Claims: (a) if the Holder of such Claim is an individual, a Claim in Class 1 up to the amount of the priority of up to $2,425 for each individual provided by Section 507(a)(7) of the Bankruptcy Code for a deposit Claim or (b) a Claim in either Class 7 or 8 to the extent such Holder has an Allowed Claim that is not entitled to a priority as set forth in Section 507(a)(7) whether in full or to the extent of any non-priority amount.   The Holders of Allowed Class 3 Claims who elect treatment under this sub-classification shall elect to move to Class 1, 7 or 8 as applicable and be treated thereunder.  Such treatment shall be in full and complete satisfaction of the Holder's claims.

Voting:  The Holders of Allowed Class 3 Claims are not impaired and are not entitled to vote.  The Holders of Allowed Class 3 Claims who are entitled to elect treatment under 3B above and thereby elect out of Class 3 shall elect to be transferred to Classes 1, 7 or 8 and will be thereafter be entitled to be treated under such other applicable class or classes.

4.4      **Class 4.  Workers Compensation Claims.**

Classification:  Class 4 consists of the Worker Compensation Claims. .

Treatment:  The Holders of Allowed Workers Compensation Claims against the Debtors will receive Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) of their claim subject to a full and complete reservation of all rights and defenses available to the applicable Debtor and upon completion of any  administrative or judicial procedure to determine the amount of such claim, such Holder shall receive payment of their respective Allowed Claims as determined under applicable non-bankruptcy law.

Voting:  Class 4 is not impaired, and Holders of Allowed Class 4 Claims are not entitled to vote.

4.5    **Class 5 (GE Commercial Finance Secured Claims)**:

    <u>Classification</u>: Class 5 consists of GE Commercial Finance's Claims.

    <u>Treatment</u>:  Subject to the provisions of section 506(d) of the Code and the terms herein, each Holder of an Allowed Class 5 Claim shall receive on account of that Claim on the Effective Date, Reinstatement in accordance with the provisions of 11 U.S.C. Sections 1124(1) or 1124(2) with payment in the ordinary course of business in accord with the terms and conditions of any agreements related thereto

    <u>Voting</u>: Class 5 is not impaired, and the Holder of an Allowed Class 5 Claims is not entitled to vote.

4.6    **Class 6 (BB&T Claims)**:

    <u>Classification</u>: Class 6 consists of BB&T's Claims including the treatment of BB&T DIP Lender Claims.

    <u>Treatment</u>:  The BB&T Claims (other than BB&T DIP Lender Claims) are Allowed, including post-petition interest, fees and charges.  In full and final satisfaction of the BB&T Claims (other than BB&T DIP Lender Claims), the Debtors shall execute the New BB&T Loan Documents in a form acceptable to BB&T and consistent with the treatment described below or such other treatment as is agreed between the Debtors and BB&T and approved by the Bankruptcy Court. The obligations of the Debtors under the New BB&T Loan Documents shall be secured by perfected liens on all assets of the Debtors without any further action on the part of the Debtors or BB&T; provided that BB&T shall be authorized to file or record financing statements, mortgages or other instruments in any jurisdiction, or take any other action, as BB&T deems necessary to perfect such liens.

    <u>Existing Credit Facilities</u>:

1.    Note 1 Prepetition Line of Credit (dated 6/1/98 in the amount of $11,728,364 as of the petition date): borrower:  HFG; Guarantors:  HFG, Norris and Larry Hendricks

2.    Note 2 Prepetition Short Term Loan (dated 5/30/07 for $6,184,220 as of the petition date): borrower: HFG – Conover Mortgage; Guarantors: HFG, Norris and Larry Hendricks

3.    Note 3 Prepetition Over-line Loan (dated 9/30/08 for $3,000,000 as of the petition date): borrower: HFG; Guarantors: HFG; Guarantors:  HFG, Norris and Larry Hendricks

4.    Note 4 Post Petition DIP Loan (dated 6/10/09 for $500,000 projected upon Exit): borrower: HFG, Norris, CMS; Guarantors: None

5.    Note 5 Letter of Credit Supporting Self-Insured Workers Compensation Plan: Current Exposure estimated at $550,000 (Face Amount: $2,875,000);

6.    Ledger Debt - Approximately $375,000.

7.    Credit Card Chargeback Recovery – Approximately $424,000.

Total indebtedness <u>$ 21,791,584 [including approx. $375,000 in ledger debt but excludes $550,000 in contingent liabilities</u>

**<u>BB&T'S DIP LENDER CLAIMS</u>:**

$500,000 of the $2,000,000 advanced by BB&T post-petition ($1,500,000 of which was participated to Sherrill Furniture) will be paid in full in cash on the Effective Date of the Debtors' Plan of Reorganization, including in part from a payment to the Debtors of post-petition credit card recoveries for pre-petition charges of approximately $424,000 and the $76,000 balance from cash of the Borrowers.  The balance of $1,500,000 would be assigned by BB&T to Sherrill Furniture outright (and the participation interest cancelled) and would be treated as previously agreed by Sherrill Furniture. Any continuing lien securing the obligations to Sherrill Furniture (the "Sherrill Note") would be subordinated to the liens of BB&T (and any refinancing of BB&T) pursuant to terms acceptable to BB&T.

### NOTE A – LINE OF CREDIT:

Principal Balance (deemed outstanding upon Exit): $5,268,380
Credit Line:        $8,000,000
  Advance Rate     55%
  Term:   1 year
Interest Rate:        Prime + 0.25%
Payment Terms:              Monthly interest payments commencing upon emergence with the outstanding
                            balance due on maturity
Annual Interest Payments (estimated)   $175,000
Contingent Liability for the adjusting estimated exposure for the Letter of Credit Supporting the Self-Insured Workers Compensation Plan shall be reserved against availability and such reserve regarding BB&T Merchant Services as is mutually agreed.

### NOTE B – CONOVER MORTGAGE:

Principal Balance (projected upon Exit):  $6,184,220
  Interest Rate:        Prime + 0.25%
Payment Terms:
  •        Monthly interest payments commencing upon emergence
  •        Monthly principal payments of $20,000 commencing January 15, 2011
  •        Due in full January 15, 2015
Annual Debt Service Payments (estimated):
  •        Interest          $ 200,000
  •        Principal         $ 240,000
  •        Total             $ 440,000

### NOTE C – TERM NOTE:

Principal Balance:        $7,424,000
Interest Rate:            Prime + 0.25%
Payment Terms:
  •        Monthly interest payments beginning on January 15, 2010
  •        Monthly principal payments of $10,000 beginning January 15, 2011
  •        Due in full January 15, 2015
Annual Debt Service Payments (estimated):
  •        Interest          $ 260,000
  •        Principal         $ 120,000
  •        Total             $ 380,000

### NOTE D– SECOND TERM NOTE:

Principal Balance:  $2,834,984   (the balance is subject to adjustment up or down based
                                 on the final amount of the ledger debt)

Interest Rate: Prime + 5%
Payment Terms:

Note D would accrue interest compounded quarterly beginning in January 2010.
Payment from any Subrogation Payment Funds shall be applied first to amounts
outstanding under Note D and thereafter to amounts outstanding under Note C.
Due in full January 15, 2015

**Other collateral and payments**:

BB&T holds as additional collateral for its loans certain real estate located in Guilford County, North
Carolina ("HFG Additional Collateral").  If any of the HFG Additional Collateral is sold while there is a
remaining principal balance due under Note D, Note C or Note B, the net proceeds of such sales shall be
used first to pay down the remaining principal due under Note D, then to pay down the remaining
principal due under Note C and then to pay down the remaining principal due under Note B.

BB&T holds as additional collateral for its loans certain collateral owned by Larry and N. Jane Hendricks
("Hendricks Collateral") that has been pledged to assist the Borrowers.
The Hendricks Collateral includes the Mooresville Property discussed below.

Mooresville Property:   The "Mooresville Property" is the home and real property owned by Larry G.
Hendricks and N. Jane Hendricks (the "Hendricks") in Mooresville, North Carolina subject to a first lien
deed of trust in favor of BB&T securing debt of the Hendricks in the amount of approximately $5.5 million
and a second lien deed of trust in favor on BB&T securing debts of HFG and Larry G. Hendricks. The
Mooresville Property is also subject to other junior lien claims.   The Hendricks shall expend their best
efforts to cause a sale of the Mooresville Property for a price acceptable to BB&T as soon as is reasonably
practicable.  On or before the Effective Date, the Hendricks shall fund an interest escrow account with an
amount sufficient to pay BB&T interest accruing (and taxes and insurance) on the Mooresville Property
first deed of trust loan for a period of 18 months (the "Interest Reserve").  If the Mooresville Property is
sold for a net amount of more than $5.5MM, then the excess amount, up to $4.5MM, shall be paid to
BB&T and applied to the Note D indebtedness and thereafter to the Note C indebtedness.
BB&T has agreed to release its deeds of trust on the Mooresville Property upon its receipt of $10.0 million
from a consensual sale of the Mooresville Property.

Subrogation:  The Hendricks' subrogation rights, whether arising from a sale of the Mooresville Property or
otherwise, shall be matured and fixed upon BB&T's receipt of any Subrogation Payment Funds in the
amount of such Subrogation Payment Funds received; provided that such subrogation rights shall be
expressly subordinated to the repayment in full of (i) all indebtedness owed to BB&T (and any lender
refinancing the indebtedness owed to BB&T), (ii) the Sherrill Note and (iii) the Reorganized Debtors
payment of the amounts required to be paid to the Holders of Allowed Claims in Class 8 pursuant to the
Debtors' confirmed Plan.  As used herein, the term "Subrogation Payment Funds" means (a) up to
$4,500,000 of the net determined (after payment of the underlying first deed of trust of BB&T, payment of
the $500,000 post-petition loan to the Hendricks and the funding of the Interest Reserve) proceeds from
the sale of the Mooresville Property for an amount in excess of $5.5MM (plus any unpaid interest) or (b)
any and all funds from the Hendricks in payment of the New BB&T Loans or the BB&T Claims or from
the sale or assignment of any other asset that has been pledged by the Hendricks to secure any of the
Reorganized Debtors' debts to BB&T.  The Hendricks shall not exercise any subrogation rights or
remedies until such time as all indebtedness owed to BB&T, and any refinancing thereof, have been paid
in full.

Subordination of Rights to Payments or Distributions; Allowance of Claims:  The Hendricks have agreed
that the Allowed DIP Lender Claim of the Hendricks which shall be converted to equity under the Plan,
and all other Claims scheduled by the Debtors or filed by the Hendricks as of the Confirmation Date or by
N. Jane Hendricks, as discussed in the immediately following paragraph, shall be subordinated as to
payment until such time as (i) all BB&T debts (and any refinance thereof) by the Debtors, the Reorganized
Debtors and the Hendricks shall have been paid in full; (ii) the Sherrill Note has been paid in full; and (iii)
creditors of the Debtors who are the Holders Allowed Unsecured Claims shall have received all
distributions as provided in Section 4.8 of the Plan,

The Claims of N. Jane Hendricks (a) in the prepetition principal amount of $962,070, and (b) resulting from any payment to any Allowed Claim of Noori's Liquidation Center that may be made out of her own funds shall be allowed and not subject to dispute, disallowance, reduction, offset or subordination except as expressly provided herein.  These claims shall be Allowed Class 8C Claims and shall not be discharged under the Plan (but shall be subordinated as provided above).

**Notwithstanding the foregoing and any other provision of this Plan, neither the Debtors nor the Reorganized Debtors shall be obligated to make Minimum Payments or True Up Amount payments to the Disbursing Agent for the Creditors' Fund as set forth in Section 4.8 herein based upon the Allowed Class 8C Claim of N. Jane Hendricks nor shall the Disbursing Agent be obligated to collect or distributed funds from the Debtors or the Reorganized Debtors based upon the Allowed Class 8C Claim of N. Jane Hendricks.**


<u>**Additional payments**</u>:

(1)        The Minimum Payment to be paid on a monthly basis is a prepayment of
 the amount to be distributed under the Net Amount Distributable From EBITDA Calculation.  Provided that the Reorganized Debtors are authorized to make a Minimum Payment as defined in the Plan then beginning on or before June 30, 2011, the Minimum Payments shall be paid (a) to the Disbursing Agent for deposit to the Creditors' Fund for the Holders of Class 8C Claims of $25,000 as provided in Section 4.8 herein and (b) to BB&T of $10,417 for principal reduction of Notes D and C as provided in Section 4.6 herein.

 **Notwithstanding the foregoing, if the Class 8B Notes have not been paid in full by June 30, 2011, the Minimum Payments by the Reorganized Debtors shall not begin until earlier of (a) payment in full of the Class 8B Notes or (b) January 31, 2012.**

This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.

 **For example and for illustrative purposes only**: The proposed Minimum Payment (beginning on June 30, 2011 for the 12 months from June 30, 2011 through May 31, 2012 provided to the Disbursing Agent ($25,000 monthly) for deposit to the Creditors' Fund for the benefit of Holders of Class 8C Claims would total $300,000 for the 12 month period and to BB&T ($10,417 monthly) for principal reductions of Notes D, C and B would total $125,000 for the 12 month period and serves as prepayment against amounts owed by the Reorganized Debtors under the Net Amount Distributable From EBITDA Calculation in accordance with the Plan. It is anticipated that the Minimum Payments will begin prior to an amount being due under the Net Amount Distributable From EBITDA Calculation and thus are a prepayment of the distribution under that calculation.

 (2)        Annually based on the fiscal year (currently ending on December 31st) of the Reorganized Debtors, the Reorganized Debtors, BB&T and the Disbursing Agent shall determine, prior to end of the sixth month after the end of the prior fiscal year, the Net Amount Distributable From EBITDA Calculation which is an amount equal to 85% of the consolidated EBITDA for the prior fiscal year in excess of the amount of EBITDA needed to achieve a Debt Service Coverage Ratio of 1.25 to 1.0.   The portion sharing of 85% is 60% to the Disbursing Agent for deposit to the Creditors' Fund and 25% to BB&T as set forth in the Plan.

 If the Reorganized Debtors, BB&T and the Disbursing Agent agree that the required Debt Service Coverage Ratio has been met for the prior fiscal year and that a distribution is due under the determined calculation then to the extent such distribution is in excess of the Minimum Payments previously made (the "**True Up Amount**"), the Reorganized Debtors will owe the True Up Amount to the Disbursing Agent and to BB&T based on the percentages set forth above.

The Reorganized Debtors shall pay the respective amounts due for the True Up Amount on or before the end of the sixth month after the end of the prior fiscal year to the Disbursing Agent for deposit to the Creditors' Fund and to BB&T. For clarification, the True Up Amount would be the amount determined to be due under the Net Amount Distributable From EBITDA Calculation for the prior fiscal year of the Reorganized Debtors less amounts already paid by the monthly Minimum Payments. This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.

**For example and illustrative purposes only**: If the Reorganized Debtors had previously remitted Minimum Payments (a) to the Disbursing Agent for deposit to the Creditors' Fund in the sum of $300,000 and (b) to BB&T in the sum of $125,000 and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $360,000 and $150,000, respectively, the difference of $60,000 and $25,000 would represent the True Up Amount due each party. The True Up Amount will be due to be paid on or before the end of the sixth month after the end of the prior fiscal year. If the Reorganized Debtors remitted Minimum Payments totaling $300,000 and $125,000 respectively to the parties as outlined above and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $240,000 and $100,000, respectively, then no True Up Amount would be due for that period.

## Additional BB&T Treatment Issues:

Pledge of Membership Interests: BB&T will receive a pledge of the membership interest of Larry Hendricks in HFG (anticipated to be not less than 70%) and that pledge would be released upon BB&T receiving not less than $4.5 million in net proceeds (after payment of any underlying obligation of the Hendricks to BB&T, including the underlying first deed of trust obligations on the Mooresville Property and the $500,000 made available to the Hendricks to fund their post-petition DIP Loan to the Debtors) from a sale of the Mooresville Property or other collateral pledged by the Hendricks (the "Required Paydown"). The extension of the maturity of the underlying deed of trust(s) on the Mooresville Property and the $500,000 loan to the Hendricks after the Petition Date shall be on terms acceptable to BB&T and the Hendricks, including a pledge by the Hendricks of any anticipated tax returns (subject, however, to rights reserved with respect to a 2009 income tax refund in Section 4.8 of this Plan).

Voting Trust: BB&T will receive, pursuant to a voting trust agreement or other documentation in form acceptable to BB&T and Larry Hendricks, the right to vote the 70% membership interest of Larry Hendricks in HFG. BB&T's rights in respect of the voting trust agreement would be surrendered once BB&T has received the Required Paydown, provided that (i) not less than 60 days had elapsed since BB&T's receipt of the reviewed financial statements of the Reorganized Debtors for the fiscal year 2010 in the form required by the New BB&T Loan Documents, and (ii) upon receipt of the Required Paydown, or the date that is 12 months after the Effective Date (if later), provided that no Event of Default then exists under the BB&T existing credit facilities.

Larry G. Hendricks shall serve as the manager of HFG following the dates on which the Plan is confirmed and becomes effective, and shall remain as a manager of HFG so long as he is competent and willing. Each person holding an equity interest in HFG as of the Petition Date has the right (but not the obligation) to remain employed by HFG upon confirmation of the Plan, subject to the rights of HFG's manager to terminate or modify the terms of such employment. Until such time as all indebtedness due BB&T shall have been paid in full and the Holders of Allowed Unsecured Claims in Class 8 shall have received a distribution as provided in Section 4.8 of the Plan: (i) no such equity holder, nor any relative of such equity holder that has been employed by HFG or any of its affiliates within one year of the Petition Date (a "Subject Person"), shall receive a bonus or pay increase from HFG except for cost of living adjustments; and (ii) HFG's members shall not be allowed to sell, assign or distribute any of their membership interests in HFG except that any member of HFG may assign any or all of his or her membership interests to any relative, directly or through a trust or other estate planning device, at any time and without restriction and Larry Hendricks may pledge his membership interests to BB&T as contemplated hereby without restrictions. Each Subject Person shall be required to act in the best interests of HFG and its creditors so long as such Subject Person remains employed by HFG.

The restated operating agreement of HFG shall be in a form reasonably acceptable to BB&T and to the Creditors' Committee.

**Letter of Credit**:   HFG's obligations to reimburse BB&T in connection with any draws would remain upon emergence.  Face amount would be reduced in the future.

**BB&T Merchant Services**:   Existing merchant services credit agreement to remain in place and all reimbursement obligations to remain upon emergence.

| **Borrowers and Guarantors**: | Existing: | • | HFG |
| | | • | Norris Furniture & Interiors, Inc. |
| | | • | Larry Hendricks |
| | New: | • | HFG |
| | | • | CMS |
| | | • | Larry Hendricks |

**Collateral**:   All assets of the Debtors (other than Avoidance Actions) to secure all obligations to BB&T upon emergence provided that BB&T will only require execution of a junior deed of trust on the property located in Guilford County, North Carolina encumbered by a lien in favor of GE Commercial Finance to the extent such junior lien is obtained with the express written consent of GE Commercial Finance and does not cause a default under the loan agreement with GE Commercial Finance.  Further, such junior deed of trust if obtainable would be subject to any documentation, including, a subordination agreement as is reasonably acceptable to GE Commercial Finance.

**Reporting Requirement**:

1.      Monthly internal financial statements
2.      Monthly Borrowing Base Certificate / ABL Reporting
3.      Annual financial statements presented in accordance with GAAP
4.      Such other reporting as is reasonably requested by BB&T.

**Covenants**:   1.      Financial covenants
                    a.      EBITDA/Debt Service Coverage (Quarterly)
                    b.      Inventory Coverage Ratio (Advance rate 55%)
                    c.      Capital Expenditures not to exceed $1.0M on an annual basis
              2.      Owner's compensation will be limited to that outlined in the Forecast as presented in the Disclosure Statement
              3.      Any distributions, dividends, or payments to any related party will be dealt with as set forth above
              4.      No new debt, guarantees or encumbrances unless approved by BB&T
              5.      Such other covenants as are reasonably requested by BB&T.

Voting: Class 6 is impaired, and the Holder of an Allowed Class 6 Claims is entitled to vote.

4.7     **Class 7 (Convenience Claims)**:

Classification:  Class 7 consists of the Convenience Claims.

Treatment:  The Holders of Allowed Unsecured Claims against the Debtors of  equal to or less than $1,000.00 or the Holders of Allowed Unsecured Claims of greater than $1,000.00 who elect to reduce their Claims to equal to or less than $1,000.00 shall receive twenty-five (25%) percent of such Allowed Unsecured Claim in one or more payments of up to three (3) monthly payments, without interest, of approximate equal amounts beginning with the first payment within 30 days

after the Effective Date of the Plan and continuing every 30 days after the first payment date in full and complete satisfaction of all claims against the Debtors.

<u>Voting</u>:  Class 7 is impaired, and Holders of Allowed Class 7 Claims are entitled to vote.

4.8      **Class 8 (Unsecured Claims):**

<u>Classification</u>:  Class 8 consists of the Unsecured Claims that are not Priority Non-Tax Claims, Workers Compensation Claims, Convenience Claims or Claims that the Holders have not elected to reduce their Allowed Claims to less than $1,000.00 in order to participate in Class 7.

<u>Treatment</u>:  Creditors who are the Holders of Allowed Unsecured Claims in Class 8 shall be entitled to receive distributions under the Plan as follows or such other treatment as is agreed to in writing by the Debtors or the Reorganized Debtors and the Holders of such Allowed Class 8 Claims with the consent of any applicable secured creditor.

**Holders of Class 8 Claims have <u>three (3)</u> <u>options</u> or <u>elections</u> regarding the treatment of their Claim as shown below.   As set forth herein and on the Class 8 Ballot, any Holder of a Class 8 Claim who (a) fails to return a Class 8 Ballot, (b) fails to specifically designate on the Class 8 Ballot only one of the three treatment options, <u>or</u> (c) designates more that one option for treatment on the Class 8 Ballot will be deemed to have elected treatment under Class 8B.**

<u>8A Treatment</u>:  Holders of Claims in Class 8 may vote to (a) elect to reduce their claims to $1,000.00 and (b) to participate in the Distribution to be made pursuant to the Holders of Allowed Class 7 Claims <u>if and when such Claims are determined to be an Allowed Claim</u>.  Holders of Claims in Class 8 who elect such treatment shall be deemed to waive and release any Claim that exceeds the amount of $1,000.00 and the balance of any Claims by the creditors electing option 8A shall be discharged.   Such Holders upon the election to move to Class 7 shall no longer be a Holder of a Class 8 Claim.  **The Ballot for voting on the Plan for Class 8 Claims shall contain the election for any Holder of an Allowed Class 8 Claim who wishes to reduce such Claim and participate in the Distribution for the Holders of Allowed Class 7 Claims.**

<u>8B Treatment</u>:      Holders of Allowed Claims in Class 8 may elect to participate in a distribution pool, if and when their Claims are Allowed Claims, designated as the "Class 8B Fund" in an aggregate amount of up to $1,000,000 to be funded in two (2) separate Distributions of $500,000 each (a) the first Distribution within sixty (60) days of the Effective Date and (b) the second Distribution on June 30, 2011 as set forth herein.   Assuming that the conditions to the establishment of the Class 8B Fund are met, the Reorganized Debtors shall be obligated to make the first Distribution as provided above, and the second Distribution on June 30, 2011 but only to the extent the Reorganized Debtors maintain a minimum net availability of $1.0 million under the revolving credit facility with BB&T under the New BB&T Loan Documents both immediately prior to and after making such second Distribution (such conditions, the "Distribution Conditions").

**<u>Condition Precedent to Creation of Class 8B</u>: Class 8B will be created <u>and</u> the proposed Distribution to Holders of Allowed Class 8B Claims shall be due and will be made <u>if and only if sufficient Holders of Allowed Class 8 Claims that equal or exceed the minimum amount of $5,000,000 ("Class 8B Minimum Amount") elect treatment as Class 8B Claims or are deemed to have elected such treatment as provided herein.</u>**

The Distribution to be made to Holders of Allowed Class 8B Claims shall be made in two (2) installments:  (a) the first, within 60 days of the Effective Date of the Plan in the amount of $500,000 and (b) the second due on June 30, 2011 in the amount of $500,000, subject to the availability limitations described above.   The second installment shall be represented by notes to each Holder of an Allowed Class 8B Claim in a dollar amount based upon the percentage of the second Distribution that is allocated to such Claim Holder (the "Class 8B Notes").

**For example and illustrative purposes only:** If the Holders of Allowed Class 8 Claims equaling $5,000,000 elect Class 8B treatment then such electing Holders of Allowed Class 8B Claims would receive installment payments of approximately 10% each of their Allowed Claims, the first within sixty (60) days of the Effective Date and the second on June 30, 2011 (subject to the conditions and Class 8B Notes set forth herein). In this example, the amount of the second Distribution for each Holder of an Allowed Class 8B Claim shall be represented by the Class 8B Note.   In this example, the total estimated to be distributed to the Holders of Allowed Class 8B Claims is approximately 20% of their respective Allowed Claims.   **For further example only**, if the Holders of Allowed Class 8 B Claims totaling $8,000,000 elect Class 8B treatment then the approximate payment percentage would be 6.25% for each installment payment and total an approximate payment of 12.5% (subject to the conditions set forth herein).

The Class 8B Notes shall be structured to provide for payment on June 30, 2011 but include a grace period for the Reorganized Debtors to make such payments through and including December 31, 2011 without penalty.  The Reorganized Debtors may make partial payments against the Class 8B Notes until such notes are fully paid from amounts in excess of net availability under the revolving credit facility of $1.0 million.

If the Reorganized Debtors have not fully paid the Class 8B Notes before January 1, 2012, then (a) any unpaid portion of the Class 8B Notes shall bear interest at the rate of six (6%) percent per annum beginning on January 1, 2012 and (b) each Holder of a Class 8B Note that had not been fully paid may sue to recover any balance then due under such Holder's Note.

To the extent that BB&T has a lien on tax refund for the tax year 2009 to be received by Larry G. Hendricks and (i) the Reorganized Debtors meet the Distribution Conditions and (ii) the Reorganized Debtors maintain a Debt Service Coverage Ratio of at least 1.0 to 1.0 for the six-month period ending on June 30, 2011, BB&T shall release its lien on an amount of up to $250,000 of such tax refund and shall permit Larry G. Hendricks to contribute such funds to the Reorganized Debtors as an additional contribution to Equity and in support of the Plan which sum shall be distributed by the Reorganized Debtors as part of the second Distributions to the Holders of Allowed Class 8B Claims if Class 8B qualifies under this Plan.  If no funds from the tax refund for 2009 are received by the Reorganized Debtors from Larry G. Hendricks by June 30, 2011, if BB&T is not obligated to release its lien or if the amount received by the Reorganized Debtors from Larry G. Hendricks is insufficient to fund up to $250,000, then the balance to bring the second Distribution amount to $500,000 shall come from the Reorganized Debtors.

Immediately following the payment in full of the Class 8B Notes, the Allowed Amount of the Class 8B Notes shall be deemed paid and discharged and each paid Class 8B Note shall be deemed fully satisfied, canceled and of no further force or effect pursuant to this Plan and the Confirmation Order without further action of the Reorganized Debtors or the Holders of the Class 8B Notes.

On the Effective Date of the Plan, all Claims of Holders of Class 8B Claims (other than the amounts to be distributed under the Plan to the Holders of Allowed Class 8B Claims), for or on account of a Class 8B Claim, shall be discharged.

**The Ballot for voting on the Plan for Class 8 Claims shall contain the election for any Holder of an Allowed Class 8 Claim who wishes to elect treatment under Class 8B.**   Assuming the Class 8B Minimum Amount elects treatment under Class 8B, the percentage repayment from the Class 8B Fund to the Holders of Allowed Class 8 Claims under the Debtors' Plan who elect treatment under Class 8B will vary depending on the amount of Allowed Claims that elect such treatment.  **As set forth herein and on the Class 8 Ballot, any Holder of a Class 8 Claim who (a) fails to return a Class 8 Ballot, (b) fails to specifically designate on the Class 8 Ballot only one of the three treatment options, or (c) designates more that one option for treatment on the Class 8 Ballot will be deemed to have elected treatment under Class 8B.**

**If the Class 8B Minimum Amount is not reached, then any Holder of a Class 8 Claims that elected treatment for their Claim as a Class 8B Claim shall be deemed to have elected the treatment as the Holders of Claims under Class 8C.**

<u>8C Treatment</u>:    Holders of Unsecured Claims in Class 8 who do not make the election under 8A or 8B, may make an election to have their Class 8 Claims treated under Class 8C.   Treatment under Class 8C involves payment based upon different formulas over time.   If and when their Claims shall become Allowed Class 8C Claims, shall receive Distributions from the Creditors' Fund as follows: After the Confirmation Date and on or before the Effective Date, the Court will appoint a Disbursing Agent to make Distributions to the Holders of Allowed Class 8C Claims (excluding, however, N. Jane Hendricks) as set forth in the Plan and in the proposed Disbursing Agent's Agreement to be filed with the Plan or as part of the Plan Supplement.  The duties and responsibilities of the Disbursing Agent are set forth herein and in the Disbursing Agent's Agreement.   The duties of the Disbursing Agent shall include reviewing and verifying the determination of the Net Amount Distributable From EBITDA Calculation.

The Plan forecasts 2 related payments to the Creditors' Fund:

(1)    The Minimum Payment to be paid on a monthly basis is a prepayment of the amount to be distributed under the Net Amount Distributable From EBITDA Calculation. Provided that the Reorganized Debtors are authorized to make a Minimum Payment as defined in the Plan then beginning on or before June 30, 2011, the Minimum Payments shall be paid (a) to the Disbursing Agent for deposit to the Creditors' Fund for the Holders of Class 8C Claims of $25,000 as provided in Section 4.8 herein and (b) to BB&T of $10,417 for principal reduction of Notes D, C and B as provided in Section 4.6 herein. This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T. **Notwithstanding the foregoing, if the Class 8B Notes have not been paid in full by June 30, 2011, the Minimum Payments by the Reorganized Debtors shall not begin until earlier of (a) payment in full of the Class 8B Notes or (b) January 31, 2012.**

**For example and for illustrative purposes only**: The proposed Minimum Payment (assuming beginning on June 30, 2011) for the 12 months from June 2011 through May 2012 provided to the Disbursing Agent ($25,000 monthly) for deposit to the Creditors' Fund for the benefit of Holders of Class 8C Claims would total $300,000 for the 12 month period and to BB&T ($10,417 monthly) for principal reductions of Notes D, C and B would total $125,000 for the 12 month period and serves as prepayment against amounts owed by the Reorganized Debtors under the Net Amount Distributable from EBITDA Calculation in accordance with the Plan. It is anticipated that the Minimum Payments will begin prior to an amount being due under the Net Amount Distributable From EBITDA Calculation and thus are a prepayment of the distribution under that calculation.

As referenced in Section VI of the Disclosure Statement, the Debtors' Projections should allow for the making of the Minimum Payments.

(2)    Annually based on the fiscal year (currently ending on December 31st) of the Reorganized Debtors, the Reorganized Debtors, BB&T and the Disbursing Agent shall determine, prior to end of the sixth month after the end of the prior fiscal year, the Net Amount Distributable From EBITDA Calculation which is an amount equal to 85% of the consolidated EBITDA for the prior fiscal year in excess of the amount of EBITDA needed to achieve a Debt Service Coverage Ratio of 1.25 to 1.0.   The portion sharing of 85% is 60% to the Disbursing Agent for deposit to the Creditors' Fund and 25% to BB&T as set forth in the Plan.

If the Reorganized Debtors, BB&T and the Disbursing Agent agree that the required Debt Service Coverage Ratio has been met for the prior fiscal year and that a distribution is due under the determined Net Amount Distributable From EBITDA Calculation then to the extent such

distribution is in excess of the cumulative Minimum Payments previously made (the "True Up Amount") and so long as the prior Minimum Payments were not applied to any prior True Up Amount, the Reorganized Debtors will owe the True Up Amount to the Disbursing Agent and to BB&T based on the percentages set forth above.  For the avoidance of doubt, the cumulative Minimum Payments shall not include net Minimum Payments previously applied to fulfill a prior obligation based upon Net Amount Distributable From EBITDA Calculation for the Creditors' Fund and BB&T.  The Reorganized Debtors shall pay the respective amounts due for the True Up Amount on or before the end of the sixth month after the end of the prior fiscal year to the Disbursing Agent for deposit to the Creditors' Fund and to BB&T.  This process will be repeated each year provided amounts are still due to complete the Class 8C Distribution and/or to BB&T.

**For example and illustrative purposes only**:  If the Reorganized Debtors had remitted cumulative Minimum Payments (a) to the Disbursing Agent for deposit to the Creditors' Fund in the sum of $300,000 and (b) to BB&T in the sum of $125,000 and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $360,000 and $150,000, respectively, the difference of $60,000 and $25,000 would represent the True Up Amount due each party. The True Up Amount will be due to be paid on or before the end of the sixth month after the end of the prior fiscal year.  If the Reorganized Debtors remitted Minimum Payments totaling $300,000 and $125,000 respectively to the parties as outlined above and the Net Amount Distributable From EBITDA Calculation for the prior fiscal year warranted payments totaling $240,000 and $100,000, respectively, then no True Up Amount would be due for that period and the prepayment carry forward will be $60,000 and $25,000 respectively.

The Disbursing Agent shall make a Distribution to the Holders of Allowed Class 8C Claims (excluding, however N. Jane Hendricks) and reserve a prorata Distribution to the Holders of a Disputed Class 8C Claim if  the amounts available in the Creditors' Fund at the time of a Distribution to the Holders of Allowed Class 8C Claims equals or exceeds two (2%) percent of the total amount of Class 8C Claims including for purposes of any Distributions, Disputed Amounts held in the Disputed Claims Reserve for Class 8C Claims (but excluding the Allowed Class 8C Claim of N. Jane Hendricks)  but shall not make a Distribution if such amounts available in the Creditors' Fund are less than one (1%) of such total amount of Class 8C Claims.   The Disbursing Agent shall be entitled to make Distributions in its discretion if the amount available in the Creditors' Fund described above is equal to or greater than one (1%).

**Notwithstanding the foregoing and any other provision of this Plan, neither the Debtors nor the Reorganized Debtors shall be obligated to make Minimum Payments or True Up Amount payments to the Disbursing Agent for the Creditors' Fund as set forth in Section 4.8 herein based upon the Allowed Class 8C Claim of N. Jane Hendricks nor shall the Disbursing Agent be obligated to collect or distributed funds from the Debtors or the Reorganized Debtors based upon the Allowed Class 8C Claim of N. Jane Hendricks.**

The amount of each Distribution shall be computed based upon the percentage of each Allowed Claim (but excluding the Allowed Class 8C Claim of N. Jane Hendricks) as part of the total of all Allowed Claims less any previous distributions.  In the event that the due date for any payment is not a Business Day, the payment required for such date shall be made on the first Business Day following such due date.  All distributions shall be applied to principal of the Unsecured Claims. Distributions to the Holders of Allowed Class 8C Claims (excluding N. Jane Hendricks) shall continue as provided above until the **later of the date** when Distributions have been made to the Holders of Allowed Class 8C Claims (excluding N. Jane Hendricks) of at least <u>thirty (32.5%) percent</u> of the principal of their Allowed Class 8C Claims which amount shall represent the Minimum Percentage Payment **or** <u>seven (7) years</u> after the Effective Date  up to payment of one hundred (100%) percent of the principal amount of the Allowed Class 8C Claims (collectively, the "Class 8C Distribution").

In the event that a Claim is a Disputed Claim, the Pro Rata share distributable to the holder of the claim shall be paid into the Disputed Claim Reserve established to segregate such funds. The

funds allocated to such Distributions placed in the Disputed Claims Reserve shall be held until such claim has been allowed or disallowed in a fixed amount by agreement or by a Final Order of a court having jurisdiction of such dispute.  Upon determination of a disputed claim, either by agreement or by Final Order as set forth above, the holder of such claim shall receive prorata distribution from the segregated account of such funds to which it is entitled.  Any amounts in the Disputed Claims Reserve allocated for Class 8C Claims that are disallowed in whole or part shall be paid to the Creditors' Fund for future distribution to Holders of Allowed Class 8C Claims until the Class 8C Distribution is accomplished.

If there is any dispute as to either the amount due or whether any amount is due for any measurement period based upon the Net Amount Distributable From EBITDA Calculation and the minimum Debt Service Coverage Ratio, the Company, BB&T and the Disbursing Agent shall seek to resolve any conflict or disputes within the forty – five (45) days following the due date. If the Reorganized Debtors, BB&T and the Disbursing Agent do not then agree to and consent to whether a Distribution is then due and in what amounts, then the parties shall invoke the Dispute Resolution Procedures.  If the dispute is only as to the amount of the Distribution, the Company shall fund the undisputed amount of the Distribution on a timely basis <u>pari passu</u> based upon the percentages due to BB&T and to the Disbursing Agent for the Creditors' Fund.  **As an example and for illustrative purposes only**, if all three parties agree that some amount is distributable as the respective 25% due to BB&T and 60% due to the Disbursing Agent for the Creditors' Fund (but BB& and/or the Disbursing Agent assert a larger amount should be distributed thus created a dispute) the Reorganized Debtors would distribute respective percentage to BB&T and to the Disbursing Agent.   Whether any balance is then due would be determined under the Dispute Resolution Procedures.

If it is determined through the Dispute Resolution Procedures that a Distribution is due to have been made and none was and/or that an additional amount should have been distributed, the amount of the approved Distribution shall bear interest at the rate of Prime + 0.25% from the original due date until paid.   Payment of any determined Distribution would be due not later than 15 days after the final conclusion of such Dispute Resolution Procedures.

The Holders of Equity Interests of HFG have no intention to sell or irrevocably assign or dispose of all or substantially all of the equity interests of the Reorganized Debtors (other than as allowable under Section 4.6 hereof) or all or substantially all of the assets of the Reorganized Debtors before the date on which the Class 8C Distribution is completed to the Holders of Allowed Class 8C Claims pursuant to Section 4.8 of the Plan (any such sale, assignment or disposal prior to the Class 8C Distribution being completed shall be a "Trigger Event").  If, however, a Trigger Event shall occur, Allowed Class 8C Claims shall be entitled to receive, pro rata (based on the Allowed Amount of each Holder's Allowed Class 8C Claim), an amount equal to the lesser of:  (A) 50% of the proceeds resulting from such Trigger Event less the sum of (i) all payments, credits, costs and expenses required to consummate such sale, (ii) the sum required to complete the Minimum Percentage Payment to the Holders of Allowed Class 8C Claims,  (iii) all amounts (including without principal, interest, fees, expenses and attorneys fees) required to pay in full any indebtedness owed in respect of any Exit Financing or any replacement financing and (iv) after payment of the obligations set forth in (i) through (iii) of this paragraph, then payment of thirty-two and one-half (32.5%) percent of N. Jane Hendricks' Allowed Class 8C Claim related to note debt due N. Jane Hendricks in the amount of $962,070; or (B) 100% of the Allowed Amount of Class 8C Claims to the extent not already paid to such Holders as Minimum Payments or True Up Amounts.   The remaining 50% of the net proceeds resulting from such Trigger Event shall accrue to the Holders of Equity Interests of Reorganized Debtors and their respective heirs and assigns, it being the intent of this paragraph that Allowed Class 8C Claims and the Holders of Equity Interests share equally in any net proceeds after the Minimum Percentage Payment or such greater amount as may have been paid or due to the Holders of Allowed Class 8C Claims at the time of such Trigger Event is made to the Holders of Allowed Class 8C Claims.

Prior to the Class 8C Distribution being completed under the Plan, the Reorganized Debtors shall:

(a)     Limit Capital Expenditures to $500,000 per year for the first 5 years and then capped at the amount allowed under the then existing senior bank financing loan documents currently $1.0 M exclusive of any
castrophic damage claim that was not covered by insurance or any insurance proceeds received.

(b)     Limit payments on Mocksville lease to Larry G. Hendricks or any insider of the Reorganized Debtors or Larry G. Hendricks as defined in the Bankruptcy Code to the amount of $15,000 per month subject to increase by a yearly adjustment to match any increase in the Consumer Price Index ("CPI").

(c)     Provide the Disbursing Agent, subject to the execution of a mutually agreed Confidentiality Agreement, the following;

(i)      a copy of any annual accounting review performed for the Reorganized Debtors by an independent accounting firm and otherwise shared with the bank providing senior bank financing loans;

(ii)     access to the books and records of the Reorganized Debtors sufficient for the Disbursing Agent to review and verify the Net Amount Distributable From EBITDA Calculation and otherwise perform the duties and comply with the obligations of the Disbursing Agent;

(iii)    a certification of an officer of the Reorganized Debtors the calculation by the Reorganized Debtors of the Net Amount Distributable From EBITDA Calculation is true and correct to the best of the knowledge and belief of such officer; and

(iv)     provide the Disbursing Agent with such other general reports and certifications provided by the Reorganized Debtors to the bank providing senior bank financing loans.

Notwithstanding the Discharge provisions of this Plan, the Claims of the Holders of Allowed Class 8C Claims shall not be discharged until the Class 8C Distribution is made on account of such Claims. The Holders of Class 8C Claims that are Disallowed Claims shall be discharged effective as of the Confirmation Date. **The Holders of Class 8C Claims shall be subject to the injunction relief set forth in the Plan, including, without limitation, Section 10.6, and applicable law against taking, directly or indirectly, any action against the Debtors, the Reorganized Debtors or the Disbursing Agent or any Assets or property of the Debtors, the Reorganized Debtors, the Creditors' Fund or the Disbursing Agent based on the existence of any Class 8C Claim other than to seek to enforce the rights of such Holder to receive payments pursuant to the Plan as set forth in Class 8C**. Upon the payment of the Class 8C Distribution to the Holders of Allowed Class 8C Claims, the then remaining balance of all Class 8C Claims existing as of the Confirmation Date shall be deemed fully and completely discharged by the Plan.

Voting:  Class 8 Claims are impaired, and Holders of Allowed Class 8 Claims are entitled to vote on the Plan.

**4.9     Class 9 (Equity Interests)**:

Classification:  Class 9 will consist of the Holders of Equity Interests.

Treatment:  The Hendricks shall, subject to the Confirmation of the Plan in form and substance acceptable to them, credit their post-petition DIP Lender Claim in the amount of $500,000 to acquire new Equity Interests in the Reorganized Debtors or at their sole election, to continue the existing Equity Interests and such Equity Interests shall survive confirmation of the Plan and may

revest in the Holder of such Equity Interest as they existed on the Petition Date.  However, there shall be no dividends paid to the Holders of such Equity Interests on account of such Interests until the Class 8 Distribution is made to the Holders of Allowed Class 8 Claims save and except for the Pass Through Tax Payments necessary to provide tax neutral treatment to the Holders of Allowed Equity Interests.  Nothing herein shall limit a Holder of an Equity Interest from continuing to be employed by one or more of the Reorganized Debtors and from receiving compensation and benefits available to other employees related to such employment or to receive market rate lease payments for the lease of property to one or more of the Reorganized Debtors.   Any Holder of an Equity Interest who is employed by any of the Reorganized Debtors shall be entitled to receive an appropriate increase in compensation of based upon the Consumer Price Index ("CPI") but not to exceed five (5%) per annum until such time as the Class 8C Distribution is completed under the Plan.

If the Plan is confirmed and to assist the Reorganized Debtors in their restructurings, (a) Larry G Hendricks shall (i) guaranty the Reorganized Debtors obligations to BB&T, (ii) pledge to BB&T his membership interest in HFG as collateral security for his guaranty and (iii) enter into a voting trust agreement or other arrangement granting BB&T certain rights with respect to Larry G. Hendricks' membership interests in HFG, each as more particularly described in Section 4.6 of the Plan; (b) the Hendricks shall (i) subordinate their rights to payment in respect of their Claims, as set forth in Section 4.6 of the Plan and (ii) remit to HFG, as a contribution to the equity in HFG and to the extent allowed by applicable law and subject to any rights of BB&T as a secured creditor in respect of such tax refunds, 2009 and subsequent income tax refunds available to either or both of the Hendricks so long as all costs, taxes and fees related with such remittance are paid by the Reorganized Debtors until the Class 8C Distribution (defined in Section 4.8) is completed. As set forth in and subject to Section 4.8 of this Plan and subject to the rights of BB&T as a secured creditor in respect of any tax refund, 50% of any tax refund for the tax year 2009, up to $250,000, that shall be received by Larry G. Hendricks on or before June 30, 2011 is anticipated to be contributed to the Reorganized Debtors to be distributed as part of the second Distribution to the Holders of Allowed Class 8B Claims if Class 8B qualifies under this Plan.

The Holders of Equity Interests of HFG have no intention to sell or irrevocably assign or dispose of all or substantially all of the equity interests of the Reorganized Debtors (other than as allowable under Section 4.6 hereof) or all or substantially all of the assets of the Reorganized Debtors before the date on which the Class 8C Distribution is completed to the Holders of Allowed Class 8C Claims pursuant to Section 4.8 of the Plan (any such sale, assignment or disposal prior to the Class 8C Distribution being completed shall be a "Trigger Event").   If, however, a Trigger Event shall occur, Allowed Class 8C Claims shall be entitled to receive, pro rata (based on the Allowed Amount of each Holder's Allowed Class 8C Claim), an amount equal to the lesser of:  (A) 50% of the proceeds resulting from such Trigger Event less  the sum of (i) all payments, credits, costs and expenses required to consummate such sale, (ii) the sum required to complete the Minimum Percentage Payment to the Holders of Allowed Class 8C Claims, (iii) all amounts (including without principal, interest, fees, expenses and attorneys fees) required to pay in full any indebtedness owed in respect of any Exit Financing or any replacement financing and (iv) after payment of the obligations set forth in (i) through (iii) of this paragraph, then payment of thirty-two and one-half (32.5%) percent of N. Jane Hendricks' Allowed Class 8C Claim related to note debt due N. Jane Hendricks in the amount of $962,070; or (B) 100% of the Allowed Amount of Class 8C Claims to the extent not already paid to such Holders as Minimum Payments or True Up Amounts.   The remaining 50% of the net proceeds resulting from such Trigger Event shall accrue to the Holders of Equity Interests of Reorganized Debtors and their respective heirs and assigns, it being the intent of this paragraph that Allowed Class 8C Claims and the Holders of Equity Interests share equally in any net proceeds after the Minimum Percentage Payment or such greater amount as may have been paid or due to the Holders of Allowed Class 8C Claims at the time of such Trigger Event is made to the Holders of Allowed Class 8C Claims.

Voting:  Class 9 is an Impaired and the Holders of Allowed Equity Interests in Class 9 are entitled to vote on the Plan.

## ARTICLE V

## IMPLEMENTATION

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means of execution and implementation of the Plan.

**5.1    Assets of the Estates**.

(a)    **Vesting of Assets.**  On the Effective Date pursuant to section 1141(b) of the Code and as otherwise provided in the Plan, (i) the Assets and property of the Debtors shall vest or revest in the appropriate Reorganized Debtors for use, sale and distribution in accordance with operation of the Reorganized Debtors' business and this Plan and (ii) the Initial Cash Distributions and other Distributions required to be made by the Plan shall be made by the Debtors or the Reorganized Debtors save and except for Distributions to the Holders of Allowed Class 8 Claims designated as Class 8C Claims in Section 4.8 of this Plan which Distributions shall be made by the Disbursing Agent.

As of the Effective Date, all Assets vested or revested, and all Assets dealt with by the Plan, shall be free and clear of all Claims, Liens, and interests except as otherwise specifically provided in the Plan and/or the Confirmation Order**.**

From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, sell and otherwise dispose of property without supervision or approval of the Bankruptcy Court, free of any restrictions of the Code, the Bankruptcy Rules, and the guidelines and requirements of the United States Bankruptcy Administrator, other than those restrictions expressly imposed by the Plan or the Confirmation Order; provided, however, that nothing herein restricts the right of the Reorganized Debtors to seek Bankruptcy Court approval for the sale, assignment, transfer, or other disposal of certain of the Reorganized Debtors' Assets after the Confirmation Date in the event that such Court approval is deemed to be beneficial or advisable.

(b)    **Retention of Rights, Causes of Actions and Defenses.**  Except as expressly provided for in the Plan or the Confirmation Order, any and all Causes of Action, of any kind or nature whatsoever, against parties arising before the Effective Date, whether known or unknown, asserted or unasserted, matured or unmatured and regardless of whether the existence of same has been disclosed, including Avoidance Actions, shall survive the Effective Date of the Plan and shall be preserved for the benefit of the Debtors and their creditors, and shall be enforceable by the parties set forth herein in the name of the Debtors or otherwise.  The primary responsibility for the prosecution and settlement of such Causes of Action, including Avoidance Actions, shall be vested in the Debtors. The Debtors may, in their sole discretion, pursue those Causes of Action, including Avoidance Actions, as appropriate, in accordance with their business judgment, of what is in the best interests, and for the benefit of the Debtors, the Creditors, the Estates and their Assets.

Subject to the foregoing proviso, the Debtors shall retain all rights to pursue, settle or abandon such Causes of Action that have vested in each of them as a representative of the Estates pursuant to section 1123(b)(3) of the Code in accordance with the Plan and the Confirmation Order.  All Causes of Action, including Avoidance Actions, are reserved and preserved to the extent set forth in the Plan, including, without limitation, this Section and Section 10.2 of the Plan.  Confirmation of this Plan shall not be deemed res judicata or waiver or the basis for estoppel or create any defense as to the prosecution to judgment on the merits of any and all claims by the Debtors, Causes of Action, including without limitation, the Avoidance Actions by the Debtors, whether an action to prosecute such claims of the Debtors or Causes of Action are filed prior to or after confirmation of the Plan.

All Avoidance Actions that are pending at the Confirmation Date are specifically preserved and reserved and shall continue in the same status as existed on the Confirmation Date subject to further order of the Court.

For the avoidance of doubt, the Debtors acknowledge and confirm (i) that all

BB&T Claims and all Liens securing such BB&T Claims are valid and perfected and are not subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) any period of time for challenging such BB&T Claims and Liens by any person entity has lapsed and expired, and (iii) any and all Causes of Action, including Avoidance Actions, against BB&T or with respect to any BB&T Claims or Liens have been waived, in each case, in accordance with the provisions of the DIP Orders, including without limitation Paragraph 30 of the Final DIP Order.

**Notwithstanding the foregoing or any other provision of this Plan, if this Plan is confirmed and the Effective Date occurs, the Debtors (i) shall not pursue Avoidance Actions that may or may not exist and (ii) shall not use the possible existence of an Avoidance Action to object to any Claim. Nothing shall prevent the Debtors, the Committee or any other party in interest from pursuing all other objections to Claims or from asserting any facts or claims, relating in any manner to any Avoidance Action as a defense, affirmative defense or counterclaim to any Cause of Action that may be commenced against or in reference to any one or more of the Debtors or the Reorganized Debtors.**

### 5.2    Distributions.

(a)    **Funding of Distributions.**

(i)    The Distributions to be made pursuant to the Plan will be available from all Cash, less Reserves.  To the extent not otherwise provided for herein or ordered by the Bankruptcy Court, the Debtors or the Reorganized Debtors shall estimate appropriate Reserves to be set aside in the Disputed Claims Reserve or other Reserves necessary to pay or reserve for the payment of actual expenses and liabilities of the Debtors subject to such Reserves.

(ii)    Creditors' Fund:  A separate trust fund denominated the Creditors' Fund shall be established by the Disbursing Agent for Distributions from the Reorganized Debtors for the benefit of Class 8C Claims when funds are distributable as set forth in the treatment provided in Section 4.8 of the Plan .  The Reorganized Debtors shall deposit to the Creditors' Fund the amounts distributable under Section 4.8 of the Plan for Class 8C Claims (the "Creditors' Fund Amount").  The Disbursing Agent shall maintain the Creditors' Fund until the Class 8C Distribution as set forth in Section 4.8 of the Plan has been completed. After the Class 8C Distribution has been made, the Creditors' Fund shall terminate and the Disbursing Agent shall disburse any funds in the Creditors' Fund at that time to the Debtors.

Subject to the Disbursing Agent Agreement as approved by the Court, the Disbursing Agent shall (a) assist in calculating and verifying the Net Amount Distributable From EBITDA Calculation and the True Up Amount, (b) in calculating the amounts distributable to the Holders of Class 8C Claims from the Creditors' Fund and (c) both reserve for Disputed Class 8C Claims and make Distributions to the Holders of Allowed Class 8C Claims.   The Disbursing Agent shall make a Distribution to the Holders of Allowed Class 8C Claims (excluding, however, N. Jane Hendricks) and reserve a prorata Distribution to the Holders of a Disputed Class 8C Claim if  the amounts available in the Creditors' Fund at the time of a Distribution to the Holders of Allowed Class 8C Claims equals or exceeds two (2%) percent of the total amount of Class 8C Claims including for purposes of any Distributions, Disputed Amounts held in the Disputed Claims Reserve for Class 8C Claims but shall not make a Distribution if such amounts available in the Creditors' Fund are less than one (1%) of such total amount of Class 8C Claims.   The Disbursing Agent shall be entitled to make Distributions in its discretion if the amount available in the Creditors' Fund described above is equal to or greater than one (1%).   **As an example and for illustrative purposes only**, if the aggregate of Allowed Class 8C Claims and Disputed Claims in Class 8C equal $10,000,000.00 then the Disbursing Agent would need to have received at least $100,000.00 into the Creditors' Fund in order to make a discretionary distribution.  If the amount of $200,000 was received in the Creditors' Fund, the Disbursing Agent would be required to make a Distribution of the funds exclusive of any Disputed Claims Reserve for Disputed Class 8C Claims.

**Notwithstanding the foregoing and any other provision of this Plan, neither the Debtors nor the Reorganized Debtors shall be obligated to make Minimum Payments or True Up Amount payments to the Disbursing Agent for the Creditors' Fund as set forth in Section 4.8 herein based upon the Allowed Class 8C Claim of N. Jane Hendricks nor shall the Disbursing Agent be obligated to**

**collect or distributed funds from the Debtors or the Reorganized Debtors based upon the Allowed Class 8C Claim of N. Jane Hendricks.**

(iii)   **Negative Covenant**. Until the Class 8C Distribution to the Holders of Allowed Class 8 Claims is made, the Debtors shall make not declare or pay any dividends upon its stock or pay any distribution on its membership interests or make any distributions of cash to any holders of Equity Interests on account of such Equity Interest <u>save</u> and <u>except</u> for the Pass Through Tax Payment necessary to provide for tax neutral treatment to the Holders of Allowed Equity Interests.  Nothing herein shall limit a Holder of an Equity Interest from continuing to be employed by one or more of the Reorganized Debtors and from receiving compensation and benefits related to such employment.   For illustrative purposes, this covenant does not prohibit or block compensation in the nature of salary or benefits earned by a person or payments for property leased at a market rate by a person who is also a Holder of Equity Interest.   Any Holder of an Equity Interest who is employed by any of the Debtors shall be entitled to receive an appropriate increase in compensation of based upon the Consumer Price Index ("CPI") but not to exceed five (5%) per annum until such time as the Class 8C Distribution is completed under the Plan.

Larry G. Hendricks shall serve as the manager of HFG following the dates on which the Plan is confirmed and becomes effective, and shall remain as a manager of HFG so long as he is competent and willing. Each person holding an equity interest in HFG as of the Petition Date has the right (but not the obligation) to remain employed by HFG upon confirmation of the Plan, subject to the rights of HFG's manager to terminate or modify the terms of such employment.  Until such time as all indebtedness due BB&T shall have been paid in full and the Holders of Allowed Unsecured Claims in Class 8C shall have received the Class 8C Distribution as provided in Section 4.8 of the Plan: (i) no such equity holder, nor any relative of such equity holder that has been employed by HFG or any of its affiliates within one year of the Petition Date (a "Subject Person"), shall receive a bonus or pay increase from HFG except for cost of living adjustments; and (ii) HFG's members shall not be allowed to sell, assign or distribute any of their membership interests in HFG except that any member of HFG may assign any or all of his or her membership interests to any relative, directly or through a trust or other estate planning device, at any time and without restriction and Larry Hendricks may pledge his membership interests to BB&T as contemplated hereby without restrictions.  Each Subject Person shall be required to act in the best interests of HFG and its creditors so long as such Subject Person remains employed by HFG.

(iv)   **Consequences of Failure To Fund or Impossibility of Performance by Reorganized Debtors**

(A)   <u>Failure to Fund If Funding Due</u>:

(i)   If the Reorganized Debtors fail to fund to BB&T and to the Disbursing Agent for deposit to the Creditors' Fund by end of the sixth month after the end of the prior fiscal year for the Reorganized Debtor (the "True Up Date") the True Up Amount determined to be due based upon the Net Amount Distributable From EBITDA Calculation as determined on an annual basis at the end of the Reorganized Debtors' fiscal year (currently December 31st ), then the amount of any prepayment by reason of the cumulative Minimum Payments by the Reorganized Debtors made prior to the determination of that any True Up Amount is owing shall first be used to offset the unfunded True Up Amount and after such prepayments may have been fully utilized, the amount of any True Up Amount shall bear interest at the rate of Prime plus 0.25% until paid.   If the Reorganized Debtors have failed to fund to BB&T and to the Disbursing Agent for deposit to the Creditors' Fund the True Up Amount due (after setoff and reduction for all Minimum Payments made prior to each True Up Date) on or before six (6) months after any True Up Date, then the Holders of Allowed Class 8C Claims would have the remedy of accelerating the balance of their debt subject to the cap of 32.5% less any amount previously funded to the Disbursing Agent and allocable to each Allowed Claim and exercise any available remedies free of any injunction provided by the Plan.  Further, it is intended that such unfunded payments and all accrued interest thereon shall be paid as soon as the Reorganized Debtors are able to make the payments pursuant to Sections 4.6 and 4.8 of the Plan.

(ii)   If the Reorganized Debtors fail to fund to BB&T and to the Disbursing Agent for deposit to the Creditors' Fund the Minimum Payment amount, then the amount of such unfunded payment shall bear interest at the rate of Prime plus 0.25% until paid.   Further, it is intended that such unfunded payments and all

accrued interest thereon shall be paid at the time of the next Minimum Payment date or as soon as the Reorganized Debtors are able to make the payments pursuant to Sections 4.6 and 4.8 of the Plan.

Notwithstanding the foregoing, nothing set forth herein is intended to modify    or limit any rights or remedies available to BB&T under the New BB&T Loan Documents or applicable law in connection with any default or event of default that may exist from time to time under the New BB&T Loan Documents except for a default arising exclusively as a result of any failure to pay the True Up Amount as set forth above.

(B)    Impossibility of Performance by the Reorganized Debtors.  In no event does the retention or acquisition of Equity Interests in the Reorganized Debtors entitle the Holder of such Equity Interests to any preferential treatment if any senior bank lender(s) declares a default, does not waive or forbear from exercising its rights regarding such default and by the enforcement of the default prevents the Debtors from complying with the requirements of the Plan as confirmed , including the obligation to fund as and when determined to be due under the Plan including, without limitation, payments to the Creditors' Fund. In the event that any senior bank lender(s) force an involuntary liquidation of the Debtors, no distributions shall be made by the Reorganized Debtors to the Holders of Equity Interests in respect of their Equity Interests other than payment of normal course of business salaries and expenses incurred in assisting in the orderly wind down and liquidation of the Reorganized Debtors' business operations until the Holders of Allowed Class 8C Claims are paid the full amount of their Allowed Class 8C Claims.

(b)    **Responsibility for Distributions**:

(i)    **For All Claims Other than Class 8C Claims.**  The Debtors or the Reorganized Debtors shall be solely responsible for making the Initial Cash Distributions and all other payments and Distributions under the Plan required to be made after the Effective Date, including, without limitation, the payment of Allowed Amounts to unclassified Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Workers Compensation Claims, BB&T Claims, GE Commercial Finance Claims, Convenience Claims and Class 8B Claims, save and except for Distributions to the Holders of Allowed Class 8C Claims which shall be made by the Disbursing Agent, all Distributions subject to appropriate Reserves as described in the Plan.

(ii)    **For Class 8C Claims.**  The Debtors have requested that the Court appoint a Disbursing Agent for purposes of verifying the Net Amount Distributable From EBITDA Calculation, for collecting the distributable funds for the Creditors' Fund and for making Distributions shall be solely responsible for making Distributions under the Plan required to be made after the Effective Date to the Holders of Allowed Class 8C Claims.  As set forth above, the form of a proposed Disbursing Agent's Agreement is filed with the Plan or a part of the Plan Supplement.   The Debtors and the Committee shall consult on the appointment of a Disbursing Agent and a Disbursing Agent Agreement that is mutually agreeable as it may be modified or amended as part of the Confirmation Order or a separate Order.   In the event, that the Debtors and the Committee cannot agree on the person or entity to be the Disbursing Agent, the Bankruptcy Court shall appoint the Disbursing Agent.

(c)    **Special Provision for Holders of DIP Financing Claims**

(i)    **BB&T** shall be paid in full its outstanding Allowed DIP Loan Claim on the Effective Date as set forth in Section 4.6 of the Plan or such other treatment as is agreed between BB&T and the Debtors and approved by the Bankruptcy Court.

(ii)    **Sherrill** has agreed to accept a Note from the Reorganized Debtors for 4 years that is payable as follows:  Interest only at the rate of prime plus 2% until the earliest of (i) six months after the confirmation of a plan by the Bankruptcy Court or (ii) twelve months from the Petition Date and thereafter forty-eight (48) equal monthly installments of principal and interest until the Note is paid in full.  Sherrill has agreed not to assert a right to payment as an Administrative Expense Claim prior to Confirmation of a plan.  To the extent interest after the Petition Date is included in the Allowed Amount of any Secured Claim, such interest shall accrue at the rate agreed by the parties or fixed by the Court, compounded annually, unless otherwise provided by Final Order.

(iii)    **Larry G. Hendricks and N. Jane Hendricks,** subject to the Confirmation of the Plan, in form and substance acceptable to them, shall purchase Equity in the Reorganized Debtors by converting their post-petition DIP Lender Claim in the amount of $500,000 to Equity as it existed as of the Petition Date or such treatment as is agreed between the Debtors and such parties and approved by the Bankruptcy Court.

(d)    **Pre-Petition Related-Party Claims** of one Debtor against another Debtor either shall be cancelled on the Effective Date and shall be of no effect after the Effective Date or shall be subordinated to the payment of all Allowed Claims in Classes 1 through 8 of the Plan, either option, if and only if this Plan is confirmed as a Substantive Consolidation Plan for the Debtor holding such Claim.

(e)    **Intra-company Credit Facility.** Prior to the Debtors' Bankruptcy filing in June, the Company's intra-company credit facility with BB&T was collateralized by the assets of HFG and Norris. The intra-company credit facility was used to fund the working capital requirements for HFG and its related entities while HFG maintained the revolving loan balance with BB&T and separately charged Norris and Classic its pro-rata share of interest. The intra-company credit facility is being refinanced as part of the Exit Financing.

5.3    **Debtors Post-Confirmation**

(a)    **Continued Corporate Existence.** Subject to the Restructuring Transactions, certain of the Debtors shall continue to exist after the Effective Date in accordance with the laws of their respective states of incorporation or organization and pursuant to their respective articles of incorporation or organization and bylaws or operating agreement in effect prior to the Effective Date (except to the extent such articles of incorporation or organization and bylaws or operating agreement  are amended pursuant to the Plan) without prejudice to any right (i) to terminate such existence (whether by dissolution, merger or otherwise) under applicable law after the Effective Date as necessary to effect a winding up of the affairs of certain of the Debtors and (ii) to amend their respective articles of incorporation or organization and bylaws or operating agreement.

(b)    **Restructuring Transactions.** Subject to compliance with the New BB&T Loan Documents and on or after the Effective Date, the Debtors may enter into Restructuring Transactions and may take such actions as may be necessary or appropriate to affect the relevant Restructuring Transactions, between or among the Debtors or Reorganized Debtors, including, but not limited to,  mergers, dissolution and the restructuring of any Debtors, and all of the transactions described in the Plan. Such actions may also include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate articles of incorporation or organization, merger, consolidation or dissolution with the appropriate governmental authorities under applicable law; and (iv) all other actions that such Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transaction.

For Restructuring Transactions, in each case in which the surviving, resulting or acquiring corporation or limited liability company in any such transaction is a successor to a Debtor or Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Debtor or Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor or Reorganized Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation or limited liability company, which may provide that another Reorganized Debtor will perform such obligations. Implementation of the Restructuring Transactions shall not affect the Distributions under the Plan.

**Notwithstanding the foregoing Restructuring Transaction provisions, no party in interests shall have waived or be deemed to waive any rights in regard to such possible Restructuring Transactions.**

(c)    **Management.** Upon the Effective Date, the operation of each of the Debtors shall become the general responsibility of its respective officers, boards of directors, managers or their equivalents that shall, thereafter, have the responsibility for the management, control and operation of each of the Debtors. The

initial board of directors or the managing member for Debtor shall be the current board of directors or the current managing member.

**HFG Manager and Officers and Compensation.** The officers of the HFG that will continue after the Effective Date and their salaries will be follows:

Larry G. Hendricks, Chairman and Manager ($100,000.00 annually)
Chad Hendricks, President ($175,000.00 annually)
Jane Hendricks, Secretary ($100,000.00 annually)

**Classic Officers and Directors and Compensation:**

Larry G. Hendricks, President and Director (included as set forth above)
Jane Hendricks, Secretary and Director (included as set forth above)

(d)      **Advisory Committee**.  The Reorganized Debtors shall seek the appointment of a committee of furniture industry and professionals to assist the Reorganized Debtors and their management with strategic operations of the companies after the Effective Date of the Plan.   If deemed appropriate, an agreement for such an Advisory Committee shall be provided as part of the Plan Supplement and for such other purposes as expressly set forth in other provisions of this Plan.

(e)      **Corporate Action and Other Documents and Actions**.  The execution and delivery of any contract, instrument, release, document or agreement, and any other matter provided for under the Plan involving the corporate action to be taken by or required of any of the Debtors shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects upon approval by the officers, boards of directors or managers of the Debtors

(f)      **Membership Interests or Common Stock of Debtors.**  On the Effective Date, the membership interest or common stock of the each of the Debtors shall be issued as directed by the Hendricks or shall remain as they existed on the Petition Date at the election of the Hendricks.   The Articles, By-Law or Operation Agreements of the Reorganized Debtors, as applicable, will be amended to the extent necessary to confirm a prohibition against the issuance of non-voting Equity Interests and other provisions of the Plan.

**5.4      Substantive Consolidation**.  For the purposes of the Chapter 11 Cases and the Plan only, all assets and liabilities of the Debtors will be substantively consolidated on the Effective Date.  As a result, Claims filed against multiple consolidated Debtors seeking recovery of the same debt shall be Allowed only once against such Debtors regardless of any differences in the legal theories supporting the various Claims and Pre-Petition Related-Party Claims shall be disregarded for voting or distribution purposes.  For any Debtors not included in the substantive consolidation, the treatment of those creditors will be as set forth in the Plan as amended as a joint plan or by a separate plan.

The Debtors decision to seek substantive consolidation solely for purposes of voting on the Plan, Confirmation of the Plan and making and receiving Distributions under the Plan is based on, among other factors, an analysis of the facts and circumstances surrounding the Debtors, including the Debtors' financial and accounting structure and business operations, the existence of some inter-companies guarantees and the Pre-Petition Related-Party Claims reconciliation.  The entry of the Confirmation Order confirming the Plan shall constitute approval by the Bankruptcy Court pursuant to Sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Confirmation Date, of the substantive consolidation of the Debtors and their respective Estates  solely for purposes of voting on the Plan, Confirmation of the Plan and making and receiving Distributions under the Plan and for no other purpose.

Notwithstanding the foregoing, (i) the treatment proposed by the Debtors to the Holders of Allowed Secured Claims against each Debtor after the Effective Date shall be unaffected by such substantive consolidation, (ii) any Liens that are maintained, recognized, or preserved hereunder shall be unaffected by the

substantive consolidation, and (iii) any claims under or with respect to any insurance policy of any Debtor (or any right to the proceeds of any such policy or policies) shall be unaffected by the substantive consolidation.

Substantive consolidation of the Debtors shall not:

        (a)      affect the legal and organizational structure of each Debtor from and after the Effective Date;

        (b)      affect or change any Cause of Action or other claim that\ any Debtor would possess had any of the Chapter 11 Cases not been substantively consolidated as provided herein or any defenses that any defendant in respect of such Causes of Action would have in connection therewith;

        (c)      destroy or otherwise affect the separate corporate existence of each Debtor and the ownership interest in each Debtor; or

        (d)      divest any Debtor of any tax attributes.

The Plan shall be deemed a motion, pursuant to Bankruptcy Rule 9013, by the Debtors for the limited substantive consolidation with respect to the Plan as set forth herein.   Any objection by an affected Creditor to such consolidation shall be treated as an objection to Confirmation and shall be determined by the Bankruptcy Court at the Confirmation Hearing.

**5.5**     **Dissolution of the Creditors' Committee**. The Creditors' Committee shall continue in existence until the later of (i) 30 days following the date of the Initial Distribution to the Holders of Allowed Class 8B Claims, (ii) the date any pleading filed by the Committee shall have been resolved by the Bankruptcy Court by a Final Order, and (iii) all objections to Claims have been concluded (the "Dissolution Date") for the purpose of exercising those powers and performing those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the this Plan or by the Bankruptcy Court.  On the Dissolution Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of any continuing duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention and employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate, except with respect to all Fee Claims and Committee members' expense claims.  All expenses of Creditors' Committee members and the fees and expenses of their professionals through the Dissolution Date which are Allowed Claims shall be paid in accordance with the terms and conditions of the Fee Order and this Plan.  Counsel to the Creditors' Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for Dissolution Date activities authorized hereunder upon the submission of invoices to the Reorganized Debtors.

5.6     **Exit Financing.**  On the Effective Date, the Exit Financing, together with all documents required to evidence the obligations of the Reorganized Debtors there under, including guarantees, documents, instruments and agreements to be entered into, delivered, or confirmed there under on the Effective Date, shall become effective.  The current proposed terms of the Exit Financing are set forth in Section 4.6 of the Plan.

### ARTICLE VI

### GENERAL PROVISIONS REGARDING TREATMENT OF CLAIMS AND INTERESTS AND DISTRIBUTIONS UNDER THE PLAN

**6.1**     **Reserves**.

    **(a)**     **Disputed Claim Reserve**.

        (i)     **Establishment of Disputed Claims Reserves.**  On or after the Effective Date, the Debtors or the Reorganized Debtors shall create and fund a Reserve for Disputed Claims, whether such Claims are Administrative, Priority, Secured or Unsecured Claims, defined as Disputed Claims Reserve and make

Distributions from such Reserve to the Holders of Disputed Claims that are ultimately Allowed by Final Order. Notwithstanding the foregoing, any Disputed Claim Reserve for Disputed Class 8C Claims and the Distributions for the Holders of Allowed Class 8C Claims shall be held and made by the Disbursing Agent.

(ii)    **Amounts to Be Reserved.**  After the Effective Date and at the time of a Distribution to a Holder of a Claim that is Disputed, the Debtors, the Reorganized Debtors or the Disbursing Agent, as applicable, shall reserve the Ratable proportion of the Cash allocated for such Distribution on account of each Disputed Claim based upon the amount of each such Disputed Claim, or such lesser amount as may be agreed to by the Holder of the Claim and the Debtors, the Reorganized Debtors or the Disbursing Agent or as may otherwise be determined by order of the Bankruptcy Court.   The Disbursing Agent shall be limited to making reserves for Disputed Claims in Class 8C from funds payable to the Creditors' Fund as set forth in Plan.

(iii)    **Distribution.**  Distributions on any Disputed Claim that becomes an Allowed Claim, other that Class 8C Claims, prior to the Effective Date shall be made on or about the date of the Initial Distribution. Distributions with respect to Disputed Claims or Disallowed Claims that subsequently become Allowed Claims shall be made only to the extent that a Distribution would have been made had such Claim been an Allowed Claim on the Effective Date (less any taxes paid or payable with respect to amounts held in the Disputed Claims Reserve) including any Reserve for Disputed Claims in Class 8C.  No interest shall accrue or be paid with respect to any Distribution paid after the Effective Date unless specifically provided for in the Plan or the Confirmation Order.   If prior Distributions have been made to the Holders of Allowed Class 8C Claims by the Disbursing Agent from the Creditors' Fund, the Disbursing Agent shall make Distributions to the Holders of Disputed Claims in Class 8C within twenty (20) Business Days of when such Claims become Allowed Claims by Final Order up to the amount of the Pro Rata funds held by the Disbursing Agent in the Creditors' Fund.  Thereafter when further Distributions are authorized for Holders of Allowed Class 8C Claims, the Disbursing Agent shall make any unpaid catch-up Distributions necessary to equalize the Pro Rata Distributions to the Holders of Allowed Class 8C Claims.

(iv)    **Termination of Disputed Claims Reserve.**  The Disputed Claims Reserve shall be closed by the Debtors or the Reorganized Debtors on the earlier of (i) the disbursement of all Assets in such Reserve or (ii) the Disallowance or Allowance of each Claim covered by such Reserve.  If Assets remain in any Disputed Claim Reserve at the time of release of such Asset from the Reserve that is not directed to be paid to the Holder of a Claim, such Assets shall be transferred to the Debtors save and except that any Asset remaining in a Disputed Claim Reserve  for the benefit of Holders of Class 8C Claims shall be transferred to the Creditors' Fund to be distributed by the Disbursing Agent to the Holders of Allowed Class 8C Claims at the time of the next quarterly distribution until the Class 8C Distribution is made and thereafter to the Debtors.

(v)    **Limitation of Liability for Funding the Disputed Claims Reserve.**  Except as expressly set forth in the Plan, the Debtors shall have no duty to fund any Disputed Claims Reserve.

(b)    **Transmittal of Distributions and Notices.**  Any property or notice that an entity is or becomes entitled to receive pursuant to the Plan may be delivered by regular mail, postage prepaid, in an envelope addressed to that entity's Distribution Address.  Property distributed in accordance with this Section shall be deemed delivered to such entity regardless of whether such property is actually received by that entity.

**6.2    Unclaimed Distributions**.  Unclaimed Property shall be forfeited by the Holder entitled thereto, whereupon all rights, titles and interests in and to the Unclaimed Property shall immediately and irrevocably revest in the Debtors save and except for Unclaimed Distributions to Holders of Allowed Class 8C Claims.  The Holder of the Allowed Claim previously entitled to such Unclaimed Property shall cease to be entitled thereto.    Any Unclaimed Property forfeited by the Holder of an Allowed Class 8C Claim shall be Ratably distributed to the other Holders of Allowed Class 8C Claims at the time of the next subsequent Distribution to such parties up to the amounts required to make the Class 8 Distribution to the remaining Holders of the Allowed Class 8C Claims. Neither a Claim nor the Unclaimed Property distributed on account of such Claim shall  escheat to any federal, state or local government or other entity by reason of the failure of its Holder to claim a Distribution in respect of such Claim.

**6.3    Setoffs.**  The Debtors may, but shall not be required to, setoff or recoup against any Claim (for purposes of determining the allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtors may have against the claimant, <u>provided</u>, <u>however</u>, neither the failure to effect such setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors may have against such Claim Holder.  All rights of setoff and recoupment are expressly preserved and reserved for the Debtors.

**6.4    Withholding Taxes and Expenses of Distribution.**  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions hereunder.  All entities holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.  In addition, all Distributions under the Plan shall be net of the actual and reasonable costs of making such Distributions.

**6.5    Allocation of Plan Distributions Between Principal and Interest.**  To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of principal indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest to the extent any interest is Allowed by Final Order.

**6.6    Method of Cash Distributions.**  Any Cash payment to be made pursuant to the Plan will be in U.S. dollars and may be made, at the sole discretion of the Debtors, as appropriate, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

**6.7    *De Minimis* Distributions and Fractional Shares.**  No Cash payment in an amount less than twenty-five dollars ($25.00) shall be made by the Debtors or the Disbursing Agent to any Holder of a Claim unless a request therefore is made in writing to the Debtors prior to one (1) year after the Effective Date.  Cash that otherwise would be payable under the Plan but for this Section shall be reserved and distributed with future Distributions, if any, that, collectively, exceed twenty-five dollars ($25.00).  Upon the final Subsequent Distribution, all amounts that exceed ten dollars ($10.00) shall be distributed, unless, in the discretion of the Debtors or the Disbursing Agent solely as to the Creditors' Fund, the cost to distribute the Cash exceeds the amount of the Cash to be distributed to a particular Holder; in such an event, the Cash otherwise distributable to the Holder shall become Unclaimed Property.

**6.8    Exemption from Certain Transfer Taxes.**  Pursuant to section 1146(c) of the Code: (a) the issuance, transfer or exchange of any securities, instruments or documents; (b) the creation or release of any other Lien, mortgage, deed of trust or other security interest; or (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale of any Assets (including any Sale Transactions), any deeds, releases, bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for under section 1146(c) of the Code

## ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1    Assumption or Rejection of Executory Contracts and Unexpired Leases.**  On the Effective Date, and to the extent permitted by applicable law, each of the Debtors shall reject all executory contracts and unexpired leases <u>except for</u> those executory contracts and unexpired leases that are (a) listed on the Executory Contract Schedule to be filed with the Bankruptcy Court by the Debtors at least ten (10) days prior to the later of the deadline for objecting to the confirmation of the Plan or voting on the Plan or (b) executory contracts or unexpired leases entered into after the Petition Date pursuant to the provisions of sections 365 and 1123 of the Code pursuant to the Confirmation Order, if not already rejected as of a prior date; <u>provided</u>, <u>however</u>, that any and all executory contracts or unexpired leases which were or are the subject of separate motions filed pursuant to section 365 of the Code by the Debtors before or on the Confirmation Date shall not be deemed assumed or rejected by the

Confirmation Order but shall be treated as so ordered by the Bankruptcy Court in an order entered pursuant to the motion.  The Confirmation Order shall constitute an order of the Court approving such treatment and any assumption and assignments and rejections pursuant to the Code and this Plan.  Contracts or leases entered into after the Petition Date by the Debtors will be performed by such Debtors in the ordinary course of their businesses.  The listing of a contract or lease on any schedule filed with the Court will not constitute an admission by the Debtors or any other party that such contracts or leases are executory contracts or unexpired leases as set forth in the Code.

**7.2     Bar Date for Rejection Damages.**  If the rejection of any executory contract or unexpired lease under the Plan gives rise to a Claim, such Claim, to the extent that it is timely filed and is an Allowed Claim, shall be classified in Class 8; provided, however, that the Claim arising from such rejection shall be forever barred and shall not be enforceable against the Debtors, the Estates or their Assets, their successors or properties, unless a proof of such Claim is filed and served on the Debtors and the Claims Agent **within thirty (30) days after the Effective Date.  Failure to comply with this deadline shall forever bar the Holder of such a Claim from seeking payment thereof.**

**7.3     Procedures for the Determination of Cure Amounts.**  Unless otherwise noted in the Executory Contract Schedule, the cure amount pursuant to section 365(b)(1) of the Code for each assumed or assumed and assigned executory contract or unexpired lease shall be $0.00.  Any dispute regarding (i) the nature or amount of any payment necessary to satisfy the listed cure amount under the contract or lease to be assumed or assumed and assigned, (ii) the ability of the Debtors or any assignee, as the case may be, to provide "adequate assurance of future performance," within the meaning of section 365 of the Code, under the contract or lease to be assumed or assumed and assigned or (iii) any other matter pertaining to assumption or assumption and assignment under section 365 of the Code shall be forever barred and shall not be enforceable against the Debtors, the Estates, their Assets, their successors or properties, unless a motion or objection, as appropriate, is filed and served on the Debtors within thirty (30) days after the date of notice of proposed assumption or assumption and assignment, or such later date as allowed by the Bankruptcy Court.  The Debtors under the Plan, shall have the right to dispute any asserted cure amounts, including any amounts noted in the Executory Contract Schedule.  And in the event the cure amount is determined to be greater than $0.00, the Debtors, in their sole and absolute discretion, shall be entitled to an order rescinding such assumption or assumption and assignment.

7.4     **Indemnification Obligations**

Except as otherwise specifically provided herein, any obligations or rights of the Debtors to indemnify their present and former directors, officers, employees or professionals under its certificate of incorporation, by-laws, agreement, employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by this Plan's confirmation, and remain an obligation of the Reorganized Debtors, regardless of whether the right to indemnification arose before or after the Petition Date.

**ARTICLE VIII**

**DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND ACTIONS**

**8.1     Objections to Claims**.

The Debtors, the Reorganized Debtors and the Committee shall have the responsibility for reviewing and objecting to the allowance of any Claim filed in the Chapter 11 Cases as set forth below.   If the Debtors or the Committee have objected to claims prior to the Effective Date, such party may continue to prosecute such objections.

Subject to the foregoing after the Effective Date, the Debtors, the Reorganized Debtors or the Committee may object to Claims and shall have until the Claims Objection Deadline to file objections to Claims. Subject to Section 8.4 below, all objections shall be litigated to a Final Order or settled with Bankruptcy Court approval.  Notwithstanding the foregoing, nothing in this Plan shall be interpreted to operate as a waiver or release of (x) any right that any party in interest may have to object to (a) any Claim prior to the Effective Date or (b) any

Fee Claim after the Effective Date; or (y) any pending objection to Claims pending as of the Effective Date, regardless of whether such objection was brought by the Debtors, the Committee or any other party in interest.

Objections to Claims shall not be subject to any defense, including, without limitation, res judicata, estoppel or any other defense because of the confirmation of the Plan and all such objection rights are expressly preserved and reserved by the Plan for the Debtors and their Estates.

**8.2    Estimation of Claims.**  The Debtors may, at any time, request that the Bankruptcy Court enter an Estimation Order pursuant to section 502(c) of the Code, fixing the value of, any Disputed Claim or portion thereof for purposes of voting or Reserves, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court enters an Estimation Order estimating any Disputed Claim for distribution or Reserve purposes, the amount of such estimation, unless otherwise provided in such Order, will constitute a maximum limitation on the Allowed Amount of such Claim that may later be determined by the Bankruptcy Court.  The Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any mechanism permitted under the Code or the Plan.

**8.3    Amendments to Claims.**  After the Confirmation Date, a Claim may not be filed or amended to increase the amount or a Lien or priority demanded unless otherwise provided by the Bankruptcy Court.  Unless otherwise provided herein, any new or amended Claim filed after the Confirmation Date shall be disregarded and deemed Disallowed in full and expunged without need for objection, unless the Holder of such Claim has obtained prior Bankruptcy Court authorization for the filing.

**8.4    Authority to Settle Disputed Claims and Causes of Action.**  From and after the Effective Date so long as the Chapter 11 Cases remain open, the Debtors or the Reorganized Debtors shall be authorized with respect to Disputed Claims and Causes of Action, pursuant to Bankruptcy Rule 9019 and section 105(a) of the Code, to (a) compromise and settle Disputed Claims in excess of $50,000.00, upon Bankruptcy Court approval of such settlement and (b) compromise and settle such Causes of Action for claimed damages in excess of $50,000.00 upon Bankruptcy Court approval of such settlement.  Notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, as of the Effective Date the Debtors or the Reorganized Debtors may settle or compromise after consultation with the Committee, (y) any Disputed Claim with a Disputed Amount of $50,000.00 or less without approval of the Bankruptcy Court and (z) any Cause of Action for claimed damages of $50,000.00 or less without notice or the approval of the Bankruptcy Court, provided that such settlement or compromise is evidenced by a writing signed by a duly authorized representative of the Debtors.

**8.5    Recourse.**  In the event any Disallowed Claim is reconsidered and becomes an Allowed Claim or any Disputed Claim is Allowed in an amount in excess of the funds in the Disputed Claim Reserve funded for such Claim, the Holder of such Claim shall have no recourse to or against the Debtors, the Estates or their Assets or any of their respective officers, directors, employees, professionals or agents, or the Committee, or any of their respective officers, directors, members (as to the Committee members, solely in their capacity as members of the Committee), professionals, employees, or agents, or their successors or assigns, or the Holder of any other Claim, or any of their respective property for any deficiencies.  However, nothing in the Plan shall modify any right of a Holder of a Claim under section 502(j) of the Code.  **THUS, THE BANKRUPTCY COURT'S ENTRY OF AN ESTIMATION ORDER OR ALLOWANCE ORDER SHALL LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH CLAIMS.**

## ARTICLE IX

## CONDITIONS PRECEDENT

**9.1    Conditions to Confirmation.**  The Plan shall not be confirmed, and the Confirmation Order shall not be entered, until and unless the following conditions have been satisfied or waived by the Debtors in accordance with the Plan, the Confirmation Order shall:

(a)    be in form and substance acceptable to the Debtors;

(b)    order, find and decree that the vesting of Assets in the Debtors: (i) are or shall be legal, valid, and effective transfers of property; (ii) vest or shall vest the transferee with good title to such property free and clear of all Liens, Claims , encumbrances, and Interests of any Person, except as expressly provided in the Plan or Confirmation Order; (iii) do not and shall not constitute avoidable transfers under the Code or under applicable bankruptcy or non-bankruptcy law; and (iv) do not and shall not subject the Debtors to any liability by reason of such transfer under the Code or under applicable non-bankruptcy law, including any laws affecting successor or transferee liability;

(c)    authorize the implementation of the Plan in accordance with its terms and approve in all respects the other settlements, transactions, and agreements, including, without limitation, the Exit Financing, to be effectuated pursuant to the Plan;

(d)    authorize and approve the continuation of the officers of the Debtors and the Managers or Directors of the Debtors; and

(e)    provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan.

**9.2    Conditions to Effective Date.**  The Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the conditions set forth below is satisfied or waived by the Debtors:

(a)    all conditions precedent to the confirmation of the Plan in Section 9.1 of the Plan shall have been satisfied or have been waived pursuant to Section 9.3 of the Plan;

(b)    all actions required to be effected on or prior to the Effective Date under the Plan either shall have been effected or shall be capable of being effected immediately;

(c)    the New BB&T Loan Documents shall be in form and substance acceptable to BB&T; and

(d)    the Debtors shall have made all adequate protection payments or other payments required to be made under the DIP Orders which for purposes of clarification are potentially any unpaid interests, cost or fees due to BB&T for any period from the last payment made to BB&T under the DIP Orders through the Effective Date.

**9.3    Waiver of Conditions.**  Notwithstanding anything contained in Sections 9.1 and 9.2 hereof, the Debtors hereby reserve the right to waive or modify in writing the occurrence of any of the foregoing conditions contained in Sections 9.1 and 9.2, at any time, without notice, without leave of or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan, provided that the Debtors will not waive the conditions set forth in Sections 9.2(c) and 9.2(d) without the consent of BB&T.

## ARTICLE X

## EFFECTS OF PLAN CONFIRMATION

**10.1    Discharge.**  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors and all successors in interest, including, without limitation, the Reorganized Debtors,

shall be discharged from, and the Confirmation Order shall operate as a permanent injunction against, the commencement or continuation of any action, the employment of any process, or any act to collect, recover, offset or recoup, right to sue, on account of any Claim, from or against the Debtors, their Estates and any and all successors in interest (including, without limitation, the Reorganized Debtors, any direct or indirect transferee of any property or any direct or indirect successor in interest), and all successors' liability in respect thereof shall be extinguished completely, and the Debtors and all successors in interest (including, without limitation, the Reorganized Debtors, any direct or indirect transferee of any property or any direct or indirect successor in interest) shall be released and discharged from any Claim or Interest of a kind specified in section 502(g), 502(h) and 502(i) of the Code, whether or not a proof of such Claim is filed or deemed filed under section 501 of the Code, such Claim is allowed under section 502 of the Code, or the Holder of such Claim or Interest has accepted the Plan. All Holders of Claims, shall be precluded and enjoined, from and after the Confirmation Date, from asserting against the Debtors, their Estates or any successors or assigns in interest or any of their respective Assets or property, based upon any Claim, existing prior to the Confirmation Date, whether or not such Holder has filed a proof of Claim and whether or not the facts or legal basis therefore were known or existed prior to the Confirmation Date.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, as of the Effective Date, the Confirmation Order will be a judicial determination of a discharge of all Claims against the Debtors, pursuant to sections 524 and 1141 of the Code, and such discharge will void any judgment obtained against a Debtor or its successors at any time and shall act as res judicata or collateral estoppel as against third parties, but not as to the Debtors, their Estates or any and all successors in interest.

Except as otherwise provided in the Plan or the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made thereunder, shall completely satisfy all existing Claims and all Equity Interests, of any kind, nature, or description whatsoever against or in the Debtors or any of their respective Assets to the fullest extent permitted by section 1141 of the Code.

**10.2    Special Discharge Provisions for Class 8C Claims.**    Notwithstanding the Discharge provisions of this Plan, the Claims of the Holders of Allowed Class 8C Claims shall not be discharged until the Class 8C Distribution has been made to the Holders of Allowed Class 8C Claims.  The Holders of Allowed Class 8C Claims shall be subject to the provisions of the Plan, including, the injunction relief set forth in the Plan and applicable law against taking, directly or indirectly, any action against the Debtors, the Reorganized Debtors or the Disbursing Agent based on the existence of any Class 8C Claim other than to seek to enforce the rights of such Holder pursuant to the Plan. Upon the payment of the Class 8C Distribution to the Holders of Allowed Class 8C Claims (excluding, N. Jane Hendricks), the balance of all Class 8C Claims existing as of the Confirmation Date (other than the Hendricks Claims that are subordinated under this Plan) shall be deemed fully and completely discharged by the Plan .

**10.3    Retention of Causes of Action/Reservation of Rights.**  Except as expressly provided for in the Plan (including Section 5.1(b)) or the Confirmation Order, any and all Causes of Action, of any kind or nature whatsoever, against parties arising before the Effective Date, including, without limitation, those possible Causes of Action set forth in the Schedules, Statement of Financial Affairs, the Disclosure Statement and any exhibit or schedule thereto as may be amended or supplemented, whether known or unknown, asserted or unasserted, matured or unmatured and regardless of whether the existence of same has been disclosed, including Avoidance Actions, shall survive confirmation of the Plan and shall be preserved for the benefit of the Debtors and their Estates and shall be enforceable by the Debtors or the Reorganized Debtors.

Neither the Plan nor Confirmation of the Plan or the Confirmation Order shall act  to cause any release, waiver, estoppel or in any way impair or diminish the enforcement of any Cause of Action, Avoidance Action, any rights or claims, including, any right of setoff or recoupment of the Debtors or the Estates, whether pending on the Confirmation Date or brought after the Effective Date.

Except as otherwise expressly provided in the Plan, nothing herein shall, or shall be deemed to affect or impair any of the Debtors' or the Reorganized Debtors or the Estate's respective rights and defenses, both legal and equitable, with respect to any Claims, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.   All Causes of Action, including Avoidance Actions, are reserved and preserved to the extent set forth in the Plan, including, without limitation, this Section and Section

5.1(b) of the Plan. **ALL SUCH CAUSES OF ACTION SHALL SURVIVE CONFIRMATION AND THE COMMENCEMENT OR PROSECUTION OF SUCH CAUSES OF ACTION SHALL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER EQUITABLE, JUDICIAL OR OTHERWISE OR BY RES JUDICATA.**

Confirmation of this Plan shall not be deemed res judicata or waiver or the basis for estoppel or create any other defense as to the adjudication of any claim, Claims and objections to Claims by the Debtors or the Committee on the merits at a later date after Confirmation or the Effective Date of the Plan.

**Notwithstanding the foregoing or any other provision of this Plan, if this Plan is confirmed and the Effective Date occurs, the Debtors (i) shall not pursue Avoidance Actions that may or may not exist and (ii) shall not use the possible existence of an Avoidance Action to object to any Claim. Nothing shall prevent the Debtors, the Committee or any other party in interest from pursuing all other objections to Claims or from asserting any facts or claims, relating in any manner to any Avoidance Action as a defense, affirmative defense or counterclaim to any Cause of Action that may be commenced against or in reference to any one or more of the Debtors or the Reorganized Debtors.**

**10.4     Term of Injunctions or Stays.** Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Code or otherwise in effect on the Confirmation Date shall remain in full force and effect until the Effective Date after which the permanent injunctions of the Plan and the Code will be given full force and effect.

**10.5     Exculpation.** From and after the Effective Date, except as specifically provided herein or in any agreement or instrument contemplated herein: (a) the Debtors, (b) all current officers and directors of the Debtors, and all other agents, employees, professionals, and representative of the Debtors; (c) the Committee, their members, acting in such capacity, and its professionals; and (d) BB&T and its agents, employees and professionals (collectively, with each of their predecessors and successors in interest and their respective officers, directors, employees, agents, professionals and other representatives, acting in such capacity, the "Exculpated Parties") shall neither have nor incur any liability to any Holder of a Claim or Interest, or a governmental entity on behalf of a Holder of a Claim or Equity Interest for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan, Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors arising from and after the Petition Date until the Effective Date (the "Exculpated Claims") to the fullest extent permitted by law; provided, however, that the foregoing provisions of this Section of the Plan shall have no effect on the liability of any entity that results from any such act or omission that has been determined in a Final Order to have constituted willful misconduct. From and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any Exculpated Claims against an Exculpated Party pursuant to the Plan.

**10.6     Injunction.** *Confirmation of this Plan shall have the effect of, among other things, permanently enjoining all Persons who have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in any of the Debtors or the Reorganized Debtors against any of the Debtors or Reorganized Debtors or their Assets, including but not limited to Holders of Class 8B and 8C Claims, with respect to any such Claim or Interest from and after the Effective Date, from taking any of the following actions (other than actions to enforce any rights or obligations under or expressly reserved by the Plan):  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Assets; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Estates, the Debtors, the Reorganized Debtors  or any of their then existing or subsequently acquired property or assets, including the Assets; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Asset; (d) asserting any right of setoff, or recoupment directly or indirectly, against any obligation due or Assets*

*of the Estates, the Debtors, the Reorganized Debtors or any of their then existing or subsequently acquired property or assets, including the Assets, except as contemplated or allowed by the Plan; (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (f) prosecuting or otherwise asserting any Claim or Interest, including any right, claim or cause of action, released pursuant to the Plan. Any Person who accepts the Plan, either by affirmation vote or by the acceptance of the Plan by the consolidated Class in which such Person is a member, shall be deemed to have given the releases, waivers, injunctions and exculpations to the fullest extent provided by law.*

**10.7    Insurance Preservation.**  Nothing in the Plan, including any releases, shall diminish or impair the Debtors' ability to enforce any insurance that may cover Claims against the Debtors or any other Person.

## ARTICLE XI

### ADMINISTRATIVE PROVISIONS

**11.1    Retention of Jurisdiction.**  After the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan to the fullest extent legally permissible, including, without limitation, for the following purposes:

(a)    to determine the validity, allowance, classification, or priority of Claims upon and the validity, extent, priority and nonavoidability of consensual and nonconsensual Liens and other encumbrances;

(b)    to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person;

(c)    to enforce the provisions of the Plan, including, without limitation all discharge and injunctive provisions and to protect the property of the Estates or the Debtors, as the case may be, including Causes of Action, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens, security interest or encumbrances on any property of the Estates or the Debtor;

(d)    to determine any and all applications for allowance of Fee Claims;

(e)    to resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the making of Distributions;

(f)    to determine any and all motions related to the rejection, assumption or assignment of executory contracts or unexpired leases, or to determine any motion to reject an executory contract or unexpired lease;

(g)    except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases, including any remands;

(h)    to modify the Plan under section 1127 of the Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(i)        to issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or governmental unit, to the full extent authorized by the Code;

(j)        to enable the Debtors to prosecute any and all Causes of Action under applicable provisions of the Code or any other federal, state or local laws;

(k)        to determine any tax liability pursuant to section 505 of the Code;

(l)        to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(m)        to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the applicable bar date for a Claim, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

(n)        to resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(o)        to authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(p)        to resolve any disputes concerning any release, discharge, injunction, exculpation or other waivers and protections provided in the Plan;

(q)        to approve any Distributions, or objections thereto, under the Plan;

(r)        to approve any Claims settlement entered into or offset exercised by the Debtors;

(s)        to hear and determine all adversary proceedings or contested matters involving Causes of Action and Avoidance Actions;

(t)        to determine such other matters, as may be provided in the Confirmation Order or as may be authorized under provisions of the Code;

(u)        to adjudicate all core proceedings under the Code, any proceedings arising under the Code, or arising under or related to the Chapter 11 Cases; and

(v)        to enter a Final Order or Decree closing the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including the matters set forth in this Article XI, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.  Notwithstanding any provisions of the Plan, the Bankruptcy Court shall have concurrent but not exclusive jurisdiction over the prosecution of Causes of Actions, including but not limited to Avoidance Actions.

**11.2    Amendments**.

(a)        **Preconfirmation Amendment**.  The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order, provided that the Plan, as modified, and the disclosure statement pertaining thereto meet applicable Code requirements OR THAT THEY Court shall have approved the modifications to the Plan.

(b)        **Postconfirmation Amendment Not Requiring Resolicitation**.  After the entry of the Confirmation Order, the Debtors may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that: (i) the Debtors obtain approval of the Bankruptcy Court for such modification, after notice and a hearing; and (ii) such modification shall not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under the Plan.  Any waiver of a condition to confirmation or the Effective Date shall not be considered to be a modification of the Plan.

(c)        **Postconfirmation/Preconsummation Amendment Requiring Resolicitation**.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may modify the Plan in a way that materially or adversely affects the interests, rights, treatment, or Distributions of a Class of Claims or Interests, provided that:  (i) the Plan, as modified, meets applicable Code requirements; (ii) the Debtors obtain Bankruptcy Court approval for such modification, after notice and a hearing; (iii) such modification is accepted by at least two-thirds in amount, and more than one-half in number, of Allowed Claims or Interests voting in each Class affected by such modification; and (iv) the Debtors comply with section 1125 of the Code with respect to the Plan as modified.

**11.3        Severability of Plan Provisions**.  If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision and make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.4        Successors and Assigns**.  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

**11.5        Effectuating Documents and Further Transactions**.  Each Debtor shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

**11.6        Confirmation Order and Plan Control**.  To the extent the Confirmation Order and/or this Plan is inconsistent with the Disclosure Statement, any other agreement entered into between or among any Debtors, or any of them and any third party, the Plan controls the Disclosure Statement and any such agreements; and the Confirmation Order and subsequent orders of the Bankruptcy Court controls the Plan.

**11.7        Payment of Statutory Fees**.  All fees payable pursuant to section 1930 of title 28 of the United States Code as Administrative Fees under the Plan, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in Cash on the Effective Date, or as soon as reasonably practicable thereafter.  Further, after the Effective Date, the Debtors shall continue to comply with the payment of statutory fees under section 1930 of title 28 of the United States Code until the Chapter 11 Cases are closed.

**11.8        Withdrawal or Modification of Plan**.  The Debtors reserve the right, in the exercise of their reasonable discretion, (i) to withdraw the Plan at any time prior to the Confirmation Date or, (ii) if the Debtors are for any reason unable to consummate the Plan after the Confirmation Date, at any time up to the Effective Date.  If the Debtors withdraw the Plan, (a) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors or any entity in any further proceeding involving the Debtors and (b) the result shall be the same as if the Confirmation Order were not entered, the Plan was not filed and the Effective Date did not occur.

**11.9    Payment Dates**.  Whenever any payment to be made under the Plan is due on a day other than a Business Day, such payment will instead be made, without interest, on the next Business Day.

**11.10    Notices**.  Any notice, request or demand given or made under this Plan or under the Code or the Bankruptcy Rules to any of the Debtors shall be in writing and shall be hand delivered or sent by a reputable overnight courier service, and shall be deemed given when received at the following addresses whether hand delivered or sent by overnight courier service:

**If to the Debtors:** Hendricks Furniture Group, LLC
Attn:  Chad Hendricks.
1123 4th Street, SW
Conover, North Carolina 28613
(828) 345-5406

With a Copy to:

RAYBURN COOPER & DURHAM, P.A.
Albert F. Durham, Esq.
Paul R. Baynard, Esq.
Shelley K. Abel, Esq.
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina  28202-1675
(704) 334-0891

**If to the Committee:**

ALLMAN SPRY LEGGETT & CRUMPLER, P.A.
R. Bradford Leggett, Esq.
C. Edwin Allman, III, Esq.
380 Knollwood Street, Suite 700
Winston-Salem, North Carolina 27103-1862
(336) 722-2300

**If to BB&T**

MOORE & VAN ALLEN, PLLC
Stephen E. Gruendel, Esq.
Charles Richard Rayburn, III, Esq.
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202-4003
704/331-3512

**If to Equity**

KATTEN MUCHIN ROSEMAN, LLP
Bradley E. Pearce, Esq.
401 South Tryon Street, Suite 2600
Charlotte, North Carolina 28202-1935
704/444-2000

Notwithstanding anything to the contrary provided herein, all notices concerning this Plan shall be served upon the entities prescribed and in the manner prescribed under the Code and the Bankruptcy Rules.

**11.11    No Admissions and Reservation of Rights**.  Notwithstanding anything herein to the contrary, no action taken by the Debtors with respect to the Plan, the Disclosure Statement or the Plan Supplement and nothing contained in the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed as an admission by any Debtor or waiver of any rights of any Debtor with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification prior to the Effective Date.

## ARTICLE XII

## CONFIRMATION REQUEST

The Debtors request confirmation of the Plan under Section 1129(b) of the Code.

[BALANCE OF THIS PAGE IS LEFT INTENTIONALLY BLANK]

Dated:   December 7, 2009

HENDRICKS FURNITURE GROUP, LLC

By:   _____
Chadwick D. Hendricks, President


CLASSIC MOVING & STORAGE, INC.

By:   _____
Larry G. Hendricks, President


NORRIS FURNITURE AND INERTIORS, INC.

By:   _____
Larry G. Hendricks, President


RAYBURN COOPER & DURHAM, P.A.
Albert F. Durham, Esq.
Paul R. Baynard, Esq.
Shelley K. Abel, Esq.
1200 Carillon, 227 West Trade Street
Charlotte, North Carolina  28202-1675
Telephone:      (704) 334-0891

Counsel for Hendricks Furniture Group, LLC, et al.,
Debtors and Debtors In Possession